<u>**ORAL ARGUMENT NOT YET SCHEDULED**</u>

**No. 12-1342 (consolidated with Nos. 12-1343, 12-1344, 12-1425, 12-1480, 13-1003, 13-1045, 13-1129, 13-1178, 13-1179, and 13-1180)**

—————————————

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

—————————————

**UTILITY AIR REGULATORY GROUP,** *et al.*,

*Petitioner*,

**v.**

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,** *et al.*,

*Respondents.*

—————————————

**On Petitions for Review of Final Action of the
United States Environmental Protection Agency**

—————————————

**JOINT OPENING BRIEF OF STATE AND INDUSTRY PETITIONERS**

—————————————

Norman W. Fichthorn
Aaron M. Flynn
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(202) 955-1500
nfichthorn@hunton.com
*Counsel for Utility Air Regulatory Group*

Dated: September 20, 2016

[ADDITIONAL COUNSEL LISTED ON INSIDE FRONT COVER AND FOLLOWING PAGES]

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

/s/ Priscilla M. Hubenak
PRISCILLA M. HUBENAK
State Bar No. 10144690
Assistant Attorney General
Chief, Environmental Protection Division
priscilla.hubenak@texasattorneygeneral.gov

Office of the Attorney General
Environmental Protection Division
P.O. Box 12548 (MC-066)
Austin, Texas 78711-2548
Tel: (512) 463-2012
Fax: (512) 457-4644

Attorneys for State of Texas and
Texas Commission on
Environmental Quality

LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY
Herman Robinson (#2077),
General Counsel

Donald Trahan (#08493)
Dwana King (#20590)
Jackie Marve (#08241)
Spencer Bowman (#33515)
Legal Division
P.O. Box 4302
Baton Rouge, LA 70821-4302
Telephone: (225) 219-3985
Facsimile: (225) 219-4068

Attorney For Petitioner
Louisiana Department of Environmental Quality

P. Stephen Gidiere III
Thomas L. Casey III
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
sgidiere@balch.com

David W. Mitchell
BALCH & BINGHAM LLP
601 Pennsylvania Avenue, N.W.
Suite 825 South
Washington, D.C. 20004

C. Frederick Beckner III
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
202-736-8027
rbeckner@sidley.com

Stephanie Z. Moore
Vice President and General Counsel
Luminant Generation Company LLC
1601 Bryan Street
22nd Floor
Dallas, Texas 75201

Daniel J. Kelly
Vice President and Associate General Counsel
Energy Future Holdings Corp.
1601 Bryan Street
43rd Floor
Dallas, Texas 75201

*Counsel for Luminant Generation Company LLC, Big Brown Power Company LLC, Oak Grove Management Company LLC, Luminant Mining Company LLC, Big Brown Lignite Company LLC, Luminant Big Brown Mining Company LLC, Luminant Energy Company LLC, Sandow Power Company LLC, and Luminant Holding Company LLC*

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

Pursuant to D.C. Circuit Rule 28(a)(1), State and Industry Petitioners—the State of Texas, the Texas Commission on Environmental Quality, the Louisiana Department of Environmental Quality, the Utility Air Regulatory Group, Luminant Generation Company LLC, Big Brown Power Company LLC, Oak Grove Management Company LLC, Luminant Mining Company LLC, Big Brown Lignite Company LLC, Luminant Big Brown Mining Company LLC, Luminant Energy Company LLC, Sandow Power Company LLC, and Luminant Holding Company LLC—state as follows:

### A.      Parties, Intervenors, and *Amici*.

Since these consolidated cases involve direct review of a final agency action, the requirement to furnish a list of parties, intervenors, and *amici curiae* that appeared below is inapplicable.  These cases involve the following parties:

**Petitioners**:

Case No. 12-1342:  Utility Air Regulatory Group.

Case No. 12-1343:  The National Parks Conservation Association ("NPCA") and Sierra Club.

Case No. 12-1344:  The State of Texas and the Texas Commission on Environmental Quality (collectively "Texas").

Case No. 12-1425:  NPCA and Sierra Club.

Case No. 12-1480:  NPCA and Sierra Club (transferred from the United States Court of Appeals for the Eighth Circuit).

Case No. 13-1003:  NPCA and Sierra Club (transferred from the United States Court of Appeals for the Fourth Circuit).

Case No. 13-1045:  NPCA and Sierra Club (transferred from the United States Court of Appeals for the Eleventh Circuit).

Case No. 13-1129:  NPCA and Sierra Club (transferred from the United States Court of Appeals for the Sixth Circuit).

Case No. 13-1178:  Luminant Generation Company LLC, Big Brown Power Company LLC, Oak Grove Management Company LLC, Luminant Mining Company LLC, Big Brown Lignite Company LLC, Luminant Big Brown Mining Company LLC, Luminant Energy Company LLC, Sandow Power Company LLC, and Luminant Holding Company LLC (transferred from the United States Court of Appeals for the Fifth Circuit).

Case No. 13-1179:  The State of Texas and the Texas Commission on Environmental Quality (transferred from the United States Court of Appeals for the Fifth Circuit).

Case No. 13-1180:  The Louisiana Department of Environmental Quality (transferred from the United States Court of Appeals for the Fifth Circuit).

**Respondents:**

Respondents are the United States Environmental Protection Agency ("EPA") (in all of the above cases) and Gina McCarthy, Administrator of EPA (in Case Nos. 12-1343, 12-1425, 12-1480, 13-1003, 13-1045, and 13-1129).

**Intervenors:**

Intervenors in support of Petitioners in Case Nos. 12-1342 and 12-1344 are Luminant Generation Company LLC, Big Brown Power Company LLC, Oak Grove Management Company LLC, Luminant Mining Company LLC, Big Brown Lignite Company LLC, Luminant Big Brown Mining Company LLC, Luminant Energy Company LLC, Sandow Power Company LLC, and Luminant Holding Company LLC.

Intervenors in support of Respondents in Nos. 12-1343, 12-1425, 12-1480, 13-1003, 13-1045, and 13-1129 are the State of Indiana; the Utility Air Regulatory Group; Georgia Power Company; Union Electric, doing business as Ameren Missouri; the Indiana Energy Association, Inc.; and Luminant Generation Company LLC, Big Brown Power Company LLC, Oak Grove Management Company LLC, Luminant Mining Company LLC, Big Brown Lignite Company LLC, Luminant Big Brown Mining Company LLC, Luminant Energy Company LLC, Sandow Power Company LLC, and Luminant Holding Company LLC.

Intervenors in support of Respondents in Nos. 12-1342, 12-1344, 13-1178, 13-1179, and 13-1180 are NPCA and Sierra Club.

### *Amici Curiae*

There are no amici curiae in these cases.

### B.    Ruling Under Review

These consolidated cases involve petitions to review final action of the United States Environmental Protection Agency ("EPA") entitled "Regional Haze: Revisions to Provisions Governing Alternatives to Source-Specific Best Available Retrofit Technology (BART) Determinations, Limited SIP Disapprovals, and Federal Implementation Plans," 77 Fed. Reg. 33,642 (June 7, 2012).

### C.    Related Cases

These cases have not previously been before this Court or any other court, apart from those of the consolidated cases, as noted above, that were transferred to this Court from other circuit courts of appeals (which took no dispositive or other action on the merits of the cases).  Cases that involve related issues, but that do not involve review of the same EPA action challenged in the present cases, are pending, and held in abeyance at the present time, in the United States Courts of Appeals for the Fourth Circuit (*Utility Air Regulatory Group v. EPA*, No. 12-1664 (filed May 22, 2012); *National Parks Conservation Ass'n, et al. v. EPA*, No. 12-2300 (filed Oct. 19, 2012)) and the Sixth Circuit (*Utility Air Regulatory Group v.*

*EPA*, No. 12-3627 (filed May 29, 2012); *Utility Air Regulatory Group v. EPA*, No. 12-3772 (filed June 25, 2012).  In addition, the United States Courts of Appeals for the Third Circuit and the Eighth Circuit have issued decisions in cases that, in part, involved issues similar to some of the issues raised by the present cases.  *National Parks Conservation Ass'n v. EPA*, 803 F.3d 151 (3d Cir. 2015); *Nebraska v. EPA*, 812 F.3d 662 (8th Cir. 2016); *National Parks Conservation Ass'n v. McCarthy*, 816 F.3d 989 (8th Cir. 2016), *amending National Parks Conservation Ass'n v. McCarthy*, 811 F.3d 1005 (8th Cir. 2016).

## RULE 26.1 DISCLOSURE STATEMENTS

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Industry Petitioners make the following statements:

The *Utility Air Regulatory Group* ("UARG") is a group of individual electric generating companies and national trade associations.  UARG's purpose is to participate on behalf of its members collectively in administrative proceedings under the Clean Air Act that affect electric generators and in litigation arising from those proceedings.  UARG has no outstanding shares or debt securities in the hands of the public and has no parent company.  No publicly held company has a 10% or greater ownership interest in UARG.

*Big Brown Lignite Company LLC*, a Texas limited liability company, is the legal entity that owns the lignite reserves associated with the Big Brown Power Plant.  Big Brown Lignite Company LLC is a wholly owned subsidiary of Luminant Holding Company LLC, whose complete corporate disclosure statement appears below.

*Big Brown Power Company LLC*, a Texas limited liability company, is the legal entity that owns Big Brown Power Plant in Freestone County, Texas.  Big Brown Power Company LLC is a wholly owned subsidiary of Luminant Holding Company LLC, whose complete corporate disclosure statement appears below.

***Luminant  Big Brown Mining Company LLC***, a Texas limited liability company, is the legal entity that owns the mine assets utilized in connection with mining lignite used to fuel the Big Brown Power Plant.  Luminant Big Brown Mining Company LLC is a wholly owned subsidiary of Luminant Holding Company LLC, whose complete corporate disclosure statement appears below.

***Luminant Energy Company LLC***, a Texas limited liability company, is the legal entity that conducts the wholesale energy sales and purchases and commodity risk management and trading activities for the Luminant Entities.  Luminant Energy Company LLC is a wholly owned subsidiary of Luminant Holding Company LLC, whose complete corporate disclosure statement appears below.

***Luminant Generation Company LLC***, a Texas limited liability company, is the legal entity that owns numerous Luminant generation facilities and assets associated with Luminant's competitive power generation business in the State of Texas.  Luminant Generation Company LLC is a wholly owned subsidiary of Luminant Holding Company LLC, whose complete corporate disclosure statement appears below.

***Luminant Holding Company LLC*** is the parent company that wholly owns the Luminant Entities.  Luminant Holding Company LLC is a Delaware limited liability company and is a wholly owned subsidiary of Texas Competitive Electric Holdings Company LLC ("TCEH").  TCEH is a Delaware limited liability

company and is a wholly owned subsidiary of Energy Future Competitive Holdings Company ("EFCH"), which is a Texas corporation and a wholly owned subsidiary of Energy Future Holdings Corp. ("EFH Corp."). Substantially all of the common stock of EFH Corp., a Texas corporation, is owned by Texas Energy Future Holdings Limited Partnership, which is a privately held limited partnership. No publicly held entities have a 10% or greater equity ownership interest in EFH Corp.

*Luminant Mining Company LLC*, a Texas limited liability company, is the legal entity that owns the mine assets utilized in connection with mining lignite used to fuel the Monticello Power Plant and the Martin Lake Power Plant as well as certain mine assets utilized in connection with mining lignite used to fuel the Sandow 4 Power Plant and the Sandow 5 Power Plant. Luminant Mining Company LLC is a wholly owned subsidiary of Luminant Holding Company LLC, whose complete corporate disclosure statement appears above.

*Oak Grove Management Company LLC*, a Delaware limited liability company, is the legal entity that owns the facility and related assets associated with Oak Grove Units 1 and 2, new lignite-fueled generation units near Robertson County, Texas. Oak Grove Management Company LLC is a wholly owned subsidiary of Luminant Holding Company LLC, whose complete corporate disclosure statement appears above.

viii

***Sandow Power Company LLC***, a Texas limited liability company, is the legal entity that owns the Sandow Unit 5 facility, a new lignite-fueled generation unit located in Rockdale, Texas, and related assets.  Sandow Power Company LLC is a wholly owned subsidiary of Luminant Holding Company LLC, whose complete corporate disclosure statement appears above.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

RULE 26.1 DISCLOSURE STATEMENTS ..........................................vi

TABLE OF AUTHORITIES ................................................... xii

GLOSSARY OF ABBREVIATIONS, ACRONYMS, AND TERMS ............... xviii

JURISDICTION....................................................................1

STATEMENT OF ISSUES ......................................................2

STATUTES AND REGULATIONS...............................................2

PRELIMINARY STATEMENT ..................................................3

STATEMENT OF THE CASE AND FACTS .......................................5

I.      Statutory and Regulatory Background ...........................................5

        A.      The CAA, Its Interstate Transport and Visibility Protection
                Provisions, and EPA's Visibility-Protection Regulatory
                Program .........................................................................5

        B.      CAIR and EPA's Rulemaking Determination that CAIR Is
                "Better than BART" ..........................................................13

II.     Litigation on CAIR and on "CAIR-for-BART," and the Cross-State
        Air Pollution Rule................................................................15

III.    EPA's Proceeding on the Rule Challenged Here .........................................19

STANDARD OF REVIEW .......................................................25

STANDING ...................................................................26

SUMMARY OF ARGUMENT ..................................................29

ARGUMENT .................................................................................................32

I.    EPA Unlawfully Provided No Reasoned Basis for Its Determination
      that It Would Not and Could Not Approve the CAIR-for-BART SIPs
      and for Its Revocation of the CAIR-for-BART Rule Provision....................32

      A.    EPA's Disapproval of CAIR-for-BART SIPs Was Arbitrary
            and Capricious. ...................................................................................32

      B.    EPA Provided No Rationale for Not Retaining the CAIR-for-
            BART Provision Alongside the New CSAPR-for-BART
            Provision, and the Agency's Rejection of That Approach Was
            Arbitrary and Capricious. ...................................................................39

II.   EPA's Rejection of the CAIR-for-BART SIPs—and Its Refusal To
      Retain the CAIR-for-BART Regulatory Provision Alongside the New
      CSAPR-for-BART Provision—Is Particularly Unreasonable in Light
      of Other EPA Actions and Statements that Are Inconsistent with
      Those Actions. ..............................................................................................41

CONCLUSION ...........................................................................................48

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

STATUTORY AND REGULATORY ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*American Corn Growers Association v. EPA*, 291 F.3d 1 (D.C. Cir. 2002) (per curiam) ...............................................................10, 13, 14

*American Petroleum Institute v. Costle*, 609 F.2d 20 (D.C. Cir. 1979) (per curiam) ...........................................................................34

*Catawba County v. EPA*, 571 F.3d 20 (D.C. Cir. 2009)....................................41, 48

*Center for Energy & Economic Development v. EPA*, 398 F.3d 653 (D.C. Cir. 2005) ...........................................................................12

*Central Arizona Water Conservation District v. EPA*, 990 F.2d 1531 (9th Cir. 1993) ...........................................................................12

*EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7 (D.C. Cir. 2012), *rev'd and remanded sub nom. EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584 (2014), *on remand, EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118 (D.C. Cir. 2015) .......................................... 5, 18, 19, 26, 37, 42, 45

*EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118 (D.C. Cir. 2015) ...........................................................................5, 7, 19

*Environmental Defense Fund v. Costle*, 657 F.2d 275 (D.C. Cir. 1981) ...........................................................................34

*EPA v. EME Homer City Generation, L.P.*, 134 S. Ct. 1584 (2014) .................5, 18

*Ethyl Corp. v. Browner*, 67 F.3d 941, 945 (D.C. Cir. 1995) ..........................48, 49

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 342-43 (1977) ...........................................................................28

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ...................................................26, 27

_____

*Authorities upon which we chiefly rely are marked with asterisks.

*Michigan v. EPA*, 213 F.3d 663 (D.C. Cir. 2000) ...................................7

*Motor Vehicle Manufacturers Association v. EPA*, 768 F.2d 385 (D.C. Cir. 1985) ......................................................................26

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ...........................33, 48

*North Carolina v. EPA*, 531 F.3d 896 (D.C. Cir.), *modified on reh'g*, 550 F.3d 1176 (D.C. Cir. 2008)...................................................13, 16

*North Carolina v. EPA*, 550 F.3d 1176 (D.C. Cir. 2008)...............13, 16, 19, 37, 42

*Prill v. NLRB*, 755 F.2d 941 (D.C. Cir. 1985)........................................33

*SEC v. Chenery Corp.*, 318 U.S. 80 (1943) .............................................33

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947). ..........................................33

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002).................................28

*Sierra Club v. EPA*, 754 F.3d 995 (D.C. Cir. 2014) .........................43, 44

*South Coast Air Quality Management District v. EPA*, 472 F.3d 882 (D.C. Cir. 2006), *modified on reh'g*, 489 F.3d 1245 (D.C. Cir. 2007) ...............................................................................28

*Train v. Natural Resources Defense Council*, 421 U.S. 60 (1975) ......................6, 7

*Utility Air Regulatory Group v. EPA*, 471 F.3d 1333 (D.C. Cir. 2006). ..............................................15, 20, 35, 48

**Federal Statutes**

Administrative Procedure Act

5 U.S.C. § 706(1) ....................................................................49

5 U.S.C. § 706(2) ..............................................................25, 26

Clean Air Act ("CAA"), 42 U.S.C. § 7401, *et seq.*

CAA § 107(a), 42 U.S.C. § 7407(a) .....................................5

CAA § 107(d)(1)(A)(i), 42 U.S.C. § 7407(d)(1)(A)(i)........................7

CAA § 107(d)(1)(A)(ii), 42 U.S.C. § 7407(d)(1)(A)(ii) .........................7

CAA § 107(d)(3)(E)(iii), 42 U.S.C. § 7407(d)(3)(E)(iii) ............................7, 46

CAA § 108, 42 U.S.C. § 7408 ....................................................5

CAA § 109, 42 U.S.C. § 7409 ....................................................5

CAA § 110(a)(2), 42 U.S.C. § 7410(a)(2) ......................................5, 6

CAA § 110(a)(2)(D)(i), 42 U.S.C. § 7410(a)(2)(D)(i) ..................................7, 13

CAA § 110(a)(2)(J), 42 U.S.C. § 7410(a)(2)(J) ....................................7, 8

CAA § 110(c), 42 U.S.C. § 7410(c) ..............................................7

CAA § 110(c)(1), 42 U.S.C. § 7410(c)(1) .........................................6

CAA § 110(k)(1), 42 U.S.C. § 7410(k)(1) .........................................6

CAA § 110(k)(2), 42 U.S.C. § 7410(k)(2) .........................................6

CAA § 110(k)(3), 42 U.S.C. § 7410(k)(3) .........................................6

CAA § 113(a)(1), 42 U.S.C. § 7413(a)(1) .........................................6

CAA § 113(b)(1), 42 U.S.C. § 7413(b)(1) .........................................6

CAA § 113(c)(1), 42 U.S.C. § 7413(c)(1) .........................................6

CAA § 113(d)(1)(A), 42 U.S.C. § 7413(d)(1)(A) ....................................6

CAA §§ 160-169, 42 U.S.C. §§ 7470-7479 .........................................8

CAA § 162(a), 42 U.S.C. § 7472(a) ..............................................8

*CAA § 169A, 42 U.S.C. § 7491.............................................1, 8, 9

CAA § 169A(a)(1), 42 U.S.C. § 7491(a)(1) ........................................8

CAA § 169A(a)(2), 42 U.S.C. § 7491(a)(2) ........................................8

CAA § 169A(a)(4), 42 U.S.C. § 7491(a)(4).........................................8, 9

CAA § 169A(b), 42 U.S.C. § 7491(b)..............................................11

CAA § 169A(b)(2)(A), 42 U.S.C. § 7491(b)(2)(A) .....................................10, 11

CAA § 169A(g)(5), 42 U.S.C. § 7491(g)(5) .......................................................8

CAA § 169A(g)(7), 42 U.S.C. § 7491(g)(7) .....................................................10

CAA § 169B, 42 U.S.C. § 7492 ......................................................................1, 8

CAA § 169B(a), 42 U.S.C. § 7492(a) .................................................................9

CAA § 169B(b), 42 U.S.C. § 7492(b) .................................................................9

CAA § 169B(d)(2)(C), 42 U.S.C. § 7492(d)(2)(C) ............................................9

CAA § 169B(e), 42 U.S.C. § 7492(e) .................................................................9

CAA § 302(q), 42 U.S.C. § 7602(q) ...................................................................6

CAA § 302(y), 42 U.S.C. § 7602(y) ...................................................................6

CAA § 307(b)(1), 42 U.S.C. § 7607(b)(1) .....................................................1, 27

CAA § 307(d)(1)(J)), 42 U.S.C. § 7607(d)(1)(J)..........................................25, 26

CAA § 307(d)(9), 42 U.S.C. § 7607(d)(9) ...................................................25, 26

**Federal Regulations**

40 C.F.R. § 51.308 .........................................................................................38

40 C.F.R. § 51.308(b) .....................................................................................11

40 C.F.R. § 51.308(e) .................................................................................23, 39

40 C.F.R. § 51.308(e)(1)(ii) ...........................................................................11

40 C.F.R. § 51.308(e)(2) .....................................................................11, 12, 13, 45

*40 C.F.R. § 51.308(e)(4) .... 14, 15, 19, 20, 22, 23, 25, 26, 31, 35, 39, 40, 41, 45, 48

40 C.F.R. § 51.308(g) .....................................................................................46

40 C.F.R. § 51.308(h)(4)..................................................................................47

40 C.F.R. pt. 51, app. Y .................................................................11

**Federal Register Notices**

45 Fed. Reg. 80,084 (Dec. 2, 1980) .............................................9

64 Fed. Reg. 35,714 (July 1, 1999) .......................................10, 12

70 Fed. Reg. 25,162 (May 12, 2005) ....................................13, 14

*70 Fed. Reg. 39,104 (July 6, 2005) ...............................10, 11, 14

71 Fed. Reg. 25,328 (Apr. 28, 2006) ..........................................14

71 Fed. Reg. 60,612 (Oct. 13, 2006) .....................................12, 14

76 Fed. Reg. 33,662 (June 9, 2011) .......................................20, 21

76 Fed. Reg. 41,158 (July 13, 2011) ..........................................21

76 Fed. Reg. 48,208 (Aug. 8, 2011) ...........................................16

76 Fed. Reg. 78,194 (Dec. 16, 2011) ..........................................21

76 Fed. Reg. 80,760 (Dec. 27, 2011) ..........................................17

76 Fed. Reg. 82,219 (Dec. 30, 2011) ................ 17, 20, 21, 22, 23, 24, 25, 32, 36, 38

77 Fed. Reg. 3691 (Jan. 25, 2012) .............................................21

77 Fed. Reg. 16,937 (Mar. 23, 2012) ..........................................24

77 Fed. Reg. 17,367 (Mar. 26, 2012) ..........................................44

77 Fed. Reg. 19,098 (Mar. 30, 2012) ..........................................24

77 Fed. Reg. 24,392 (Apr. 24, 2012) ..........................................24

77 Fed. Reg. 33,642 (June 7, 2012) .............. 1, 22, 24, 25, 32, 33, 34, 36, 38, 41, 42

78 Fed. Reg. 5158 (Jan. 24, 2013) .........................................................45

79 Fed. Reg. 39,322 (July 10, 2014).............................................37, 44, 45

79 Fed. Reg. 71,663 (Dec. 3, 2014) .....................................................19

79 Fed. Reg. 78,755 (Dec. 31, 2014) ...................................................46

80 Fed. Reg. 9207 (Feb. 20, 2015) .......................................................46

80 Fed. Reg. 12,607 (Mar. 10, 2015).............................................46, 47

80 Fed. Reg. 32,019 (June 5, 2015) ...............................................16, 47

80 Fed. Reg. 45,631 (July 31, 2015).....................................................47

80 Fed. Reg. 58,410 (Sept. 29, 2015) ...................................................47

80 Fed. Reg. 75,706 (Dec. 3, 2015) .....................................................19

81 Fed. Reg. 296 (Jan. 5, 2016) ...........................................................27

81 Fed. Reg. 13,275 (Mar. 14, 2016) ...................................................19

81 Fed. Reg. 50,351 (Aug. 1, 2016)......................................................47

81 Fed. Reg. 53,924 (Aug. 15, 2016).....................................................47

# GLOSSARY OF ABBREVIATIONS, ACRONYMS, AND TERMS

| | |
|---|---|
| Act | Clean Air Act |
| Agency | United States Environmental Protection Agency |
| APA | Administrative Procedure Act |
| BART | Best available retrofit technology |
| CAA | Clean Air Act |
| CAIR | Clean Air Interstate Rule |
| CSAPR | Cross-State Air Pollution Rule |
| EPA | United States Environmental Protection Agency |
| JA | Joint Appendix |
| NOx | Nitrogen oxide or nitrogen oxides |
| NPCA | National Parks Conservation Association |
| SIP | State implementation plan |
| $SO_2$ | Sulfur dioxide |
| UARG | Utility Air Regulatory Group |

## JURISDICTION

The petitions for review in these cases challenge a regulation of the U.S. Environmental Protection Agency ("EPA" or "Agency") entitled "Regional Haze: Revisions to Provisions Governing Alternatives to Source-Specific Best Available Retrofit Technology (BART) Determinations, Limited SIP Disapprovals, and Federal Implementation Plans," 77 Fed. Reg. 33,642 (June 7, 2012), Joint Appendix ("JA") ___-___. As authority for its rule, EPA invoked sections 169A and 169B of the Clean Air Act ("CAA" or "Act"), 42 U.S.C. §§ 7491, 7492. *See* 77 Fed. Reg. at 33,656, JA___. State and Industry Petitioners filed petitions to review the rule in this Court on August 6, 2012, within the 60-day period prescribed by section 307(b)(1) of the Clean Air Act ("CAA" or "Act"). 42 U.S.C. § 7607(b)(1). *Utility Air Regulatory Group v. EPA*, No. 12-1342 (Aug. 6, 2012); *State of Texas and Texas Commission on Environmental Quality v. EPA*, No. 12-1344 (Aug. 6, 2012).[1] This Court has jurisdiction under that provision. Petitions for review were also timely filed in the U.S. Court of Appeals for the Fifth Circuit by the State of Texas and Texas Commission on Environmental Quality, the Louisiana Department of Environmental Quality, and Luminant Generation

---

[1] On August 6, 2012, Petitioners National Parks Conservation Association ("NPCA") and Sierra Club (collectively, "Sierra Club") also filed a petition for review of the rule in this Court (No. 12-1343), challenging elements of the rule different from those that State and Industry Petitioners challenge.

1

Company LLC, *et al.*, No. 12-60617 (5th Cir., filed Aug. 6, 2012).  On May 3, 2013, the Fifth Court transferred those petitions to this Court, which consolidated all petitions under lead case No. 12-1342.[2]

## STATEMENT OF ISSUES

1.      Whether it was arbitrary, capricious, or otherwise unlawful for EPA to disapprove CAA state implementation plans ("SIPs") that invoked a duly promulgated EPA regulation, affirmed by this Court, that allowed states to rely on EPA's Clean Air Interstate Rule ("CAIR")—a rule that remained in effect and enforceable pursuant to this Court's decisions—to satisfy CAA visibility-protection requirements.

2.      Whether it was arbitrary, capricious, or otherwise unlawful for EPA to revoke its regulation that allowed states to rely on CAIR when, pursuant to this Court's decisions, CAIR remained in effect and enforceable in those states.

## STATUTES AND REGULATIONS

Pertinent CAA and regulatory provisions are in the Statutory and Regulatory Addendum in this brief.

---

[2] Sierra Club also filed petitions for review of the rule after the 60-day period in this Court (No. 12-1425) and other Courts of Appeals.  The petitions in other courts were transferred to this Court, which consolidated those petitions, No. 12-1425, and all other petitions under No. 12-1342.

## PRELIMINARY STATEMENT

State and Industry Petitioners challenge two related aspects of the June 7, 2012 EPA rule under review.  In those aspects of its rule, EPA refused to apply a long-standing regulation authorizing states to rely—for purposes of meeting visibility-program requirements addressing multistate "regional haze" in protected areas such as national parks—on an existing CAA program, CAIR, that limited interstate pollution.  In its June 2012 rule, EPA reversed its policy, on which Texas, Louisiana, and other states had relied, even though CAIR remained in effect and enforceable pursuant to this Court's orders, and even though that program was to be replaced at an undetermined future date by a new EPA-promulgated interstate pollution rule that was *more* stringent than CAIR.  State and Industry Petitioners submit that it was arbitrary, capricious, and otherwise unlawful for EPA in the challenged rule (1) to refuse to apply its existing policy by disapproving state implementation plans that relied on that policy in conformance with EPA's extant regulations, and (2) to revoke the regulation which codified that policy and on which states had properly based their implementation plans.

State and Industry Petitioners support EPA's decision, also included in its June 2012 rule, to authorize participating states to rely on another interstate pollution control program—the Cross-State Air Pollution Rule ("CSAPR") (also called the "Transport Rule"), which later superseded CAIR—to satisfy relevant

3

visibility program requirements.[3]  Although states that sought to rely on CAIR could, under the June 2012 rule, instead rely on the more-stringent CSAPR, the June 2012 rule barred them from relying on CAIR.  In EPA's rulemaking, UARG and others urged an approach that would authorize states, at their option, to rely on *either* CAIR or CSAPR because, as discussed below, CAIR continued in effect and there was at that time uncertainty about whether (and when) CSAPR would take effect.  *See, e.g.*, Utility Air Regulatory Group Comments at 7-10, 15-16, EPA Docket EPA-HQ-OAR-2011-0729-0298, JA___-___, ___-___ ("UARG Comments").  Because Sierra Club here is challenging the rule's CSAPR-based provision (and because of the concomitant possibility of future rescission or modification of that provision), State and Industry Petitioners are pursuing their challenge to avoid the prospect of being left with neither the protection of that

---

[3] Petitioners Utility Air Regulatory Group ("UARG") and UARG member Luminant—together with two other electric generating companies (UARG members Union Electric (doing business as Ameren Missouri) and Georgia Power Company), an association of electric generating companies (the Indiana Energy Association), and the State of Indiana—are Intervenor-Respondents in these cases supporting EPA against Sierra Club's challenge to the June 2012 rule's provision that authorizes states to rely on CSAPR.  State and Industry Petitioners support EPA's conclusion in the final rule that a state may choose to use compliance with CSAPR to satisfy pertinent visibility program requirements.  (State and Industry Petitioners do not support the part of EPA's rule that established federal implementation plans based on CSAPR—but only because they believe EPA lacked a valid basis for disapproving the CAIR-based SIPs, an Agency action that, under the Act, was a prerequisite to EPA imposition of federal plans.)

provision *nor* the protection of the CAIR-related provision that EPA's rule

unlawfully revoked.

## STATEMENT OF THE CASE AND FACTS

I.   **Statutory and Regulatory Background**

   A.   **The CAA, Its Interstate Transport and Visibility Protection Provisions, and EPA's Visibility-Protection Regulatory Program**

The CAA is a complex statute that relies on "cooperative federalism."

Under the CAA, EPA sets national air quality standards and other national

requirements, and states develop and submit to EPA plans—state implementation

plans, or "SIPs"—to achieve those requirements within their borders.  *See, e.g.,*

*EME Homer City Generation, L.P. v. EPA*, 696 F.3d 7, 11 (D.C. Cir. 2012) ("*EME*

*Homer City I*"), *rev'd and remanded sub nom. EPA v. EME Homer City*

*Generation, L.P.*, 134 S. Ct. 1584 (2014) ("*EME Homer City II*"), *on remand*,

*EME Homer City Generation, L.P. v. EPA*, 795 F.3d 118 (D.C. Cir. 2015) ("*EME*

*Homer City III*").  For example, EPA establishes national ambient air quality

standards, *see* CAA §§ 108, 109, 42 U.S.C. §§ 7408, 7409, which states achieve

through emission controls and other measures they include in SIPs, CAA §

110(a)(2), 42 U.S.C. § 7410(a)(2) (listing categories of requirements SIPs address);

*see* CAA § 107(a), 42 U.S.C. § 7407(a) ("Each State shall have the primary

responsibility for assuring air quality within the entire geographic area comprising

such State by submitting an implementation plan for such State which will specify

5

the manner in which national . . . air quality standards will be achieved and maintained within . . . such State.").

Once a state submits a SIP, EPA has up to 18 months to approve or disapprove it.  CAA § 110(k)(1), (2), 42 U.S.C. § 7410(k)(1), (2).  EPA may approve part of a SIP and disapprove part.  CAA § 110(k)(3), 42 U.S.C. § 7410(k)(3).  If a state fails to make a required SIP submission (or submits a SIP that does not meet minimum criteria) or EPA disapproves a SIP, EPA may have authority to promulgate its own plan, called a "federal implementation plan," to implement relevant CAA requirements.  CAA § 110(c)(1), 42 U.S.C. § 7410(c)(1); CAA § 302(y), 42 U.S.C. § 7602(y) (a federal implementation plan is "promulgated by [EPA] to fill all or a portion of a gap or otherwise correct all or a portion of an inadequacy" in a SIP).  Once approved by EPA, a SIP becomes an "applicable implementation plan" and thus is federally enforceable (as is a federal implementation plan).  CAA § 302(q), 42 U.S.C. § 7602(q); CAA § 113(a)(1), (b)(1), (c)(1), (d)(1)(A), 42 U.S.C. § 7413(a)(1), (b)(1), (c)(1), (d)(1)(A).

A central principle underlying the Act is that, in reviewing SIPs, EPA must defer to the state's choices in implementing CAA requirements:

> The Act gives the Agency no authority to question the wisdom of a State's choices of emission limitations if they are part of a plan which satisfies the standards of [CAA] § 110(a)(2), and the Agency may devise and promulgate a specific plan of its own only if a State fails to submit an implementation plan which satisfies those standards.

*Train v. Natural Res. Def. Council*, 421 U.S. 60, 79 (1975) (citing CAA § 110(c)).

EPA thus lacks authority to disapprove SIP provisions on the grounds that it might

adopt a different plan if it were the primary decision-maker. *E.g.*, *Michigan v.*

*EPA*, 213 F.3d 663, 686-87 (D.C. Cir. 2000).

Among the requirements SIPs are to address are those described in sections

110(a)(2)(D)(i) and 110(a)(2)(J) of the CAA, 42 U.S.C. § 7410(a)(2)(D)(i), (J).

Section 110(a)(2)(D)(i) requires that a SIP "contain adequate provisions"

prohibiting emission sources "within the State from emitting any air pollutant in

amounts which will . . . contribute significantly to nonattainment in, or interfere

with maintenance by, any other State with respect to any . . . national . . . air

quality standard."[4]  This "interstate transport" provision of the Act is also called

the "good neighbor" provision. *EME Homer City III*, 795 F.3d at 123.

---

[4] "Nonattainment" relates to failure to meet a national air quality standard.  CAA §
107(d)(1)(A)(i), 42 U.S.C. § 7407(d)(1)(A)(i) (defining a "nonattainment" area as
"any area that does not meet (or that contributes to ambient air quality in a nearby
area that does not meet) the national . . . air quality standard" for a pollutant).
"Attainment" areas, in contrast, "meet[] the national . . . air quality standard."
CAA § 107(d)(1)(A)(ii), 42 U.S.C. § 7407(d)(1)(A)(ii).  EPA may redesignate a
nonattainment area to attainment if EPA determines the area satisfies several
criteria, including that

> the improvement in air quality [in that area] is due to permanent and
> enforceable reductions in emissions resulting from implementation of
> the applicable implementation plan and applicable Federal air
> pollution control regulations and other permanent and enforceable
> reductions.

CAA § 107(d)(3)(E)(iii), 42 U.S.C. § 7407(d)(3)(E)(iii).

Section 110(a)(2)(J) also requires states to include in SIPs measures to address air quality problems that in some cases may cross state borders. That provision requires SIPs to "meet the applicable requirements of . . . part C of [Title I of the Act] (relating to . . . visibility protection)." 42 U.S.C. § 7410(a)(2)(J). Part C,[5] in turn, contains sections 169A and 169B, which establish the CAA program to protect visibility in certain national parks and wilderness areas.

Section 169A declares "as a national goal the prevention of any future, and the remedying of any existing, impairment of visibility in mandatory class I Federal areas which impairment results from manmade air pollution."[6] CAA § 169A(a)(1), 42 U.S.C. § 7491(a)(1). Section 169A directs EPA to issue regulations "to assure . . . reasonable progress toward meeting th[at] national goal." CAA § 169A(a)(4), 42 U.S.C. § 7491(a)(4).

---

[5] Part C of Title I of the Act includes: (i) sections 160 through 169, which constitute subpart I of part C and include "Prevention of Significant Deterioration" provisions—not at issue here—intended to avert deterioration of attainment areas' air quality, 42 U.S.C. §§ 7470-7479); and (ii) sections 169A and 169B, which constitute subpart II of part C and address visibility protection requirements at issue here.

[6] "[T]he term 'mandatory class I Federal areas' means Federal areas [*i.e.*, federally owned lands] which may not be designated as other than class I under" part C of Title I. CAA § 169A(g)(5), 42 U.S.C. § 7491(g)(5). These include "national parks which exceed six thousand acres" and "national wilderness areas which exceed 5,000 acres." CAA § 162(a), 42 U.S.C. § 7472(a); *see also* CAA § 169A(a)(2), 42 U.S.C. § 7491(a)(2) (directing EPA to "promulgate a list of mandatory class I Federal areas in which [it] determines visibility is an important value").

Through a series of rulemakings, EPA issued regulations under section 169A(a)(4).  In 1980, EPA adopted "a phased approach to visibility protection" and limited its initial regulations' scope to "plume blight" phenomena.  45 Fed. Reg. 80,084, 80,085 (Dec. 2, 1980).[7]  EPA deferred to a later regulatory phase the more complex problems associated with a second kind of visibility impairment called "regional haze"—"widespread, regionally homogeneous haze from a multitude of sources which impairs visibility in every direction over a large area." *Id.*; *see id.* at 80,086 (describing developments in information and scientific capabilities needed before regional haze regulation would be feasible).  Regional haze was understood to be a phenomenon that often involves many emission sources and long-range, wind-driven "transport" of pollutants, frequently over multistate regions.

Congress prompted EPA action on regional haze through 1990 amendments to the CAA that added section 169B, which called for research on and assessment of regional-scale visibility impairment affecting mandatory class I Federal areas.[8]

---

[7] Plume blight is "[s]moke, dust, colored gas plumes, or layered haze emitted from stacks which obscure the sky or horizon and are relatable to a single source or a small group of sources."  45 Fed. Reg. at 80,085.

[8] CAA § 169B(a), (b), 42 U.S.C. § 7492(a), (b); *see id.* § 169B(d)(2)(C), 42 U.S.C. § 7492(d)(2)(C) (referring to EPA promulgation of section 169A regulations "to address long range strategies for addressing regional haze which impairs visibility in affected class I areas"); CAA § 169B(e), 42 U.S.C. § 7492(e) (calling for EPA rulemaking on "criteria for measuring 'reasonable progress' toward the national

EPA promulgated regional haze rules in 1999.  64 Fed. Reg. 35,714 (July 1, 1999).

Aspects of those rules were challenged in this Court, which vacated and remanded

the rules in part.  *Am. Corn Growers Ass'n v. EPA*, 291 F.3d 1, 3, 6 (D.C. Cir.

2002) (per curiam).  On remand, EPA in 2005 promulgated revised regional haze

rules.  70 Fed. Reg. 39,104 (July 6, 2005).  A particular focus of the 2005 rules is

the set of requirements governing BART.

BART is an element of the regional haze regulatory program's approach to

achieving reasonable progress toward the national visibility goal.  In their SIPs,

states generally are to determine, and require installation and operation of, BART

at "BART-eligible" emission sources that are "subject to BART."  BART-eligible

sources are those that emit sizeable amounts of visibility-impairing pollutants,

including sulfur dioxide ("$SO_2$") and nitrogen oxides ("NOx"), that are within

certain source categories (including fossil fuel-fired electric generating facilities of

a certain size[9]), and that were in existence on August 7, 1977, but had not been in

operation for more than 15 years as of that date.  CAA § 169A(b)(2)(A), 42 U.S.C.

---

[visibility] goal" and providing that EPA's regulations should require SIPs "to
contain such emission limits, schedules of compliance, and other measures as may
be necessary to carry out [the EPA] regulations").

[9] The Act refers to "fossil-fuel fired steam electric plants of more than 250 million
British thermal units per hour heat input."  CAA § 169A(g)(7), 42 U.S.C. §
7491(g)(7).  These facilities are often called "electric generating units" or, simply,
"generating units."

§ 7491(b)(2)(A).  A BART-eligible source is "subject to BART" if, due to the

effects of its emissions, it "may reasonably be anticipated to cause or contribute to

any impairment of visibility in any mandatory Class I Federal area."  40 C.F.R.

§ 51.308(e)(1)(ii).  Although states have discretion in determining BART for a

particular source or source category, the Act provides that for large fossil fuel-fired

electric generating plants, BART "emission limitations . . . shall be determined

pursuant to guidelines[] promulgated by" EPA as part of its visibility protection

regulations.  CAA § 169A(b), 42 U.S.C. § 7491(b).  EPA promulgated "BART

Guidelines" for these electric generating plants as part of its 2005 regional haze

rules.  40 C.F.R. pt. 51, app. Y, *promulgated at* 70 Fed. Reg. at 39,156-72.[10]

EPA's rules required states to submit SIPs addressing BART and other regional

haze regulatory requirements by December 2007.  40 C.F.R. § 51.308(b).

　　　An important aspect of these rules addresses authority to determine that

other (non-BART) emission control measures achieve "greater reasonable

progress" toward the national visibility goal than BART would.  State

determinations of "BART alternative" measures are authorized by 40 C.F.R. §

51.308(e)(2), which EPA promulgated in its 1999 regional haze rules and amended

---

[10] The BART Guidelines, for example, include "presumptive" $SO_2$ and NOx
BART emission limits for many fossil fuel-fired electric generating facilities.  70
Fed. Reg. at 39,171-72 & Table 1.  UARG members own and operate generating
units in several states, including Texas, that are subject to BART and, in many
cases, to the BART Guidelines.

11

in 2006. *See* 64 Fed. Reg. at 35,768 (promulgating section 51.308(e)(2), which (as later amended) provides that "[a] State may opt to implement or require participation in an emissions trading program or other alternative measure rather than to require sources subject to BART to install, operate, and maintain BART"). Section 51.308(e)(2) provides that "[s]uch an emissions trading program or other alternative measure must achieve greater reasonable progress than would be achieved through the installation and operation of BART." *See also* 71 Fed. Reg. 60,612 (Oct. 13, 2006) (amending and expanding the 1999 BART-alternative rules).[11]  In February 2005, this Court held that authorization of alternatives to BART that make greater reasonable progress than BART comports with the Act and that, where an alternative meets the greater-reasonable-progress criterion, no individual-source BART determination or BART emission limit is necessary to satisfy the Act's visibility protection requirements. *Ctr. for Energy & Econ. Dev. v. EPA*, 398 F.3d 653, 659-60 (D.C. Cir. 2005) ("*CEED*"); *see also Cent. Az. Water Conservation Dist. v. EPA*, 990 F.2d 1531, 1543 (9th Cir. 1993), *cited in CEED*, 398 F.3d at 660.

---

[11] No petitions for review were filed challenging the BART-alternative provisions of EPA's 1999 rules or the Agency's 2006 revised BART-alternative rules.

## B.    CAIR and EPA's Rulemaking Determination that CAIR Is "Better than BART"

At the same time EPA conducted its BART rulemaking pursuant to this Court's remand in *Corn Growers*, EPA also developed a rule to address interstate transport of emissions of pollutants, in particular $SO_2$ and NOx, from electric generating units located in most states in the eastern half of the United States. EPA published this rule—CAIR—under the Act's good neighbor provision (section 110(a)(2)(D)(i)) in May 2005, shortly before it completed its BART remand rulemaking.

CAIR established $SO_2$ and NOx emission limits in the form of "emission budgets" for most states in the eastern half of the country.  *See generally North Carolina v. EPA*, 531 F.3d 896, 903-05 (D.C. Cir.) ("*North Carolina I*"), *modified on reh'g*, 550 F.3d 1176 (D.C. Cir. 2008) ("*North Carolina II*").  Although each covered state could, if it chose, meet its emission budgets through its own uniquely tailored SIP, EPA by regulation offered states the option of complying with CAIR by having their generating units participate in EPA-designed interstate emission allowance "cap-and-trade" programs restricting those facilities' emissions of $SO_2$ and NOx—an example of an "emissions trading program" to which 40 C.F.R. § 51.308(e)(2) refers.  *See* 70 Fed. Reg. 25,162, 25,166-67 (May 12, 2005).  To address the possibility that some states might fail (or choose not) to submit SIPs to implement CAIR in a timely way, EPA promulgated federal implementation plans

13

that would apply the CAIR trading programs automatically to any such states. 71

Fed. Reg. 25,328 (Apr. 28, 2006).

In its CAIR rulemaking, EPA addressed the fact that participation in the

CAIR emission trading programs would achieve greater "reasonable progress" on

visibility than would source-by-source BART emission limits for the affected

electric generating units—*i.e.*, would be "better than BART"—and thus serve as an

EPA-approved alternative to BART with respect to generating units' $SO_2$ and NOx

emissions.[12]  70 Fed. Reg. at 25,299-304.  In promulgating CAIR, however, EPA

deferred final rulemaking action authorizing CAIR participation as a BART

alternative until EPA completed its then-pending BART rulemaking on remand

from *Corn Growers*.  *See id.* at 25,300, 25,304.

Shortly thereafter, in July 2005, EPA published its final BART rules,

including the CAIR better-than-BART alternative for states.  70 Fed. Reg. at

39,156 (promulgating 40 C.F.R. § 51.308(e)(4)).  In October 2006, EPA

promulgated, as part of its amended BART-alternative rules, a new version of 40

C.F.R. § 51.308(e)(4).  71 Fed. Reg. at 60,632.  Because EPA promulgated these

amended BART-alternative rules after it had published, in April 2006, the CAIR

---

[12] Generating units' emissions of particulate matter (an additional type of visibility-impairing pollutant), and all visibility-impairing emissions from other source categories, were not subject to CAIR and, thus, were outside the scope of EPA's CAIR-is-better-than-BART policy.

federal implementation plans, EPA modified section 51.308(e)(4) to clarify that

generating units in states subject to those federal plans could satisfy BART

obligations via CAIR on the same basis as units in states with EPA-approved

CAIR SIPs.  As revised, section 51.308(e)(4) provided:

> A State that chooses to meet the emission reduction requirements of
> the Clean Air Interstate Rule (CAIR) by participating in one or more
> of the EPA-administered CAIR trading programs for $SO_2$ and NOx
> need not require BART-eligible [generating units] subject to such
> trading programs in the State to install, operate, and maintain BART
> for the pollutants covered by such trading programs in the State.  A
> State may choose to participate in the EPA-administered CAIR
> trading programs either by submitting a State implementation plan
> that . . . is approved, in accordance with [applicable CAIR provisions,]
> . . . or by remaining subject to the Federal implementation plan . . . .

40 C.F.R. § 51.308(e)(4) (2011).

## II.    Litigation on CAIR and on "CAIR-for-BART," and the Cross-State Air Pollution Rule

In this Court, NPCA challenged 40 C.F.R. § 51.308(e)(4) (which the Court

termed the "CAIR-for-BART" provision) as promulgated in EPA's July 2005

BART rules.  The Court fully affirmed the CAIR-for-BART provision, "squarely

reject[ing]" NPCA's challenge and holding that the provision was both consistent

with "[t]he plain language of the Act" and "reasonable."  *Utility Air Regulatory

Group v. EPA*, 471 F.3d 1333, 1340 (D.C. Cir. 2006) ("*UARG v. EPA*").[13]

---

[13] *UARG v. EPA* was the lead case among consolidated petitions for review of
EPA's 2005 BART rules, which included NPCA's petition.  UARG was a
petitioner challenging other, distinct aspects of the 2005 BART rules.  UARG also

Numerous parties also challenged CAIR itself, which this Court addressed in *North Carolina I.* Although the Court initially ordered CAIR vacated, it withheld its vacatur mandate, which never issued. Subsequently, in response to EPA's petition for rehearing of its opinion, the Court ordered that CAIR would remain in effect pending EPA's development and adoption on remand of a valid replacement rule. *North Carolina II*, 550 F.3d at 1178. The Court "allow[ed] CAIR to remain in effect until it is replaced by a rule consistent with our opinion" in order to "at least temporarily preserve the environmental values covered by CAIR." *Id.*; *see also, e.g.*, 80 Fed. Reg. 32,019, 32,023 n.8 (June 5, 2015) (EPA final rule recognizing that CAIR was not "'struck down' by the Court" but was "*remanded . . . without vacatur to preserve the environmental benefits provided by CAIR*") (citing *North Carolina II*, 550 F.3d at 1178) (emphasis added).

In response to the Court's remand of CAIR, EPA in August 2011 promulgated a replacement interstate transport rule establishing a new emission trading program for electric generators. 76 Fed. Reg. 48,208 (Aug. 8, 2011). That rule—CSAPR, also sometimes called the Transport Rule—includes state emission budgets and otherwise is generally similar in design to CAIR, and it covers most of

---

participated in the litigation as an intervenor-respondent, supporting the CAIR-for-BART provision against NPCA's challenge.

the states CAIR did, but it imposes more stringent emission limits than CAIR did.[14]
*See, e.g.*, 76 Fed. Reg. 82,219, 82,229 (Dec. 30, 2011) (observing that "the Transport Rule will result in greater emission reductions overall than CAIR"), JA___; *id.* at 82,221 (noting that "[t]he overall [electric generating unit] emission reductions from the Transport Rule are larger than the [electric generating unit emission] reductions achieved by CAIR"), JA___.  As promulgated, CSAPR was to take effect by limiting generating units' emissions beginning on January 1, 2012.  Numerous parties petitioned this Court to review CSAPR, and several petitioners filed motions to stay CSAPR.

On December 30, 2011—the last business day before CAIR was to terminate and CSAPR was to take effect on January 1, 2012—this Court stayed the effectiveness of CSAPR.  Order, *EME Homer City Generation, L.P. v. EPA*, No. 11-1302 (Dec. 30, 2011).  In doing so, the Court made clear that EPA "is expected to continue administering the Clean Air Interstate Rule pending the court's resolution of the[] petitions for review" of CSAPR.  *Id.* at 2.  It was that same day, December 30, 2011, that the Federal Register published EPA's proposed rule that resulted in the final rule at issue here.  *See infra* at 19-20.

---

[14] In a supplemental rule, EPA included five additional states (Iowa, Michigan, Missouri, Oklahoma, and Wisconsin) in CSAPR's "ozone-season" (May-through-September) NOx emission trading program.  76 Fed. Reg. 80,760 (Dec. 27, 2011).

In August 2012, in *EME Homer City I*, this Court held CSAPR was unlawful and vacated and remanded the rule in its entirety. The Court specified that "EPA must continue administering CAIR pending the promulgation of a valid replacement" rule by EPA. *EME Homer City I*, 696 F.3d at 38. The Court explained:

> In accordance with our [December 30, 2011] Order granting the motions to stay the Transport Rule, EPA has continued to administer CAIR. . . . Vacating CAIR now would have the same consequences that moved the *North Carolina* Court to stay its hand—and indeed might be more severe now, in light of the reliance interests accumulated over the intervening four years. We therefore conclude, as did the Court in *North Carolina*, that the appropriate course is for EPA to continue to administer CAIR pending its development of a valid replacement.

*Id.*

In April 2014, the Supreme Court reversed and remanded this Court's judgment invalidating CSAPR. *EME Homer City II*, 134 S. Ct. at 1610. The Supreme Court directed this Court to address on remand elements of challenges to CSAPR that this Court had not addressed or resolved in *EME Homer City I*, and the Supreme Court left open for consideration on remand "as-applied challenges" to CSAPR, *id.* at 1609. The Supreme Court, however, did not disturb this Court's continuing stay of CSAPR and did not disturb or otherwise address this Court's directives that EPA continue to administer CAIR, which remained in effect and fully enforceable.

18

After the case returned to this Court, EPA in June 2014 filed a motion to lift

the stay of CSAPR, which this Court granted in October 2014.  Order, *EME Homer*

*City Generation, L.P. v. EPA*, No. 11-1302, at 3 (Oct. 23, 2014).  As a result,

CSAPR took effect on January 1, 2015.[15]  *See* 79 Fed. Reg. 71,663 (Dec. 3, 2014);

81 Fed. Reg. 13,275 (Mar. 14, 2016).  Due to this Court's CAIR-remand decision

in *North Carolina II* and its December 30, 2011 order staying CSAPR and

directing continued administration of CAIR (as well as its August 2012 directive in

*EME Homer City I* mandating continued administration of CAIR), CAIR remained

fully in effect and enforceable throughout the EPA rulemaking at issue in the

present cases, and indeed continued in full effect and enforceable until December

31, 2014—more than two-and-a-half years after the rulemaking challenged here

concluded.

## III.    EPA's Proceeding on the Rule Challenged Here

As noted above, on December 30, 2011, EPA published its proposed rule to

disapprove SIPs that relied on the CAIR-for-BART provision (40 C.F.R. §

---

[15] On remand, this Court issued its opinion in *EME Homer City III* in July 2015, granting "as-applied" challenges to CSAPR and remanding to EPA, without vacating, several of CSAPR's state emission budgets.  *EME Homer City III*, 795 F.3d at 128-32, 138.  EPA subsequently proposed a rule that included a proposed partial response to the remand of emission budgets, 80 Fed. Reg. 75,706 (Dec. 3, 2015), and on September 7, 2016, issued a final rule that, *inter alia*, makes final that partial response.  *See https://www.epa.gov/airmarkets/final-cross-state-air-pollution-rule-update* (last visited Sept. 20, 2016).

51.308(e)(4)) that this Court had affirmed in *UARG v. EPA*.[16]  76 Fed. Reg.

82,219, JA___.  Regarding the CAIR-for-BART SIPs,[17] EPA proposed "limited

disapproval"—a term that does not appear in the CAA but that EPA described as

an action that "provide[s] EPA the authority to issue a [federal implementation

plan] at any time [to replace the disapproved SIP], and to obligate the Agency to

take such action no more than two years after the effective date of the final limited

[SIP] disapproval action."  76 Fed. Reg. 33,662, 33,668 (June 9, 2011) (proposed

disapproval of Tennessee's CAIR-for-BART SIP).  EPA said that "'limited

disapproval is a rulemaking action, and it is subject to notice and comment.'"  *Id.*

(quoting "Processing of State Implementation Plan (SIP) Submittals," EPA

Memorandum from John Calcagni, Director, Air Quality Management Division,

EPA Office of Air Quality Planning and Standards  (Sept. 7, 1992), at 3 (*located at*

---

[16] As noted, the proposed rule was published on the same day this Court stayed
CSAPR and directed EPA to keep CAIR in effect.  The proposed rule was signed
on December 23, 2011.  76 Fed. Reg. at 82,232, JA___.

[17] Although the principal focus of EPA's SIP-disapproval action was states'
reliance on CAIR to meet BART requirements, EPA's action also addressed SIPs'
reliance on CAIR to meet "the requirement for a long-term strategy sufficient to
achieve the state-adopted reasonable progress goals" under the visibility protection
program.  76 Fed. Reg. at 82,221, 82,229, JA___.  *See* EPA Response to
Comments at 151 ("For the same reasons that EPA cannot fully approve SIPs that
rely on CAIR to meet the BART requirements, we cannot fully approve SIPs that
rely on CAIR as a long-term strategy."), JA___.  For convenience, this brief's
references to SIPs' reliance on CAIR to meet BART requirements also encompass
SIPs' reliance on CAIR to meet other visibility program requirements, including
the long-term-strategy requirement, to the extent relevant.

*http://www.epa.gov/ttn/caaa/t1/memoranda/siproc.pdf*) (last visited Sept. 20, 2016))).

In the December 30, 2011 proposed rule, EPA proposed limited disapproval of the CAIR-for-BART SIPs submitted by fourteen states subject to CAIR: Alabama, Florida, Georgia, Indiana, Iowa, Louisiana, Michigan, Mississippi, Missouri, North Carolina, Ohio, Pennsylvania, South Carolina, and Texas. 76 Fed. Reg. at 82,221, JA___. In separate rulemaking proceedings, EPA earlier had proposed limited disapproval of CAIR-for-BART SIPs of three additional CAIR states—Tennessee,[18] West Virginia,[19] and Kentucky[20]—and shortly thereafter EPA separately proposed limited disapproval of Virginia's CAIR-for-BART SIP.[21] EPA said it "plan[ned] to take final action" on all these SIPs (*i.e.*, the SIPs of the fourteen states addressed in the December 30, 2011 proposed rule and the SIPs of the other four states) "when this action is finalized." *Id.* All of the states, EPA explained, are "covered by the requirements of the Transport Rule." *Id.* at 82,221 n.4.

---

[18] 76 Fed. Reg. 33,662.

[19] 76 Fed. Reg. 41,158 (July 13, 2011).

[20] 76 Fed. Reg. 78,194 (Dec. 16, 2011).

[21] 77 Fed. Reg. 3691 (Jan. 25, 2012).

EPA proposed to disapprove the SIPs that were submitted even though they were, as the Agency repeatedly acknowledged, "fully consistent with the EPA's regulations at the time." *Id.* at 82,221, 82,229, JA___, ___; *id.* at 82,223 (the SIPs were "fully consistent with our regulations"), JA___. EPA's regulations authorized those SIPs at the time they were submitted and at the time of the proposed rule, and continued to authorize them until the August 6, 2012 effective date of EPA's June 7, 2012 final rule revoking the CAIR-for-BART provision. *See* 77 Fed. Reg. at 33,643, JA___. EPA based its proposed SIP disapprovals on the fact that "CAIR and the CAIR [federal implementation plan] requirements . . . will only remain in force to address emissions through the 2011 control period [of CAIR, *i.e.*, until December 31, 2011,] and thus CAIR cannot be relied upon in a SIP as a substitute for BART or as part of a long-term control strategy." 76 Fed. Reg. at 82,221, JA___; *see id.* at 82,223 (stating "CAIR . . . has now been replaced by the Transport Rule," and the states in question "are now covered by the Transport Rule requirements"), JA___. EPA concluded it "cannot fully approve regional haze SIP revisions that have relied on CAIR for emission reduction measures." *Id*.

Comments on the proposed rule noted that, contrary to EPA's rationale for its proposed disapproval of CAIR-for-BART SIPs and revocation of the CAIR-for-BART provision in 40 C.F.R. § 51.308(e)(4), CAIR had not terminated at the end

22

of 2011 but instead remained in effect.  *E.g.*, EPA Response to Comments at 128

(describing Comments of Luminant, EPA-HQ-OAR-2011-0729-0293 ("Luminant

Comments")), JA___.  Commenters explained there was no basis and no need for

EPA either to revoke the CAIR-for-BART provision (which some commenters

called "CAIR=BART") or to disapprove CAIR-for-BART SIPs:

> EPA easily could—and should—avoid the problems that would stem
> from its proposed approach to replacing CAIR with CSAPR—and
> constructively address appropriate state reliance on the CAIR=BART
> and CSAPR=BART alternatives—by modifying its proposed rule.
> Rather than rewrite 40 C.F.R. § 51.308(e)(4) by "replacing the name
> of CAIR with the name of the Transport Rule," [76 Fed. Reg.] at
> 82229, EPA should promulgate its proposed new CSAPR=BART
> regulatory text as a new, *added* paragraph within 40 C.F.R. §
> 51.308(e), to be available *in parallel with* the existing CAIR=BART
> provision at § 51.308(e)(4), *which should be retained*.  Using this
> approach, EPA's rules would simply provide that a state may rely on
> either CAIR=BART or CSAPR=BART, or both, where CAIR and/or
> CSAPR, respectively, applies in that state.  With such a modification
> to its rules, EPA would make clear that CAIR=BART remains
> operative and fully available to states, as it should be, while
> permitting any state on which EPA imposed CSAPR requirements to
> adopt—in lieu of or in addition to CAIR=BART, as the state deems
> appropriate—a CSAPR=BART SIP provision, which the state could
> adopt as a contingency matter to become applicable if and when
> CSAPR becomes effective in that state.  In addition, EPA should
> make clear that it will promptly propose and promulgate approval of
> all SIP provisions that rely on CAIR=BART.

UARG Comments at 9-10 (emphases in original) (footnotes omitted), JA___-___;

*see* EPA Response to Comments at 132-33, JA___-___ (describing UARG

Comments).

In its final rulemaking action published on June 7, 2012, EPA expressly recognized that the CAIR-for-BART SIPs were "fully consistent with our regulations" as a result of EPA's "determination that CAIR was 'better-than-BART.'" [22] 77 Fed. Reg. at 33,644, JA___; *id.* at 33,653, JA___. EPA also recognized that this Court, in its December 30, 2011 order, "stayed the Transport Rule (including the provisions that would have sunset CAIR and the CAIR [federal implementation plans]) and instructed the EPA to continue to administer CAIR" pending resolution of the petitions for review of CSAPR. *Id.* at 33,645, JA___. Yet, EPA concluded, it "cannot fully approve" the CAIR-for-BART SIPs because "CAIR has been remanded and only remains in place temporarily," *id.*, and "we do not anticipate that CAIR will continue in effect indefinitely," *id.* at 33,647, JA___. Notwithstanding its acknowledgement that CSAPR will produce even "greater

---

[22] EPA's final rule disapproved the SIPs of the states for which EPA had proposed disapproval in the December 30, 2011 proposed rule, with the exception of Florida. 77 Fed. Reg. at 33,653, JA___. The final rule also included disapproval of Virginia's CAIR-for-BART SIP, which, as noted above, EPA had proposed to disapprove in a separate proposed rule. EPA earlier had published separate final rules disapproving the CAIR-for-BART SIPs of West Virginia, 77 Fed. Reg. 16,937 (Mar. 23, 2012), Kentucky, 77 Fed. Reg. 19,098 (Mar. 30, 2012), and Tennessee, 77 Fed. Reg. 24,392 (Apr. 24, 2012). UARG filed petitions for review of the final disapproval rules for those three states. *UARG v. EPA*, No. 12-1664 (4th Cir., filed May 22, 2012) (West Virginia); *UARG v. EPA*, No. 12-3627 (6th Cir., filed May 29, 2012) (Kentucky); *UARG v. EPA*, No. 12-3772 (6th Cir., filed June 25, 2012) (Tennessee). Those petitions have been held in abeyance during the *EME Homer City* litigation in this Court and the Supreme Court on CSAPR, EPA's CSAPR remand proceedings, and the present litigation in this Court.

emission reductions" than CAIR, 76 Fed. Reg. at 82,229, JA___, EPA asserted that the fact that CAIR would not be "in effect indefinitely" meant that "our determination that CAIR provides for greater reasonable progress than BART is no longer valid," 77 Fed. Reg. at 33,647, JA___. EPA made no substantive response to commenters' argument that EPA could and should allow states to use *either* CAIR-for-BART or CSAPR-for-BART, depending on the status of CAIR and CSAPR.

## STANDARD OF REVIEW

Because the CAA does not by its terms specify a standard of review for EPA actions disapproving SIPs, the default standard of the Administrative Procedure Act ("APA") applies. Under that standard, "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; . . . (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706(2). The standard of review for EPA's "promulgation or revision of regulations under part C of title I of th[e] Act (relating to . . . protection of visibility," which include EPA's regulation revoking 40 C.F.R. § 51.308(e)(4) as in effect before EPA's promulgation of the June 7, 2012 rule, is stated in section 307(d)(9) of the CAA, which essentially restates the APA standard. CAA §

307(d)(1)(J), (d)(9), 42 U.S.C. § 7607(d)(1)(J), (d)(9); *see EME Homer City I*, 696

F.3d at 23 n.17 ("The standard we apply 'is the same' under the judicial review

provision of the Clean Air Act, 42 U.S.C. § 7607(d)(9), as under the

Administrative Procedure Act, 5 U.S.C. § 706(2).") (quoting *Motor Vehicle Mfrs.*

*Ass'n v. EPA*, 768 F.2d 385, 389 n.6 (D.C. Cir. 1985)).

## <u>STANDING</u>

State and Industry Petitioners have suffered injury-in-fact resulting from

EPA's disapproval of the CAIR-for-BART SIPs and revocation of the CAIR-for-

BART provision in 40 C.F.R. § 51.308(e)(4), and that injury would be redressed

by vacatur of those actions.  Thus, State and Industry Petitioners have standing.[23]

State Petitioners include the State of Texas (and the Texas Commission on

Environmental Quality) and the Louisiana Department of Environmental Quality.

Texas and Louisiana are two of the states whose CAIR-for-BART SIPs were

disapproved in the EPA action challenged here.[24]  In enacting the CAA's judicial

review provision, "Congress . . . recognized a concomitant procedural right" to

challenge agency action "as arbitrary and capricious," and, "[g]iven that procedural

right" and states' "stake in protecting [their] quasi-sovereign interests," states are

---

[23] It is, moreover, a familiar principle that "[o]nly one of the petitioners needs to have standing."  *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).

[24] *See also* Comments of the Texas Commission on Environmental Quality, EPA-HQ-OAR-2011-0729-0234, JA___-___.

"entitled to special solicitude in . . . standing analysis." *Massachusetts*, 549 U.S. at 520 (citing CAA § 307(b)(1)).  The relief that State and Industry Petitioners seek here—vacatur of EPA's CAIR-for-BART SIP disapprovals and its revocation of the CAIR-for-BART provision, together with a directive that EPA approve in full the CAIR-for-BART SIPs—would remedy the injury to Texas and Louisiana (among other states) that was caused by those EPA actions.

Industry Petitioners include Luminant Generation Company LLC and affiliated companies, which own and operate generating units in Texas that, absent establishment and application of BART alternatives including the CAIR-for-BART provision, would be the subject of source-specific BART analyses that, EPA has said, would require costly and burdensome emission limits for $SO_2$ and NOx.  *See* Luminant Comments at 6-7, JA___-___; *see also* 81 Fed. Reg. 296, 301-02 (Jan. 5, 2016) (refusing to finalize BART alternative for Texas generating units and explaining that EPA "anticipate[s]" that  "stringent" $SO_2$ controls would be imposed to meet the "BART requirement").  EPA's disapproval of Texas's CAIR-for-BART SIP thus exposed Luminant to the prospect of imposition of stringent, costly source-specific BART emission limits, beyond compliance with the CAIR requirements that Luminant was already meeting.  Luminant Comments at 6 ("Luminant's coal-fired [generating units] are presently subject to and comply with

CAIR"), JA___.  As the subject of regulation, Luminant's standing is thus easily established.  *Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002).

Furthermore, UARG has associational standing because "at least one of its members would have standing to sue in [its] own right," the interests it "seeks to protect are germane to its purpose," and neither its claims nor the relief sought by State and Industry Petitioners (including UARG) "requires that an individual member . . . participate in the lawsuit."  *Id.* at 898 (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 342-43 (1977)); *see also, e.g., S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 895-96 (D.C. Cir. 2006), *modified on reh'g on other grounds*, 489 F.3d 1245 (D.C. Cir. 2007).  Rulemaking comments in the record illustrate that UARG members, which include Luminant, have (or would have) standing to petition for review in their own right.[25]

---

[25] *See* Luminant Comments at 6-7, JA___-___; *id.* at 4 n.1, JA___; Comments of Consumers Energy at 2-3, EPA-HQ-OAR-2011-0729-0288 ("Consumers Energy Comments") ("BART target[s] coal-fired [generating units], including those owned by Consumers Energy" in Michigan, one of the states whose CAIR-for-BART SIPs were disapproved in the rule at issue here), JA___-___; *id.* at 2 (noting that Consumers Energy is an "active member[] of the Utility Air Regulatory Group" and "supports and incorporates" UARG's comments), JA___; Comments of American Electric Power at 1, EPA-HQ-OAR-2011-0729-0302 ("American Electric Power Comments") (explaining that "the operating companies of the [American Electric Power] system would be directly affected" and that "[American Electric Power] and its customers are projected to be heavily impacted by this rule"), JA___; *id.* at 2 (noting that American Electric Power is a UARG member and "is in agreement and endorse[s] the arguments made by" UARG's comments), JA___.  UARG members own and operate a number of BART-eligible and subject-to-BART generating units in states (*e.g.*, Michigan and Texas) that EPA made

Moreover, the interests UARG seeks to protect in these cases are germane to its purpose (*i.e.*, as stated *supra* in its Rule 26.1 certificate, "to participate on behalf of its members collectively in administrative proceedings under the Clean Air Act that affect electric generators and in litigation arising from those proceedings"), and UARG members' participation in their own right is not required (although, as noted above, Petitioner Luminant is in fact a UARG member).

## <u>SUMMARY OF ARGUMENT</u>

EPA failed to provide any reasoned, non-arbitrary basis for disapproving the CAIR-for-BART SIPs. EPA based that action on the *non sequitur* that its 2005 rulemaking determination that CAIR provides greater reasonable progress than BART—a determination that this Court affirmed without qualification—was no longer operative because EPA predicted that CAIR would soon terminate. That Agency premise was faulty because nothing had occurred since 2005, and nothing would or could occur, that would negate or undermine EPA's factual and legal determination that CAIR was "better than BART." Assuming, as EPA did, that CSAPR at some point would supersede CAIR did not and could not create any reason for disapproving CAIR-for-BART SIPs because EPA acknowledged that CSAPR was even more stringent than CAIR. In other words, the scenario EPA

---

subject to CAIR and that submitted CAIR-for-BART SIPs that EPA disapproved in its June 2012 rule.

cited in its SIP disapproval action—replacement of CAIR's emission limits by the *more stringent* CSAPR limits—entailed no relaxation of CAIR's better-than-BART limits and thus could provide no grounds for disapproving CAIR-for-BART SIPs. EPA's action, moreover, conflicted with this Court's determination that CAIR should remain in place pending its replacement by a valid rule in order to preserve environmental values covered by CAIR and to avoid undermining legitimate reliance interests surrounding CAIR that had accumulated over a period of years.

Further, EPA lacked any basis for its conclusion that it *could not* approve the CAIR-for-BART SIPs. EPA cited no statutory or regulatory provision that precluded approval of CAIR-for-BART SIPs—and no such provision existed. EPA's mistaken premise that it had no discretion to approve the SIPs resulted in Agency action that rested on an erroneous view of EPA's legal authority, and thus, under this Court's case law, the SIP disapprovals should be set aside on that basis as well.

Moreover, EPA provided no rationale for rejecting commenters' proffered solution of keeping the CAIR-for-BART regulatory provision in place alongside a new, parallel CSAPR-for-BART provision, with either approach available to states to use, depending on CAIR and CSAPR's status as they were affected by unfolding litigation and rulemaking proceedings. EPA's unexplained dismissal of this

recommended approach was arbitrary and is additional grounds for setting its action aside.

Finally, EPA's disapproval of CAIR-for-BART SIPs—as well as its refusal to retain the CAIR-for-BART provision in 40 C.F.R. § 51.308(e)(4) alongside a new CSAPR-for-BART provision—is even more clearly arbitrary given other EPA actions that contradict these aspects of the Agency's June 2012 rule.  Those other EPA actions included its full *approval* of one state's CAIR-for-BART SIP, as well as the Agency's approval of regional haze "progress report" SIPs and nonattainment-area redesignations that expressly relied on CAIR—actions EPA took even after CAIR was no longer in effect.

Accordingly, the Court should vacate EPA's revocation of the CAIR-for-BART provision in 40 C.F.R. § 51.308(e)(4) (as it existed before June 7, 2012) and the Agency's disapproval of CAIR-for-BART SIPs.  The Court should further order EPA to approve the CAIR-for-BART SIPs because no lawful basis exists for EPA's refusal to approve them.

# ARGUMENT

**I.    EPA Unlawfully Provided No Reasoned Basis for Its Determination that It Would Not and Could Not Approve the CAIR-for-BART SIPs and for Its Revocation of the CAIR-for-BART Rule Provision.**

**A.    EPA's Disapproval of CAIR-for-BART SIPs Was Arbitrary and Capricious.**

EPA presented—and had—no plausible or credible justification for disapproving the CAIR-for-BART SIPs in the June 2012 rule.  In its December 2011 proposed rule, signed seven days before this Court stayed CSAPR and ordered CAIR kept in effect, EPA asserted that "CAIR and the CAIR [federal implementation plan] requirements . . . will only remain in force to address emissions through the 2011 control period [*i.e.*, until December 31, 2011] and *thus CAIR cannot be relied upon* in a SIP as a substitute for BART or as part of a long-term control strategy."  76 Fed. Reg. at 82,221 (emphasis added), JA___; *see id.* at 82,223 (contending that "CAIR . . . has now been replaced by the Transport Rule" and the states "are now covered by the Transport Rule requirements"), JA___.  EPA's prediction that CAIR would terminate on December 31, 2011, was soon proved wrong by this Court's December 30, 2011 stay order.  Yet EPA, in promulgating its final rule months after the Court issued that order, continued to insist that CAIR-for-BART SIPs would not—indeed, *could* not—be approved.  EPA repeatedly said it "cannot fully approve SIPs that rely on CAIR to meet the BART requirements."  EPA Response to Comments at 151, JA___; *see* 77 Fed.

Reg. at 33,645 ("we cannot" give full approval to these SIPs), JA___; *id.* at 33,653

(same: "we cannot"), JA___.  EPA's position on this issue and its resulting SIP

disapprovals were arbitrary and capricious.

　　　The Supreme Court has described tests that courts apply in reviewing agency

actions:

> Normally, an agency rule would be arbitrary and capricious if the
> agency has relied on factors which Congress has not intended it to
> consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs counter to
> the evidence before the agency, or is so implausible that it could not
> be ascribed to a difference in view or the product of agency expertise.
> The reviewing court should not attempt itself to make up for such
> deficiencies; we may not supply a reasoned basis for the agency's
> action that the agency itself has not given.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).  Moreover, "'an

order may not stand if the agency has misconceived the law.'"  *Prill v. NLRB*, 755

F.2d 941, 947 (D.C. Cir. 1985) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94

(1943)).  Thus, "judicial deference is not accorded a decision of [an agency] when

the [agency] acts pursuant to an erroneous view of law and, as a consequence, fails

to exercise the discretion delegated to it by Congress."  *Id.* at 942.

　　　Under these governing criteria, EPA's disapproval of CAIR-for-BART SIPs

merits no deference and does not withstand judicial scrutiny.  Particularly in light

of EPA's own statements about CAIR and CSAPR and the circumstances that

existed when EPA took final action in June 2012, at a time when CAIR was continuing in effect—by order of this Court—and administered by EPA, the Agency provided no reasoned justification for making final its proposed position that it would not and, indeed, could not approve SIPs that relied on CAIR.[26] EPA's CAIR-for-BART SIP disapprovals therefore were arbitrary and should be vacated.

First, the very limited reasoning EPA offered appeared to rest on the bare fact that "[a]lthough CAIR is currently in place as a result of the D.C. Circuit's stay . . ., we do not anticipate that CAIR will continue in effect indefinitely." 77 Fed. Reg. at 33,647, JA___.  EPA appears to have based its decision on its view that "BART would result in emission reductions going forward beyond 2018" and that its 2005 rulemaking "determination that CAIR provides for greater reasonable progress than BART was based on the assumption that the [emission] reductions required by CAIR would be enforceable requirements that would also apply going forward to 2018 and beyond."  *Id.*  EPA concluded that "*[a]s a result*" of the fact that it did not expect that CAIR would be in effect indefinitely, the Agency's

---

[26] EPA had an obligation to make its decision based only on the rulemaking record that existed at the time of its final action; EPA therefore could consider only facts and circumstances that existed at that time.  *See, e.g.*, *Envtl. Def. Fund v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981); *Am. Petroleum Inst. v. Costle*, 609 F.2d 20, 23 (D.C. Cir. 1979) (per curiam).

34

"*determination that CAIR provides for greater reasonable progress* than BART *is*

*no longer valid*."  *Id.* (emphases added).

But EPA's reasoning was a *non sequitur*.  EPA's 2005 rulemaking

determination that CAIR provides for greater reasonable progress than BART is a

factual and legal determination that EPA codified in its regulations, that this Court

fully affirmed against NPCA's challenge in *UARG v. EPA*, and that was never

thereafter revised or even questioned (apart from EPA's unsupported and arbitrary

abandonment of that determination in the rule challenged here).  The terms of 40

C.F.R. § 51.308(e)(4) did not state that that provision was applicable only where

EPA determined CAIR would remain in effect indefinitely or past 2018, or that

that provision would cease to apply where EPA determined CAIR would not stay

in effect indefinitely.

If, for example, it were known in 2005 that CAIR would, at some time

before 2018, be superseded by an interstate emission control program that was

*even more stringent* than CAIR—and that, *a fortiori*, would provide *even greater*

reasonable progress than BART—there still would have been no reason for EPA to

conclude that the protection for states and generating units afforded by the CAIR-

for-BART provision should be withdrawn.  And certainly there would have been

no basis for EPA to conclude that it was *compelled* to withdraw that protection.

Indeed, the factual scenario described in the preceding paragraph is not hypothetical—it was, in fact, the scenario EPA faced when it took its final rulemaking action in June 2012. That is, EPA emphasized that it anticipated that CAIR, at a future time, would be superseded by a *more stringent* program, namely CSAPR.[27] EPA expressly recognized in the rulemaking that CSAPR was more stringent than CAIR, and EPA never suggested otherwise. *See, e.g.*, 76 Fed. Reg. at 82,229 ("the Transport Rule will result in greater emission reductions overall than CAIR"), JA___; *id.* at 82,221 (noting that "[t]he overall [electric generating unit] emission reductions from the Transport Rule are larger than the [electric generating unit emission] reductions achieved by CAIR"), JA___. To be sure, if CSAPR had represented a *relaxation* of the stringency of CAIR's emission limits—or if CAIR had been revised to become less stringent than it was in 2005, when EPA adopted the CAIR-for-BART provision—a question arguably might have arisen as to whether EPA and states would run a risk of "backsliding" on visibility improvement had EPA approved CAIR-for-BART SIPs. But EPA faced neither of these situations. That CSAPR was "better" (*i.e.*, more stringent) than CAIR eliminated any possible reason to refuse to approve SIPs that relied on CAIR as a BART alternative. That is, if CSAPR *did* take effect in the future, then *even*

---

[27] EPA in the final rule expressed confidence that CSAPR would take effect; it said "we believe the Transport Rule has a strong legal basis." 77 Fed. Reg. at 33,647, JA___.

*greater reasonable progress* would occur than with the already-adequate CAIR-for-BART SIPs.  Given the record, EPA had no rational justification not to fully approve CAIR-for-BART SIPs.

Further, EPA's SIP disapprovals conflicted with this Court's recognition of the importance of maintaining the environmental benefits of CAIR by keeping CAIR in place—and the importance of protecting reliance interests that had grown up around CAIR over a prolonged period—notwithstanding that CAIR would in the future have to be replaced by a new rule.  As this Court determined in *North Carolina II*, "allowing CAIR to remain in effect"—*at EPA's request*, in its rehearing petition in that case—pending CAIR's replacement by a new rule was important to "at least temporarily preserve the environmental values covered by CAIR."  550 F.3d at 1178.  In *EME Homer City I*, moreover, the Court reemphasized this principle:  "Vacating CAIR now would have the same [adverse] consequences that moved the *North Carolina* Court to stay its hand—and indeed might be more severe now, in light of the reliance interests accumulated over the intervening four years."  696 F.3d at 38.  Indeed, EPA itself recognized that "[t]he accumulated reliance interests" to which the Court referred "*included the interests of States who reasonably assumed they could rely on reductions associated with CAIR* to meet the requirements" of EPA's regional haze regulations.  79 Fed. Reg.

37

39,322, 39,326 (July 10, 2014) (final rule approving Connecticut's CAIR-for-BART SIP, citing *EME Homer City I*, 696 F.3d at 38) (emphasis added).[28]

Furthermore, EPA's action was based on a fundamental legal error: that it was prohibited from approving the SIPs. Thus, even assuming *arguendo* that some justification existed for EPA to exercise discretion to disapprove the SIPs—and none did—any such justification could provide no support for EPA's conclusion that it *could not* approve them, *i.e.*, that it did not even have discretion to approve them. As noted above, EPA repeatedly said it "cannot" approve CAIR-for-BART SIPs, even when CAIR continued in effect with no definite termination date.[29] Yet EPA failed to identify any provision of the CAA, anything in the text of 40 C.F.R. § 51.308, or any other EPA regulation that precluded full approval of the CAIR-for-BART SIPs—and, indeed, no such provision existed. In disapproving the SIPs, EPA acted "on a faulty legal premise and without adequate rationale," *Prill*, 755 F.2d at 942, and its action therefore must be set aside.

In sum, EPA's disapproval of the CAIR-for-BART SIPs was arbitrary, capricious, and unlawful and should be vacated.

---

[28] EPA's approval of Connecticut's CAIR-for-BART SIP is discussed *infra* in Argument II.

[29] *See, e.g.,* 76 Fed. Reg. at 82,223, JA___; 77 Fed. Reg. at 33,645, 33,653, JA___, ___; EPA Response to Comments at 151, JA___.

**B.    EPA Provided No Rationale for Not Retaining the CAIR-for-BART Provision Alongside the New CSAPR-for-BART Provision, and the Agency's Rejection of That Approach Was Arbitrary and Capricious.**

In the rulemaking, commenters argued that EPA should retain the CAIR-for-BART provision in 40 C.F.R. § 51.308(e)(4) while adding the Agency's proposed new CSAPR-for-BART provision:

> EPA easily could—and should—avoid the problems that would stem from its proposed approach to replacing CAIR with CSAPR—and constructively address appropriate state reliance on the CAIR=BART and CSAPR=BART alternatives—by modifying its proposed rule. Rather than rewrite 40 C.F.R. § 51.308(e)(4) by "replacing the name of CAIR with the name of the Transport Rule," [76 Fed. Reg.] at 82229, EPA should promulgate its proposed new CSAPR=BART regulatory text as a new, *added* paragraph within 40 C.F.R. § 51.308(e), to be available *in parallel with* the existing CAIR=BART provision at § 51.308(e)(4), *which should be retained*. Using this approach, EPA's rules would simply provide that a state may rely on either CAIR=BART or CSAPR=BART, or both, where CAIR and/or CSAPR, respectively, applies in that state.

UARG Comments at 9-10 (emphases in original) (footnote omitted), JA___-___. If , commenters explained, EPA were to adopt this two-track approach,

> EPA would make clear that CAIR=BART remains operative and fully available to states, as it should be, while permitting any state on which EPA imposed CSAPR requirements to adopt—in lieu of or in addition to CAIR=BART, as the state deems appropriate—a CSAPR=BART SIP provision, which the state could adopt as a contingency matter to become applicable if and when CSAPR becomes effective in that state.

*Id.* at 10 (footnote omitted), JA___.  As Petitioner Luminant's comments explained, "§ 51.308(e)(4), which allows for CAIR as an alternative to BART,

39

should remain in EPA's regulations as presently written," and "EPA should finalize its 'CSAPR is better than BART' determination in another provision that would apply if and when CSAPR survives judicial review and goes into effect in a particular State." Luminant Comments at 5, JA___; *see* Comments of Progress Energy at 2, EPA-HQ-OAR-2011-0729-0299 ("This [approach] would ensure necessary flexibility in light of the uncertainty surrounding CAIR and CSAPR's status due to the stay and pending judicial review of CSAPR."), JA___; *see also* Comments of South Carolina Department of Health and Environmental Control at 2, EPA-HQ-OAR-2011-0729-0241, JA___; Comments of Duke Energy at 2-3, EPA-HQ-OAR-2011-0729-0240, JA___-___; Comments of the Edison Electric Institute at 6, EPA-HQ-OAR-2011-0729-0296, JA___; Consumers Energy Comments at 3-4, JA___-___; American Electric Power Comments at 2, JA___.

Neither in the preamble to its final rule nor in its Response to Comments document did EPA explain why this proposed regulatory approach, supported by several commenters, was inappropriate or unapprovable. Instead, EPA relied solely on its overall justification for its CAIR-for-BART SIP disapprovals—a rationale that, as discussed in Argument I.A. *supra*, was fatally deficient.

EPA's refusal to adopt the approach of retaining the CAIR-for-BART regulatory language in 40 C.F.R. § 51.308(e)(4) while adding a parallel CSAPR-

for-BART regulatory provision was without any reasoned basis, was arbitrary and

capricious, and should be vacated.

**II.    EPA's Rejection of the CAIR-for-BART SIPs—and Its Refusal To Retain the CAIR-for-BART Regulatory Provision Alongside the New CSAPR-for-BART Provision—Is Particularly Unreasonable in Light of Other EPA Actions and Statements that Are Inconsistent with Those Actions.**

"[I]nconsistent treatment is the hallmark of arbitrary agency action."

*Catawba County v. EPA*, 571 F.3d 20, 51(D.C. Cir. 2009).  EPA repeatedly has

taken actions and made statements that are inconsistent with its asserted

justification for the June 2012 rule's disapproval of CAIR-for-BART SIPs and the

Agency's refusal to retain the CAIR-for-BART provision in 40 C.F.R. §

51.308(e)(4) alongside the new CSAPR-for-BART provision.  These other EPA

actions and statements further undermine the elements of the June 2012 rule that

State and Industry Petitioners challenge.

As discussed above, in its June 2012 rule, EPA said "our determination that

CAIR provides for greater reasonable progress than BART is no longer valid"

"[a]s a result" of the fact that, although CAIR continued in effect at that time

pursuant to this Court's order, EPA "do[es] not anticipate that CAIR will continue

in effect indefinitely."  77 Fed. Reg. at 33,647, JA___.  EPA's rationale was that,

"as CAIR has been remanded and only remains in place temporarily, we cannot

fully approve these regional haze SIP revisions that have relied on the now-

41

temporary reductions from CAIR." *Id.* at 33,645, JA___.  As explained above, however, EPA's rationale for its SIP disapprovals and for rescinding the CAIR-for-BART provision was flawed and arbitrary because the fact that CAIR would not remain in effect indefinitely did not alter or impair the basis for EPA's unequivocal and judicially affirmed determination that CAIR is "better than BART" and, thus, a lawful and approvable BART alternative.

Other actions and statements by EPA recognized and reflected this fundamental fact.  The resulting inconsistency with the components of EPA's June 2012 rule that State and Industry Petitioners challenge underscores the arbitrary nature of those aspects of the rule.  For example, after this Court vacated CSAPR in *EME Homer City I*, EPA expressly announced that the still-temporary status of CAIR[30] erected no bar to approving regional haze SIPs and other state submittals that relied on CAIR.  Specifically, on November 19, 2012, EPA issued a guidance memorandum that stated that SIPs that relied on CAIR for regional haze requirements and other purposes under the CAA (including redesignations of areas

---

[30] *EME Homer City I*'s vacatur of CSAPR in August 2012 did not create grounds to conclude that CAIR would remain in effect indefinitely.  In *EME Homer City I*, this Court said that just as, when it remanded CAIR in 2008 the Court "did 'not intend to grant an indefinite stay of the effectiveness' of its decision," 696 F.3d at 38 n.35 (quoting *North Carolina II*, 550 F.3d at 1178), in remanding CSAPR "[w]e likewise expect that EPA will proceed expeditiously on remand," *id.*

from "nonattainment" to "attainment" status[31]) could indeed be approved by EPA,

notwithstanding the remand of CAIR and the fact that CAIR would remain in

effect only temporarily:[32]

> The [EPA] Memorandum of November 19, 2012, "communicate[d] . . . [EPA's] intent with regard to a range of actions potentially affected by" this court's decision in *EME Homer City*.  Mem. at 1.  It stated that "[c]ertain state submittals awaiting approval . . . may be partly dependent on the assurance of ongoing regional NOx and SO$_2$ emission reductions" based on "the expectation that [the Transport Rule] . . . would be fully implemented." *Id.*  With regard to pending *"attainment SIPs, redesignation requests, and associated maintenance SIPs," the Memorandum stated that "based on th[e] direction from the Court [in EME Homer City to 'continue administering CAIR'], . . . it will be appropriate to rely on CAIR emission reductions as* **permanent and enforceable** *for* **certain actions** *in certain circumstances*." *Id.* at 1-2 (emphasis added).

>> Specifically, . . . it will be appropriate to rely on those reductions either until th[e] petition [for rehearing filed by EPA] and any further proceedings in the . . . case are resolved or, if the decision vacating [the Transport Rule] is not changed, until a valid replacement rule is developed and implementation plans complying with any new rule are submitted by the states and acted upon by the EPA.  Thus, action on those pending requests and SIPs may go forward.

> *Id.* at 2.  *With regard to regional haze, the Memorandum stated that it "will be appropriate to approve" a specific proposed state regional haze plan "that relies on CAIR emission reductions." Id.*

---

[31] *See supra* note 4.

[32] A copy of EPA's memorandum is attached to this brief.

*Sierra Club v. EPA*, 754 F.3d 995, 997-98 (D.C. Cir. 2014) (boldface italics

indicate emphasis by the Court; other emphases added; other alterations within

quoted passages are the Court's).[33]  Thus, although CAIR's temporary status had

not changed since EPA published the June 2012 rule at issue here—*i.e.*, CAIR

remained remanded and only temporarily in effect as of both June 2012 and

November 2012—EPA concluded that reliance on CAIR was appropriate,

including for a regional haze SIP.

Connecticut's SIP was the "proposed state regional haze plan" to which

EPA's November 19, 2012 memorandum referred.  Connecticut—one of three

states that were subject to CAIR but not to CSAPR—relied in its SIP on CAIR as a

BART alternative.[34]  On July 10, 2014, EPA fully approved Connecticut's CAIR-

for-BART SIP, over objections from Sierra Club and NPCA in comments on

EPA's proposed SIP approval for that state.  *See* 79 Fed. Reg. at 39,322, 39,325-

---

[33] In *Sierra Club v. EPA*, Sierra Club petitioned for review of EPA's November 19, 2012 Memorandum, but this Court held that Sierra Club lacked standing and thus dismissed its petition for lack of jurisdiction.  *Sierra Club v. EPA*, 754 F.3d at 1000-02.

[34] *See* 77 Fed. Reg. 17,367, 17,370 (Mar. 26, 2012) (proposed approval of Connecticut's regional haze SIP).  EPA included Connecticut in CAIR's ozone-season NOx control program, *see id.* at 17,370, 17,374 n.6, though not in CAIR's annual NOx or $SO_2$ control programs.  Because EPA did not make Connecticut subject to the emission reduction requirements in CSAPR, "the option to rely on CSAPR as an alternative to BART was not available to th[at] State."  *Id.* at 17,370.

44

27.[35]  EPA published its final rule approving Connecticut's SIP *after* the Supreme

Court in April 2014 reversed this Court's judgment vacating CSAPR in *EME*

*Homer City I* and after EPA in June 2014 moved this Court to lift its stay of

CSAPR.[36]  Yet the fact that EPA at that time expected CAIR to terminate

imminently did not deter it from approving Connecticut's CAIR-for-BART SIP.

Remarkably, EPA offered no explanation for the startling inconsistency between

its approval of Connecticut's CAIR-for-BART SIP under these circumstances and

the Agency's disapproval of the CAIR-for-BART SIPs of Texas, Louisiana, and

the other states at issue here.[37]

---

[35] Although EPA said that Connecticut's CAIR-for-BART SIP relied on 40 C.F.R. § 51.308(e)(2) rather than on the pre-June 2012 version of 40 C.F.R. § 51.308(e)(4), that EPA statement merely reflected the reality that, at the time EPA acted on Connecticut's SIP, section 51.308(e)(4) had been changed (by the June 2012 rule challenged here) to eliminate that rule's previous authorization to rely on CAIR.  Connecticut nonetheless relied on the underlying EPA determination that CAIR is better than BART as the state's basis for a BART alternative for Connecticut generating units' ozone-season NOx emissions.  *See, e.g.*, 78 Fed. Reg. 5158, 5161 (Jan. 24, 2013) (supplemental proposed rule to approve Connecticut's CAIR-for-BART SIP) ("EPA believes it is appropriate to allow Connecticut to rely on CAIR at this time[] and the existing emissions reductions achieved by CAIR . . . .").

[36] EPA's final rule approving the Connecticut CAIR-for-BART SIP originally was signed on April 26, 2013, and EPA's signature was "affirmed" on May 27, 2014. 79 Fed. Reg. at 39,329.  The final rule "was received by the Office of the Federal Register on July 3, 2014," *id.*, and published on July 10, 2014.

[37] No petition for review was filed challenging EPA's approval of Connecticut's CAIR-for-BART SIP.

Also in line with its November 19, 2012 memorandum, EPA approved redesignations of nonattainment areas to attainment where "states relied"—as support for redesignation—"on CAIR as an 'enforceable measure.'" 80 Fed. Reg. 12,607, 12,610 (Mar. 10, 2015) (citing redesignations of West Virginia areas). Tellingly, EPA's practice of approving redesignations that relied on CAIR continued even after the Supreme Court in April 2014 reversed this Court's judgment vacating CSAPR and even after this Court in October 2014 lifted the stay of CSAPR—indeed, it continued even after CSAPR actually took effect and superseded CAIR on January 1, 2015. 79 Fed. Reg. 78,755, 78,761-62 (Dec. 31, 2014) (proposing to redesignate St. Louis to attainment, noting that "[r]elative to CAIR, CSAPR requires similar or greater emission reductions . . . starting in 2015 and beyond," and finding that "[t]he emission reductions associated with CAIR . . . can therefore be considered permanent and enforceable for purposes of redesignation under section 107(d)(3)(E)(iii) of the CAA"); 80 Fed. Reg. 9207, 9208 (Feb. 20, 2015) (EPA final rule approving St. Louis redesignation).

EPA also approved states' reliance on CAIR in their "five-year progress report" regional haze SIPs required under EPA's visibility rules, *see* 40 C.F.R. § 51.308(g)[38]—and, again, did so even after CAIR expired and was superseded by

---

[38] The required five-year progress "reports" are actually revisions to SIPs. 40 C.F.R. § 51.308(g) (introductory paragraph). If inadequacies exist in the state's

the more stringent CSAPR.  For example, in proposing to approve West Virginia's progress report SIP, EPA said the state "appropriately . . . relied on CAIR reductions to demonstrate the State's progress towards meeting its reasonable progress goals."  80 Fed. Reg. at 12,610 (footnote omitted); *see also id.* (explaining that "CSAPR should result in greater emissions reductions of $SO_2$ and NOx than CAIR throughout the affected region[,] including in West Virginia and neighboring states").  And, in its final rule approving that SIP, EPA emphasized it "does not view West Virginia's reliance through December 2014 upon CAIR for BART or for any other part of the regional haze SIP as a reason to disapprove the West Virginia progress report" SIP.  80 Fed. Reg. at 32,025.  EPA took the same position in approving other states' progress report SIPs.  80 Fed. Reg. 45,631, 45,632-33 (July 31, 2015) (proposed approval of Iowa SIP); 81 Fed. Reg. 53,924 (Aug. 15, 2016) (final EPA rule approving Iowa SIP); 80 Fed. Reg. 58,410, 58,415-16 (Sept. 29, 2015) (proposed approval of Missouri SIP); 81 Fed. Reg. 50,351 (Aug. 1, 2016) (final EPA rule approving Missouri SIP).

The inconsistency of EPA's June 2012 disapproval of CAIR-for-BART SIPs (and its revocation of the CAIR-for-BART regulatory provision) with the other EPA actions described above cannot be explained by reference to CAIR and

---

emission controls, submission to EPA of a progress report may trigger an obligation by the state to impose additional emission controls.  *Id.* § 51.308(h)(4).

47

CSAPR's status as of June 2012. As of June 2012, by order of this Court, CAIR remained fully effective and enforceable, while CSAPR, in contrast, had been stayed indefinitely pending completion of judicial review. Accordingly, there was, if anything, *more* reason for EPA in June 2012 to conclude that states' reliance on CAIR was valid than there was when (as in the above-described EPA actions) it was clear that CAIR would be—or in some cases actually was—no longer in effect.

This fundamental Agency inconsistency thus further underscores that EPA's disapproval of CAIR-for-BART SIPs and its revocation of the CAIR-for-BART provision in its June 2012 rule were supported by no "reasoned basis," *State Farm*, 463 U.S. at 43, and constitute "arbitrary agency action," *Catawba County*, 571 F.3d at 51, that must be vacated.

## CONCLUSION

For the foregoing reasons, the Court should hold unlawful and vacate the rule's revocation of 40 C.F.R. § 51.308(e)(4) (as it existed before June 7, 2012) and EPA's disapproval of CAIR-for-BART SIPs. The Court should further order EPA to approve in full the CAIR-for-BART SIPs because no lawful basis exists for EPA's refusal to approve them, given this Court's ruling affirming the CAIR-for BART provision. *UARG v. EPA*, 471 F.3d at 1340-41; *see, e.g.*, *Ethyl Corp. v. Browner*, 67 F.3d 941, 945 (D.C. Cir. 1995) (issuing *nunc pro tunc* relief to

48

establish retroactive effectiveness of CAA registration that EPA unlawfully denied;

"a complete remedy for [the petitioner] requires that the registration be treated as

taking effect on approximately the date it would have occurred if EPA had acted

lawfully."); *see also* 5 U.S.C. § 706(1) ("The reviewing court shall . . . compel

agency action unlawfully withheld[.]").

Dated:  September 20, 2016

Respectfully submitted,

/s/ Norman W. Fichthorn
Norman W. Fichthorn
Aaron M. Flynn
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(202) 955-1500
nfichthorn@hunton.com

*Counsel for Petitioner Utility Air
   Regulatory Group*

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

/s/ Priscilla M. Hubenak
PRISCILLA M. HUBENAK
State Bar No. 10144690
Assistant Attorney General
Chief, Environmental Protection Division
priscilla.hubenak@texasattorneygeneral.gov

Office of the Attorney General
Environmental Protection Division
P.O. Box 12548 (MC-066)
Austin, Texas 78711-2548
Tel: (512) 463-2012
Fax: (512) 457-4644

Attorneys for State of Texas and
Texas Commission on
Environmental Quality

LOUISIANA DEPARTMENT OF
ENVIRONMENTAL QUALITY
Herman Robinson (#2077),
General Counsel

By /s/ Dwana King
Donald Trahan (#08493)
Dwana King (#20590)
Jackie Marve (#08241)
Spencer Bowman (#33515)
Legal Division
P.O. Box 4302
Baton Rouge, LA 70821-4302
Telephone: (225) 219-3985
Facsimile: (225) 219-4068

Attorney For Petitioner
Louisiana Department of Environmental Quality

/s/ P. Stephen Gidiere III
P. Stephen Gidiere III
Thomas L. Casey III
BALCH & BINGHAM LLP
1901 6th Ave. N., Ste. 1500
Birmingham, Alabama 35203
205-251-8100
sgidiere@balch.com

David W. Mitchell
BALCH & BINGHAM LLP
601 Pennsylvania Avenue, N.W.
Suite 825 South
Washington, D.C. 20004

C. Frederick Beckner III
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
202-736-8027
rbeckner@sidley.com

Stephanie Z. Moore
Vice President and General Counsel
Luminant Generation Company LLC
1601 Bryan Street, 22nd Floor
Dallas, Texas 75201

Daniel J. Kelly
Vice President and Associate General Counsel
Energy Future Holdings Corp.
1601 Bryan Street, 43rd Floor
Dallas, Texas 75201

*Counsel for Luminant Generation Company LLC,
Big Brown Power Company LLC, Oak Grove
Management Company LLC, Luminant Mining
Company LLC, Big Brown Lignite Company LLC,
Luminant Big Brown Mining Company LLC,
Luminant Energy Company LLC, Sandow Power
Company LLC, and Luminant Holding Company
LLC*

52

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Rule 32(a)(7)(B)(iii) and (C) of the Federal Rules of Appellate

Procedure, I hereby certify that the foregoing Joint Opening Brief of State and

Industry Petitioners contains 11,983 words, as counted by a word processing

system that includes headings, footnotes, quotations, and citations in the count, and

that this brief therefore is within the word limit of 12,000 words as established by

the Court in its Order of May 17, 2016.


                                        /s/ Norman W. Fichthorn
                                        Norman W. Fichthorn

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 20th day of September, 2016, I served one copy of the foregoing Joint Opening Brief of State and Industry Petitioners on all registered counsel in these consolidated cases through the Court's CM/ECF system.

<u>/s/ Norman W. Fichthorn</u>
Norman W. Fichthorn

# ATTACHMENT



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
WASHINGTON, D.C. 20460

November 19, 2012

OFFICE OF
AIR AND RADIATION

## MEMORANDUM

**SUBJECT:**    Next Steps for Pending Redesignation Requests and State Implementation Plan
Actions Affected by the Recent Court Decision Vacating the 2011 Cross-State Air
Pollution Rule

**FROM:**    Gina McCarthy
Assistant Administrator

**TO:**    Air Division Directors, Regions 1 – 10

The purpose of this memorandum is to communicate to Environmental Protection Agency (EPA)
Regional Offices about our intent with regard to a range of actions potentially affected by the
August 21, 2012, decision by the U.S. Court of Appeals to vacate the 2011 Cross-State Air
Pollution Rule (CSAPR). (EME Homer City Generation, L.P. v. EPA, No. 11-1302. (D.C. Cir.
2012)). As you know, we have filed a petition for rehearing of the Court's decision. Until a
decision is made, CSAPR is stayed and the 2005 Clean Air Interstate Rule (CAIR) remains in
effect. In the meantime, we have work to do. Statutory deadlines and other circumstances will
require us to take various actions during this period and it is important that we all understand
how best to take into account the Court's decision.

Certain state submittals awaiting approval by the EPA, such as pending redesignation requests
for the 1997 ozone National Ambient Air Quality Standards (NAAQS) and the 1997 and 2006
$PM_{2.5}$ NAAQS, and pending submittals of certain ozone, $PM_{2.5}$, and regional haze State
Implementation Plans (SIPs), may be partly dependent on the assurance of ongoing regional $NO_x$
and $SO_2$ emission reductions. In many cases, state and local air agencies made these submittals
with the expectation that CSAPR, which was designed to limit emissions of $NO_x$ and $SO_2$ from
power plants, would be fully implemented, thus ensuring such reductions would take place.

At the time of the Court's decision, the EPA was considering whether to approve a number of
attainment SIPs, redesignation requests, and associated maintenance SIPs that relied on CSAPR
in part to provide the necessary regional emission reductions for attaining the ozone and $PM_{2.5}$
NAAQS and maintaining the standards for the relevant future time period. With the Court's

1

August 2012 decision to vacate CSAPR, the ability of states to ensure that the necessary reductions would be achieved and maintained was brought into question. However, on page 60 of its August 2012 decision, the Court also ordered the EPA to "continue administering CAIR pending the promulgation of a valid replacement." While we have filed a petition for rehearing of the Court's decision on CSAPR, based on this direction from the Court, we believe that it will be appropriate to rely on CAIR emission reductions as permanent and enforceable for certain actions in certain circumstances. Specifically, we believe it will be appropriate to rely on those reductions either until that petition and any further proceedings in the CSAPR case are resolved or, if the decision vacating CSAPR is not changed, until a valid replacement rule is developed and implementation plans complying with any new rule are submitted by the states and acted upon by the EPA. Thus, action on those pending requests and SIPs may go forward.

With respect to regional haze, there is one pending action that has yet to be finalized for a state plan that relies on the use of CAIR to satisfy the requirements of the regional haze program for its electric generating units. Given the need to act on this plan, we believe that it will be appropriate to approve the submitted state plan that relies on CAIR emission reductions, for the reasons explained above. You may also receive questions about two other categories of regional haze actions taken prior to the CSAPR decision: (1) determinations that certain haze plans did not meet the requirements of the Clean Air Act because of the plans' reliance on CAIR, and (2) actions relying on the CSAPR trading programs to satisfy Best Available Retrofit Technology (BART) for power plants. For these actions, we believe it is the best use of our own, the states', and the courts' resources to await the decision on our petition for rehearing before deciding whether we need to revisit these final actions.

I have directed OAR staff to work closely with EPA Regional Offices to identify, prioritize, and act promptly on any pending redesignation requests and SIP submittals that involve CSAPR reductions. While noting that each EPA action on a pending state request will need to address the specifics of the state's submittal, it is my expectation that Regional Offices, working with national program staff, can move forward to draft and process these notices expeditiously.

I would also like to note that the recent CSAPR decision made certain holdings regarding the requirement for states to submit SIPs addressing the provisions of Clean Air Act section 110(a)(2)(D)(i)(I), the good neighbor provision that addresses upwind emissions linked to NAAQS attainment problems in downwind states. The decision states that a SIP cannot be deemed deficient for failing to meet the good neighbor obligation before the EPA quantifies that obligation. Although we have filed a petition for rehearing of the Court's decision, including this element of the decision, and although the mandate for that decision has not yet been issued, we intend to act in accordance with the decision during the pendency of the appeal. Therefore, at this time the EPA does not intend to make findings that states failed to submit SIPs to comply with section 110(a)(2)(D)(i)(I). To the extent states may inquire about their obligations to submit SIPs

2

addressing this provision, we believe it would be appropriate to convey that at this time we do not intend to make such findings with respect to section 110(a)(2)(D)(i)(I).

I trust that this information will be helpful to you in responding to questions about pending state actions, and I encourage you to distribute this memo to state and local air agencies in your Region. We will continue to assist Regional Offices on an individual basis to ensure that pending and new actions are being processed as expeditiously as possible in accordance with the recent CSAPR court decision.

# STATUTORY AND REGULATORY ADDENDUM

# STATUTORY AND REGULATORY ADDENDUM

## TABLE OF CONTENTS

Page

Clean Air Act ("CAA") § 110, 42 U.S.C. § 7410 ......................................ADD-01

CAA § 169A, 42 U.S.C. § 7491 ...................................................ADD-10

CAA § 169B, 42 U.S.C. § 7492...................................................ADD-11

CAA § 307, 42 U.S.C. § 7607 ....................................................ADD-14

40 C.F.R. § 51.308 (July 1, 2011 edition) (*i.e.*, prior to amendment by
EPA's June 7, 2012 rule)...................................................ADD-20

40 C.F.R. § 51.308 (July 1, 2015 edition) (*i.e.*, as amended by EPA's
June 7, 2012 rule) ...............................................................ADD-30

concentrations of pollutants listed pursuant to section 108 [42 U.S.C. 7408] and other pollutants which may be listed;

''(2) estimate welfare and environmental costs incurred as a result of such effects;

''(3) examine the role of secondary standards and the State implementation planning process in preventing such effects;

''(4) determine ambient concentrations of each such pollutant which would be adequate to protect welfare and the environment from such effects;

''(5) estimate the costs and other impacts of meeting secondary standards; and

''(6) consider other means consistent with the goals and objectives of the Clean Air Act [42 U.S.C. 7401 et seq.] which may be more effective than secondary standards in preventing or mitigating such effects.

''(b) SUBMISSION TO CONGRESS; COMMENTS; AUTHORIZATION.—(1) The report shall be transmitted to the Congress not later than 3 years after the date of enactment of the Clean Air Act Amendments of 1990 [Nov. 15, 1990].

''(2) At least 90 days before issuing a report the Administrator shall provide an opportunity for public comment on the proposed report. The Administrator shall include in the final report a summary of the comments received on the proposed report.

''(3) There are authorized to be appropriated such sums as are necessary to carry out this section.''

## §7410. State implementation plans for national primary and secondary ambient air quality standards

### (a) Adoption of plan by State; submission to Administrator; content of plan; revision; new sources; indirect source review program; supplemental or intermittent control systems

(1) Each State shall, after reasonable notice and public hearings, adopt and submit to the Administrator, within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national primary ambient air quality standard (or any revision thereof) under section 7409 of this title for any air pollutant, a plan which provides for implementation, maintenance, and enforcement of such primary standard in each air quality control region (or portion thereof) within such State. In addition, such State shall adopt and submit to the Administrator (either as a part of a plan submitted under the preceding sentence or separately) within 3 years (or such shorter period as the Administrator may prescribe) after the promulgation of a national ambient air quality secondary standard (or revision thereof), a plan which provides for implementation, maintenance, and enforcement of such secondary standard in each air quality control region (or portion thereof) within such State. Unless a separate public hearing is provided, each State shall consider its plan implementing such secondary standard at the hearing required by the first sentence of this paragraph.

(2) Each implementation plan submitted by a State under this chapter shall be adopted by the State after reasonable notice and public hearing. Each such plan shall—

(A) include enforceable emission limitations and other control measures, means, or techniques (including economic incentives such as fees, marketable permits, and auctions of emissions rights), as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements of this chapter;

(B) provide for establishment and operation of appropriate devices, methods, systems, and procedures necessary to—

(i) monitor, compile, and analyze data on ambient air quality, and

(ii) upon request, make such data available to the Administrator;

(C) include a program to provide for the enforcement of the measures described in subparagraph (A), and regulation of the modification and construction of any stationary source within the areas covered by the plan as necessary to assure that national ambient air quality standards are achieved, including a permit program as required in parts C and D of this subchapter;

(D) contain adequate provisions—

(i) prohibiting, consistent with the provisions of this subchapter, any source or other type of emissions activity within the State from emitting any air pollutant in amounts which will—

(I) contribute significantly to nonattainment in, or interfere with maintenance by, any other State with respect to any such national primary or secondary ambient air quality standard, or

(II) interfere with measures required to be included in the applicable implementation plan for any other State under part C of this subchapter to prevent significant deterioration of air quality or to protect visibility,

(ii) insuring compliance with the applicable requirements of sections 7426 and 7415 of this title (relating to interstate and international pollution abatement);

(E) provide (i) necessary assurances that the State (or, except where the Administrator deems inappropriate, the general purpose local government or governments, or a regional agency designated by the State or general purpose local governments for such purpose) will have adequate personnel, funding, and authority under State (and, as appropriate, local) law to carry out such implementation plan (and is not prohibited by any provision of Federal or State law from carrying out such implementation plan or portion thereof), (ii) requirements that the State comply with the requirements respecting State boards under section 7428 of this title, and (iii) necessary assurances that, where the State has relied on a local or regional government, agency, or instrumentality for the implementation of any plan provision, the State has responsibility for ensuring adequate implementation of such plan provision;

(F) require, as may be prescribed by the Administrator—

(i) the installation, maintenance, and replacement of equipment, and the implementation of other necessary steps, by owners or operators of stationary sources to monitor emissions from such sources,

(ii) periodic reports on the nature and amounts of emissions and emissions-related data from such sources, and

(iii) correlation of such reports by the State agency with any emission limitations

or standards established pursuant to this chapter, which reports shall be available at reasonable times for public inspection;

(G) provide for authority comparable to that in section 7603 of this title and adequate contingency plans to implement such authority;

(H) provide for revision of such plan—

(i) from time to time as may be necessary to take account of revisions of such national primary or secondary ambient air quality standard or the availability of improved or more expeditious methods of attaining such standard, and

(ii) except as provided in paragraph (3)(C), whenever the Administrator finds on the basis of information available to the Administrator that the plan is substantially inadequate to attain the national ambient air quality standard which it implements or to otherwise comply with any additional requirements established under this chapter;

(I) in the case of a plan or plan revision for an area designated as a nonattainment area, meet the applicable requirements of part D of this subchapter (relating to nonattainment areas);

(J) meet the applicable requirements of section 7421 of this title (relating to consultation), section 7427 of this title (relating to public notification), and part C of this subchapter (relating to prevention of significant deterioration of air quality and visibility protection);

(K) provide for—

(i) the performance of such air quality modeling as the Administrator may prescribe for the purpose of predicting the effect on ambient air quality of any emissions of any air pollutant for which the Administrator has established a national ambient air quality standard, and

(ii) the submission, upon request, of data related to such air quality modeling to the Administrator;

(L) require the owner or operator of each major stationary source to pay to the permitting authority, as a condition of any permit required under this chapter, a fee sufficient to cover—

(i) the reasonable costs of reviewing and acting upon any application for such a permit, and

(ii) if the owner or operator receives a permit for such source, the reasonable costs of implementing and enforcing the terms and conditions of any such permit (not including any court costs or other costs associated with any enforcement action),

until such fee requirement is superseded with respect to such sources by the Administrator's approval of a fee program under subchapter V of this chapter; and

(M) provide for consultation and participation by local political subdivisions affected by the plan.

(3)(A) Repealed. Pub. L. 101–549, title I, § 101(d)(1), Nov. 15, 1990, 104 Stat. 2409.

(B) As soon as practicable, the Administrator shall, consistent with the purposes of this chapter and the Energy Supply and Environmental

Coordination Act of 1974 [15 U.S.C. 791 et seq.], review each State's applicable implementation plans and report to the State on whether such plans can be revised in relation to fuel burning stationary sources (or persons supplying fuel to such sources) without interfering with the attainment and maintenance of any national ambient air quality standard within the period permitted in this section. If the Administrator determines that any such plan can be revised, he shall notify the State that a plan revision may be submitted by the State. Any plan revision which is submitted by the State shall, after public notice and opportunity for public hearing, be approved by the Administrator if the revision relates only to fuel burning stationary sources (or persons supplying fuel to such sources), and the plan as revised complies with paragraph (2) of this subsection. The Administrator shall approve or disapprove any revision no later than three months after its submission.

(C) Neither the State, in the case of a plan (or portion thereof) approved under this subsection, nor the Administrator, in the case of a plan (or portion thereof) promulgated under subsection (c) of this section, shall be required to revise an applicable implementation plan because one or more exemptions under section 7418 of this title (relating to Federal facilities), enforcement orders under section 7413(d)[1] of this title, suspensions under subsection (f) or (g) of this section (relating to temporary energy or economic authority), orders under section 7419 of this title (relating to primary nonferrous smelters), or extensions of compliance in decrees entered under section 7413(e)[1] of this title (relating to iron-and steel-producing operations) have been granted, if such plan would have met the requirements of this section if no such exemptions, orders, or extensions had been granted.

(4) Repealed. Pub. L. 101–549, title I, § 101(d)(2), Nov. 15, 1990, 104 Stat. 2409.

(5)(A)(i) Any State may include in a State implementation plan, but the Administrator may not require as a condition of approval of such plan under this section, any indirect source review program. The Administrator may approve and enforce, as part of an applicable implementation plan, an indirect source review program which the State chooses to adopt and submit as part of its plan.

(ii) Except as provided in subparagraph (B), no plan promulgated by the Administrator shall include any indirect source review program for any air quality control region, or portion thereof.

(iii) Any State may revise an applicable implementation plan approved under this subsection to suspend or revoke any such program included in such plan, provided that such plan meets the requirements of this section.

(B) The Administrator shall have the authority to promulgate, implement and enforce regulations under subsection (c) of this section respecting indirect source review programs which apply only to federally assisted highways, airports, and other major federally assisted indirect sources and federally owned or operated indirect sources.

---

[1] See References in Text note below.

(C) For purposes of this paragraph, the term "indirect source" means a facility, building, structure, installation, real property, road, or highway which attracts, or may attract, mobile sources of pollution. Such term includes parking lots, parking garages, and other facilities subject to any measure for management of parking supply (within the meaning of subsection (c)(2)(D)(ii) of this section), including regulation of existing off-street parking but such term does not include new or existing on-street parking. Direct emissions sources or facilities at, within, or associated with, any indirect source shall not be deemed indirect sources for the purpose of this paragraph.

(D) For purposes of this paragraph the term "indirect source review program" means the facility-by-facility review of indirect sources of air pollution, including such measures as are necessary to assure, or assist in assuring, that a new or modified indirect source will not attract mobile sources of air pollution, the emissions from which would cause or contribute to air pollution concentrations—

(i) exceeding any national primary ambient air quality standard for a mobile source-related air pollutant after the primary standard attainment date, or

(ii) preventing maintenance of any such standard after such date.

(E) For purposes of this paragraph and paragraph (2)(B), the term "transportation control measure" does not include any measure which is an "indirect source review program".

(6) No State plan shall be treated as meeting the requirements of this section unless such plan provides that in the case of any source which uses a supplemental, or intermittent control system for purposes of meeting the requirements of an order under section 7413(d)[1] of this title or section 7419 of this title (relating to primary nonferrous smelter orders), the owner or operator of such source may not temporarily reduce the pay of any employee by reason of the use of such supplemental or intermittent or other dispersion dependent control system.

**(b) Extension of period for submission of plans**

The Administrator may, wherever he determines necessary, extend the period for submission of any plan or portion thereof which implements a national secondary ambient air quality standard for a period not to exceed 18 months from the date otherwise required for submission of such plan.

**(c) Preparation and publication by Administrator of proposed regulations setting forth implementation plan; transportation regulations study and report; parking surcharge; suspension authority; plan implementation**

(1) The Administrator shall promulgate a Federal implementation plan at any time within 2 years after the Administrator—

(A) finds that a State has failed to make a required submission or finds that the plan or plan revision submitted by the State does not satisfy the minimum criteria established under subsection (k)(1)(A) of this section, or

(B) disapproves a State implementation plan submission in whole or in part,

unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan.

(2)(A) Repealed. Pub. L. 101–549, title I, §101(d)(3)(A), Nov. 15, 1990, 104 Stat. 2409.

(B) No parking surcharge regulation may be required by the Administrator under paragraph (1) of this subsection as a part of an applicable implementation plan. All parking surcharge regulations previously required by the Administrator shall be void upon June 22, 1974. This subparagraph shall not prevent the Administrator from approving parking surcharges if they are adopted and submitted by a State as part of an applicable implementation plan. The Administrator may not condition approval of any implementation plan submitted by a State on such plan's including a parking surcharge regulation.

(C) Repealed. Pub. L. 101–549, title I, §101(d)(3)(B), Nov. 15, 1990, 104 Stat. 2409.

(D) For purposes of this paragraph—

(i) The term "parking surcharge regulation" means a regulation imposing or requiring the imposition of any tax, surcharge, fee, or other charge on parking spaces, or any other area used for the temporary storage of motor vehicles.

(ii) The term "management of parking supply" shall include any requirement providing that any new facility containing a given number of parking spaces shall receive a permit or other prior approval, issuance of which is to be conditioned on air quality considerations.

(iii) The term "preferential bus/carpool lane" shall include any requirement for the setting aside of one or more lanes of a street or highway on a permanent or temporary basis for the exclusive use of buses or carpools, or both.

(E) No standard, plan, or requirement, relating to management of parking supply or preferential bus/carpool lanes shall be promulgated after June 22, 1974, by the Administrator pursuant to this section, unless such promulgation has been subjected to at least one public hearing which has been held in the area affected and for which reasonable notice has been given in such area. If substantial changes are made following public hearings, one or more additional hearings shall be held in such area after such notice.

(3) Upon application of the chief executive officer of any general purpose unit of local government, if the Administrator determines that such unit has adequate authority under State or local law, the Administrator may delegate to such unit the authority to implement and enforce within the jurisdiction of such unit any part of a plan promulgated under this subsection. Nothing in this paragraph shall prevent the Administrator from implementing or enforcing any applicable provision of a plan promulgated under this subsection.

(4) Repealed. Pub. L. 101–549, title I, §101(d)(3)(C), Nov. 15, 1990, 104 Stat. 2409.

(5)(A) Any measure in an applicable implementation plan which requires a toll or other charge for the use of a bridge located entirely within one city shall be eliminated from such plan by the Administrator upon application by the Governor of the State, which application shall in-

clude a certification by the Governor that he will revise such plan in accordance with subparagraph (B).

(B) In the case of any applicable implementation plan with respect to which a measure has been eliminated under subparagraph (A), such plan shall, not later than one year after August 7, 1977, be revised to include comprehensive measures to:

(i) establish, expand, or improve public transportation measures to meet basic transportation needs, as expeditiously as is practicable; and

(ii) implement transportation control measures necessary to attain and maintain national ambient air quality standards,

and such revised plan shall, for the purpose of implementing such comprehensive public transportation measures, include requirements to use (insofar as is necessary) Federal grants, State or local funds, or any combination of such grants and funds as may be consistent with the terms of the legislation providing such grants and funds. Such measures shall, as a substitute for the tolls or charges eliminated under subparagraph (A), provide for emissions reductions equivalent to the reductions which may reasonably be expected to be achieved through the use of the tolls or charges eliminated.

(C) Any revision of an implementation plan for purposes of meeting the requirements of subparagraph (B) shall be submitted in coordination with any plan revision required under part D of this subchapter.

**(d), (e) Repealed. Pub. L. 101–549, title I, § 101(d)(4), (5), Nov. 15, 1990, 104 Stat. 2409**

**(f) National or regional energy emergencies; determination by President**

(1) Upon application by the owner or operator of a fuel burning stationary source, and after notice and opportunity for public hearing, the Governor of the State in which such source is located may petition the President to determine that a national or regional energy emergency exists of such severity that—

(A) a temporary suspension of any part of the applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) may be necessary, and

(B) other means of responding to the energy emergency may be inadequate.

Such determination shall not be delegable by the President to any other person. If the President determines that a national or regional energy emergency of such severity exists, a temporary emergency suspension of any part of an applicable implementation plan or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets) adopted by the State may be issued by the Governor of any State covered by the President's determination under the condition specified in paragraph (2) and may take effect immediately.

(2) A temporary emergency suspension under this subsection shall be issued to a source only if the Governor of such State finds that—

(A) there exists in the vicinity of such source a temporary energy emergency involving high levels of unemployment or loss of necessary energy supplies for residential dwellings; and

(B) such unemployment or loss can be totally or partially alleviated by such emergency suspension.

Not more than one such suspension may be issued for any source on the basis of the same set of circumstances or on the basis of the same emergency.

(3) A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator, if any. The Administrator may disapprove such suspension if he determines that it does not meet the requirements of paragraph (2).

(4) This subsection shall not apply in the case of a plan provision or requirement promulgated by the Administrator under subsection (c) of this section, but in any such case the President may grant a temporary emergency suspension for a four month period of any such provision or requirement if he makes the determinations and findings specified in paragraphs (1) and (2).

(5) The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c–10[2] of this title, as in effect before August 7, 1977, or section 7413(d)[2] of this title, upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

**(g) Governor's authority to issue temporary emergency suspensions**

(1) In the case of any State which has adopted and submitted to the Administrator a proposed plan revision which the State determines—

(A) meets the requirements of this section, and

(B) is necessary (i) to prevent the closing for one year or more of any source of air pollution, and (ii) to prevent substantial increases in unemployment which would result from such closing, and

which the Administrator has not approved or disapproved under this section within 12 months of submission of the proposed plan revision, the Governor may issue a temporary emergency suspension of the part of the applicable implementation plan for such State which is proposed to be revised with respect to such source. The determination under subparagraph (B) may not be made with respect to a source which would close without regard to whether or not the proposed plan revision is approved.

(2) A temporary emergency suspension issued by a Governor under this subsection shall remain in effect for a maximum of four months or such lesser period as may be specified in a disapproval order of the Administrator. The Administrator may disapprove such suspension if

---

[2] See References in Text note below.

he determines that it does not meet the requirements of this subsection.

(3) The Governor may include in any temporary emergency suspension issued under this subsection a provision delaying for a period identical to the period of such suspension any compliance schedule (or increment of progress) to which such source is subject under section 1857c–10 [2] of this title as in effect before August 7, 1977, or under section 7413(d) [2] of this title upon a finding that such source is unable to comply with such schedule (or increment) solely because of the conditions on the basis of which a suspension was issued under this subsection.

**(h) Publication of comprehensive document for each State setting forth requirements of applicable implementation plan**

(1) Not later than 5 years after November 15, 1990, and every 3 years thereafter, the Administrator shall assemble and publish a comprehensive document for each State setting forth all requirements of the applicable implementation plan for such State and shall publish notice in the Federal Register of the availability of such documents.

(2) The Administrator may promulgate such regulations as may be reasonably necessary to carry out the purpose of this subsection.

**(i) Modification of requirements prohibited**

Except for a primary nonferrous smelter order under section 7419 of this title, a suspension under subsection (f) or (g) of this section (relating to emergency suspensions), an exemption under section 7418 of this title (relating to certain Federal facilities), an order under section 7413(d) [2] of this title (relating to compliance orders), a plan promulgation under subsection (c) of this section, or a plan revision under subsection (a)(3) of this section; no order, suspension, plan revision, or other action modifying any requirement of an applicable implementation plan may be taken with respect to any stationary source by the State or by the Administrator.

**(j) Technological systems of continuous emission reduction on new or modified stationary sources; compliance with performance standards**

As a condition for issuance of any permit required under this subchapter, the owner or operator of each new or modified stationary source which is required to obtain such a permit must show to the satisfaction of the permitting authority that the technological system of continuous emission reduction which is to be used at such source will enable it to comply with the standards of performance which are to apply to such source and that the construction or modification and operation of such source will be in compliance with all other requirements of this chapter.

**(k) Environmental Protection Agency action on plan submissions**

**(1) Completeness of plan submissions**

**(A) Completeness criteria**

Within 9 months after November 15, 1990, the Administrator shall promulgate minimum criteria that any plan submission must

meet before the Administrator is required to act on such submission under this subsection. The criteria shall be limited to the information necessary to enable the Administrator to determine whether the plan submission complies with the provisions of this chapter.

**(B) Completeness finding**

Within 60 days of the Administrator's receipt of a plan or plan revision, but no later than 6 months after the date, if any, by which a State is required to submit the plan or revision, the Administrator shall determine whether the minimum criteria established pursuant to subparagraph (A) have been met. Any plan or plan revision that a State submits to the Administrator, and that has not been determined by the Administrator (by the date 6 months after receipt of the submission) to have failed to meet the minimum criteria established pursuant to subparagraph (A), shall on that date be deemed by operation of law to meet such minimum criteria.

**(C) Effect of finding of incompleteness**

Where the Administrator determines that a plan submission (or part thereof) does not meet the minimum criteria established pursuant to subparagraph (A), the State shall be treated as not having made the submission (or, in the Administrator's discretion, part thereof).

**(2) Deadline for action**

Within 12 months of a determination by the Administrator (or a determination deemed by operation of law) under paragraph (1) that a State has submitted a plan or plan revision (or, in the Administrator's discretion, part thereof) that meets the minimum criteria established pursuant to paragraph (1), if applicable (or, if those criteria are not applicable, within 12 months of submission of the plan or revision), the Administrator shall act on the submission in accordance with paragraph (3).

**(3) Full and partial approval and disapproval**

In the case of any submittal on which the Administrator is required to act under paragraph (2), the Administrator shall approve such submittal as a whole if it meets all of the applicable requirements of this chapter. If a portion of the plan revision meets all the applicable requirements of this chapter, the Administrator may approve the plan revision in part and disapprove the plan revision in part. The plan revision shall not be treated as meeting the requirements of this chapter until the Administrator approves the entire plan revision as complying with the applicable requirements of this chapter.

**(4) Conditional approval**

The Administrator may approve a plan revision based on a commitment of the State to adopt specific enforceable measures by a date certain, but not later than 1 year after the date of approval of the plan revision. Any such conditional approval shall be treated as a disapproval if the State fails to comply with such commitment.

**(5) Calls for plan revisions**

Whenever the Administrator finds that the applicable implementation plan for any area is substantially inadequate to attain or maintain the relevant national ambient air quality standard, to mitigate adequately the interstate pollutant transport described in section 7506a of this title or section 7511c of this title, or to otherwise comply with any requirement of this chapter, the Administrator shall require the State to revise the plan as necessary to correct such inadequacies. The Administrator shall notify the State of the inadequacies, and may establish reasonable deadlines (not to exceed 18 months after the date of such notice) for the submission of such plan revisions. Such findings and notice shall be public. Any finding under this paragraph shall, to the extent the Administrator deems appropriate, subject the State to the requirements of this chapter to which the State was subject when it developed and submitted the plan for which such finding was made, except that the Administrator may adjust any dates applicable under such requirements as appropriate (except that the Administrator may not adjust any attainment date prescribed under part D of this subchapter, unless such date has elapsed).

**(6) Corrections**

Whenever the Administrator determines that the Administrator's action approving, disapproving, or promulgating any plan or plan revision (or part thereof), area designation, redesignation, classification, or reclassification was in error, the Administrator may in the same manner as the approval, disapproval, or promulgation revise such action as appropriate without requiring any further submission from the State. Such determination and the basis thereof shall be provided to the State and public.

**(l) Plan revisions**

Each revision to an implementation plan submitted by a State under this chapter shall be adopted by such State after reasonable notice and public hearing. The Administrator shall not approve a revision of a plan if the revision would interfere with any applicable requirement concerning attainment and reasonable further progress (as defined in section 7501 of this title), or any other applicable requirement of this chapter.

**(m) Sanctions**

The Administrator may apply any of the sanctions listed in section 7509(b) of this title at any time (or at any time after) the Administrator makes a finding, disapproval, or determination under paragraphs (1) through (4), respectively, of section 7509(a) of this title in relation to any plan or plan item (as that term is defined by the Administrator) required under this chapter, with respect to any portion of the State the Administrator determines reasonable and appropriate, for the purpose of ensuring that the requirements of this chapter relating to such plan or plan item are met. The Administrator shall, by rule, establish criteria for exercising his authority under the previous sentence with respect to any deficiency referred to in section 7509(a) of this title to ensure that, during the 24-month period following the finding, disapproval, or determination referred to in section 7509(a) of this title, such sanctions are not applied on a statewide basis where one or more political subdivisions covered by the applicable implementation plan are principally responsible for such deficiency.

**(n) Savings clauses**

**(1) Existing plan provisions**

Any provision of any applicable implementation plan that was approved or promulgated by the Administrator pursuant to this section as in effect before November 15, 1990, shall remain in effect as part of such applicable implementation plan, except to the extent that a revision to such provision is approved or promulgated by the Administrator pursuant to this chapter.

**(2) Attainment dates**

For any area not designated nonattainment, any plan or plan revision submitted or required to be submitted by a State—

(A) in response to the promulgation or revision of a national primary ambient air quality standard in effect on November 15, 1990, or

(B) in response to a finding of substantial inadequacy under subsection (a)(2) of this section (as in effect immediately before November 15, 1990),

shall provide for attainment of the national primary ambient air quality standards within 3 years of November 15, 1990, or within 5 years of issuance of such finding of substantial inadequacy, whichever is later.

**(3) Retention of construction moratorium in certain areas**

In the case of an area to which, immediately before November 15, 1990, the prohibition on construction or modification of major stationary sources prescribed in subsection (a)(2)(I) of this section (as in effect immediately before November 15, 1990) applied by virtue of a finding of the Administrator that the State containing such area had not submitted an implementation plan meeting the requirements of section 7502(b)(6) of this title (relating to establishment of a permit program) (as in effect immediately before November 15, 1990) or 7502(a)(1) of this title (to the extent such requirements relate to provision for attainment of the primary national ambient air quality standard for sulfur oxides by December 31, 1982) as in effect immediately before November 15, 1990, no major stationary source of the relevant air pollutant or pollutants shall be constructed or modified in such area until the Administrator finds that the plan for such area meets the applicable requirements of section 7502(c)(5) of this title (relating to permit programs) or subpart 5 of part D of this subchapter (relating to attainment of the primary national ambient air quality standard for sulfur dioxide), respectively.

**(o) Indian tribes**

If an Indian tribe submits an implementation plan to the Administrator pursuant to section

7601(d) of this title, the plan shall be reviewed in accordance with the provisions for review set forth in this section for State plans, except as otherwise provided by regulation promulgated pursuant to section 7601(d)(2) of this title. When such plan becomes effective in accordance with the regulations promulgated under section 7601(d) of this title, the plan shall become applicable to all areas (except as expressly provided otherwise in the plan) located within the exterior boundaries of the reservation, notwithstanding the issuance of any patent and including rights-of-way running through the reservation.

**(p) Reports**

Any State shall submit, according to such schedule as the Administrator may prescribe, such reports as the Administrator may require relating to emission reductions, vehicle miles traveled, congestion levels, and any other information the Administrator may deem necessary to assess the development[3] effectiveness, need for revision, or implementation of any plan or plan revision required under this chapter.

(July 14, 1955, ch. 360, title I, §110, as added Pub. L. 91–604, §4(a), Dec. 31, 1970, 84 Stat. 1680; amended Pub. L. 93–319, §4, June 22, 1974, 88 Stat. 256; Pub. L. 95–95, title I, §§107, 108, Aug. 7, 1977, 91 Stat. 691, 693; Pub. L. 95–190, §14(a)(1)–(6), Nov. 16, 1977, 91 Stat. 1399; Pub. L. 97–23, §3, July 17, 1981, 95 Stat. 142; Pub. L. 101–549, title I, §§101(b)–(d), 102(h), 107(c), 108(d), title IV, §412, Nov. 15, 1990, 104 Stat. 2404–2408, 2422, 2464, 2466, 2634.)

REFERENCES IN TEXT

The Energy Supply and Environmental Coordination Act of 1974, referred to in subsec. (a)(3)(B), is Pub. L. 93–319, June 22, 1974, 88 Stat. 246, as amended, which is classified principally to chapter 16C (§791 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 791 of Title 15 and Tables.

Section 7413 of this title, referred to in subsecs. (a)(3)(C), (6), (f)(5), (g)(3), and (i), was amended generally by Pub. L. 101–549, title VII, §701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, subsecs. (d) and (e) of section 7413 no longer relates to final compliance orders and steel industry compliance extension, respectively.

Section 1857c–10 of this title, as in effect before August 7, 1977, referred to in subsecs. (f)(5) and (g)(3), was in the original "section 119, as in effect before the date of the enactment of this paragraph", meaning section 119 of act July 14, 1955, ch. 360, title I, as added June 22, 1974, Pub. L. 93–319, §3, 88 Stat. 248, (which was classified to section 1857c–10 of this title) as in effect prior to the enactment of subsecs. (f)(5) and (g)(3) of this section by Pub. L. 95–95, §107, Aug. 7, 1977, 91 Stat. 691, effective Aug. 7, 1977. Section 112(b)(1) of Pub. L. 95–95 repealed section 119 of act July 14, 1955, ch. 360, title I, as added by Pub. L. 93–319, and provided that all references to such section 119 in any subsequent enactment which supersedes Pub. L. 93–319 shall be construed to refer to section 113(d) of the Clean Air Act and to paragraph (5) thereof in particular which is classified to section 7413(d)(5) of this title. Section 7413 of this title was subsequently amended generally by Pub. L. 101–549, title VII, §701, Nov. 15, 1990, 104 Stat. 2672, see note above. Section 117(b) of Pub. L. 95–95 added a new section 119 of act July 14, 1955, which is classified to section 7419 of this title.

---

[3] So in original. Probably should be followed by a comma.

CODIFICATION

Section was formerly classified to section 1857c–5 of this title.

PRIOR PROVISIONS

A prior section 110 of act July 14, 1955, was renumbered section 117 by Pub. L. 91–604 and is classified to section 7417 of this title.

AMENDMENTS

1990—Subsec. (a)(1). Pub. L. 101–549, §101(d)(8), substituted "3 years (or such shorter period as the Administrator may prescribe)" for "nine months" in two places.

Subsec. (a)(2). Pub. L. 101–549, §101(b), amended par. (2) generally, substituting present provisions for provisions setting the time within which the Administrator was to approve or disapprove a plan or portion thereof and listing the conditions under which the plan or portion thereof was to be approved after reasonable notice and hearing.

Subsec. (a)(3)(A). Pub. L. 101–549, §101(d)(1), struck out subpar. (A) which directed Administrator to approve any revision of an implementation plan if it met certain requirements and had been adopted by the State after reasonable notice and public hearings.

Subsec. (a)(3)(D). Pub. L. 101–549, §101(d)(1), struck out subpar. (D) which directed that certain implementation plans be revised to include comprehensive measures and requirements.

Subsec. (a)(4). Pub. L. 101–549, §101(d)(2), struck out par. (4) which set forth requirements for review procedure.

Subsec. (c)(1). Pub. L. 101–549, §102(h), amended par. (1) generally, substituting present provisions for provisions relating to preparation and publication of regulations setting forth an implementation plan, after opportunity for a hearing, upon failure of a State to make required submission or revision.

Subsec. (c)(2)(A). Pub. L. 101–549, §101(d)(3)(A), struck out subpar. (A) which required a study and report on necessity of parking surcharge, management of parking supply, and preferential bus/carpool lane regulations to achieve and maintain national primary ambient air quality standards.

Subsec. (c)(2)(C). Pub. L. 101–549, §101(d)(3)(B), struck out subpar. (C) which authorized suspension of certain regulations and requirements relating to management of parking supply.

Subsec. (c)(4). Pub. L. 101–549, §101(d)(3)(C), struck out par. (4) which permitted Governors to temporarily suspend measures in implementation plans relating to retrofits, gas rationing, and reduction of on-street parking.

Subsec. (c)(5)(B). Pub. L. 101–549, §101(d)(3)(D), struck out "(including the written evidence required by part D)," after "include comprehensive measures".

Subsec. (d). Pub. L. 101–549, §101(d)(4), struck out subsec. (d) which defined an applicable implementation plan for purposes of this chapter.

Subsec. (e). Pub. L. 101–549, §101(d)(5), struck out subsec. (e) which permitted an extension of time for attainment of a national primary ambient air quality standard.

Subsec. (f)(1). Pub. L. 101–549, §412, inserted "or of any requirement under section 7651j of this title (concerning excess emissions penalties or offsets)" in subpar. (A) and in last sentence.

Subsec. (g)(1). Pub. L. 101–549, §101(d)(6), substituted "12 months of submission of the proposed plan revision" for "the required four month period" in closing provisions.

Subsec. (h)(1). Pub. L. 101–549, §101(d)(7), substituted "5 years after November 15, 1990, and every three years thereafter" for "one year after August 7, 1977, and annually thereafter" and struck out at end "Each such document shall be revised as frequently as practicable but not less often than annually."

Subsecs. (k) to (n). Pub. L. 101–549, §101(c), added subsecs. (k) to (n).

Subsec. (o). Pub. L. 101–549, §107(c), added subsec. (o).

Subsec. (p). Pub. L. 101–549, §108(d), added subsec. (p).

1981—Subsec. (a)(3)(C). Pub. L. 97–23 inserted reference to extensions of compliance in decrees entered under section 7413(e) of this title (relating to iron- and steel-producing operations).

1977—Subsec. (a)(2)(A). Pub. L. 95–95, §108(a)(1), substituted "(A) except as may be provided in subparagraph (I)(i) in the case of a plan" for "(A)(i) in the case of a plan".

Subsec. (a)(2)(B). Pub. L. 95–95, §108(a)(2), substituted "transportation controls, air quality maintenance plans, and preconstruction review of direct sources of air pollution as provided in subparagraph (D)" for "land use and transportation controls".

Subsec. (a)(2)(D). Pub. L. 95–95, §108(a)(3), substituted "it includes a program to provide for the enforcement of emission limitations and regulation of the modification, construction, and operation of any stationary source, including a permit program as required in parts C and D and a permit or equivalent program for any major emitting facility, within such region as necessary to assure (i) that national ambient air quality standards are achieved and maintained, and (ii) a procedure" for "it includes a procedure".

Subsec. (a)(2)(E). Pub. L. 95–95, §108(a)(4), substituted "it contains adequate provisions (i) prohibiting any stationary source within the State from emitting any air pollutant in amounts which will (I) prevent attainment or maintenance by any other State of any such national primary or secondary ambient air quality standard, or (II) interfere with measures required to be included in the applicable implementation plan for any other State under part C to prevent significant deterioration of air quality or to protect visibility, and (ii) insuring compliance with the requirements of section 7426 of this title, relating to interstate pollution abatement" for "it contains adequate provisions for intergovernmental cooperation, including measures necessary to insure that emissions of air pollutants from sources located in any air quality control region will not interfere with the attainment or maintenance of such primary or secondary standard in any portion of such region outside of such State or in any other air quality control region".

Subsec. (a)(2)(F). Pub. L. 95–95, §108(a)(5), added cl. (vi).

Subsec. (a)(2)(H). Pub. L. 95–190, §14(a)(1), substituted "1977;" for "1977".

Pub. L. 95–95, §108(a)(6), inserted "except as provided in paragraph (3)(C)," after "or (ii)" and "or to otherwise comply with any additional requirements established under the Clean Air Act Amendments of 1977" after "to achieve the national ambient air quality primary or secondary standard which it implements".

Subsec. (a)(2)(I). Pub. L. 95–95, §108(b), added subpar. (I).

Subsec. (a)(2)(J). Pub. L. 95–190, §14(a)(2), substituted "; and" for ", and".

Pub. L. 95–95, §108(b), added subpar. (J).

Subsec. (a)(2)(K). Pub. L. 95–95, §108(b) added subpar. (K).

Subsec. (a)(3)(C). Pub. L. 95–95, §108(c), added subpar. (C).

Subsec. (a)(3)(D). Pub. L. 95–190, §14(a)(4), added subpar. (D).

Subsec. (a)(5). Pub. L. 95–95, §108(e), added par. (5).

Subsec. (a)(5)(D). Pub. L. 95–190, §14(a)(3), struck out "preconstruction or premodification" before "review".

Subsec. (a)(6). Pub. L. 95–95, §108(e), added par. (6).

Subsec. (c)(1). Pub. L. 95–95, §108(d)(1), (2), substituted "plan which meets the requirements of this section" for "plan for any national ambient air quality primary or secondary standard within the time prescribed" in subpar. (A) and, in provisions following subpar. (C), directed that any portion of a plan relating to any measure described in first sentence of 7421 of this title (relating to consultation) or the consultation process required under such section 7421 of this title not be required to be promulgated before the date eight months after such date required for submission.

Subsec. (c)(3) to (5). Pub. L. 95–95, §108(d)(3), added pars. (3) to (5).

Subsec. (d). Pub. L. 95–95, §108(f), substituted "and which implements the requirements of this section" for "and which implements a national primary or secondary ambient air quality standard in a State".

Subsec. (f). Pub. L. 95–95, §107(a), substituted provisions relating to the handling of national or regional energy emergencies for provisions relating to the postponement of compliance by stationary sources or classes of moving sources with any requirement of applicable implementation plans.

Subsec. (g). Pub. L. 95–95, §108(g), added subsec. (g) relating to publication of comprehensive document.

Pub. L. 95–95, §107(b), added subsec. (g) relating to Governor's authority to issue temporary energy suspensions.

Subsec. (h). Pub. L. 95–190, §14(a)(5), redesignated subsec. (g), added by Pub. L. 95–95, §108(g), as (h). Former subsec. (h) redesignated (i).

Subsec. (i). Pub. L. 95–190, §14(a)(5), redesignated subsec. (h), added by Pub. L. 95–95, §108(g), as (i). Former subsec. (i) redesignated (j) and amended.

Subsec. (j). Pub. L. 95–190 §14(a)(5), (6), redesignated subsec. (i), added by Pub. L. 95–95, §108(g), as (j) and in subsec. (j) as so redesignated, substituted "will enable such source" for "at such source will enable it".

1974—Subsec. (a)(3). Pub. L. 93–319, §4(a), designated existing provisions as subpar. (A) and added subpar. (B).

Subsec. (c). Pub. L. 93–319, §4(b), designated existing provisions as par. (1) and existing pars. (1), (2), and (3) as subpars. (A), (B), and (C), respectively, of such redesignated par. (1), and added par. (2).

EFFECTIVE DATE OF 1977 AMENDMENT

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

PENDING ACTIONS AND PROCEEDINGS

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF RULES, REGULATIONS, ORDERS, DETERMINATIONS, CONTRACTS, CERTIFICATIONS, AUTHORIZATIONS, DELEGATIONS, AND OTHER ACTIONS

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

MODIFICATION OR RESCISSION OF IMPLEMENTATION PLANS APPROVED AND IN EFFECT PRIOR TO AUG. 7, 1977

Nothing in the Clean Air Act Amendments of 1977 [Pub. L. 95–95] to affect any requirement of an approved implementation plan under this section or any other provision in effect under this chapter before Aug. 7, 1977, until modified or rescinded in accordance with this chapter as amended by the Clean Air Act Amendments of 1977, see section 406(c) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

SAVINGS PROVISION

Pub. L. 91–604, §16, Dec. 31, 1970, 84 Stat. 1713, provided that:

"(a)(1) Any implementation plan adopted by any State and submitted to the Secretary of Health, Education, and Welfare, or to the Administrator pursuant to the Clean Air Act [this chapter] prior to enactment of this Act [Dec. 31, 1970] may be approved under section 110 of the Clean Air Act [this section] (as amended by this Act) [Pub. L. 91–604] and shall remain in effect, unless the Administrator determines that such implementation plan, or any portion thereof, is not consistent with applicable requirements of the Clean Air Act [this chapter] (as amended by this Act) and will not provide for the attainment of national primary ambient air quality standards in the time required by such Act. If the Administrator so determines, he shall, within 90 days after promulgation of any national ambient air quality standards pursuant to section 109(a) of the Clean Air Act [section 7409(a) of this title], notify the State and specify in what respects changes are needed to meet the additional requirements of such Act, including requirements to implement national secondary ambient air quality standards. If such changes are not adopted by the State after public hearings and within six months after such notification, the Administrator shall promulgate such changes pursuant to section 110(c) of such Act [subsec. (c) of this section].

"(2) The amendments made by section 4(b) [amending sections 7403 and 7415 of this title] shall not be construed as repealing or modifying the powers of the Administrator with respect to any conference convened under section 108(d) of the Clean Air Act [section 7415 of this title] before the date of enactment of this Act [Dec. 31, 1970].

"(b) Regulations or standards issued under this title II of the Clean Air Act [subchapter II of this chapter] prior to the enactment of this Act [Dec. 31, 1970] shall continue in effect until revised by the Administrator consistent with the purposes of such Act [this chapter]."

FEDERAL ENERGY ADMINISTRATOR

"Federal Energy Administrator", for purposes of this chapter, to mean Administrator of Federal Energy Administration established by Pub. L. 93–275, May 7, 1974, 88 Stat. 97, which is classified to section 761 et seq. of Title 15, Commerce and Trade, but with the term to mean any officer of the United States designated as such by the President until Federal Energy Administrator takes office and after Federal Energy Administration ceases to exist, see section 798 of Title 15, Commerce and Trade.

Federal Energy Administration terminated and functions vested by law in Administrator thereof transferred to Secretary of Energy (unless otherwise specifically provided) by sections 7151(a) and 7293 of this title.

## § 7411. Standards of performance for new stationary sources

### (a) Definitions

For purposes of this section:

(1) The term "standard of performance" means a standard for emissions of air pollutants which reflects the degree of emission limitation achievable through the application of the best system of emission reduction which (taking into account the cost of achieving such reduction and any nonair quality health and environmental impact and energy requirements) the Administrator determines has been adequately demonstrated.

(2) The term "new source" means any stationary source, the construction or modification of which is commenced after the publication of regulations (or, if earlier, proposed reg-

ulations) prescribing a standard of performance under this section which will be applicable to such source.

(3) The term "stationary source" means any building, structure, facility, or installation which emits or may emit any air pollutant. Nothing in subchapter II of this chapter relating to nonroad engines shall be construed to apply to stationary internal combustion engines.

(4) The term "modification" means any physical change in, or change in the method of operation of, a stationary source which increases the amount of any air pollutant emitted by such source or which results in the emission of any air pollutant not previously emitted.

(5) The term "owner or operator" means any person who owns, leases, operates, controls, or supervises a stationary source.

(6) The term "existing source" means any stationary source other than a new source.

(7) The term "technological system of continuous emission reduction" means—

(A) a technological process for production or operation by any source which is inherently low-polluting or nonpolluting, or

(B) a technological system for continuous reduction of the pollution generated by a source before such pollution is emitted into the ambient air, including precombustion cleaning or treatment of fuels.

(8) A conversion to coal (A) by reason of an order under section 2(a) of the Energy Supply and Environmental Coordination Act of 1974 [15 U.S.C. 792(a)] or any amendment thereto, or any subsequent enactment which supersedes such Act [15 U.S.C. 791 et seq.], or (B) which qualifies under section 7413(d)(5)(A)(ii)[1] of this title, shall not be deemed to be a modification for purposes of paragraphs (2) and (4) of this subsection.

### (b) List of categories of stationary sources; standards of performance; information on pollution control techniques; sources owned or operated by United States; particular systems; revised standards

(1)(A) The Administrator shall, within 90 days after December 31, 1970, publish (and from time to time thereafter shall revise) a list of categories of stationary sources. He shall include a category of sources in such list if in his judgment it causes, or contributes significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare.

(B) Within one year after the inclusion of a category of stationary sources in a list under subparagraph (A), the Administrator shall publish proposed regulations, establishing Federal standards of performance for new sources within such category. The Administrator shall afford interested persons an opportunity for written comment on such proposed regulations. After considering such comments, he shall promulgate, within one year after such publication, such standards with such modifications as he deems appropriate. The Administrator shall, at least every 8 years, review and, if appropriate,

[1] See References in Text note below.

Par. (3). Pub. L. 101–549, §403(d), directed the insertion of ", clean fuels," after "including fuel cleaning,", which was executed by making the insertion after "including fuel cleaning" to reflect the probable intent of Congress, and inserted at end "Emissions from any source utilizing clean fuels, or any other means, to comply with this paragraph shall not be allowed to increase above levels that would have been required under this paragraph as it existed prior to November 15, 1990."

1977—Par. (2)(C). Pub. L. 95–190 added subpar. (C).

STUDY OF MAJOR EMITTING FACILITIES WITH POTENTIAL OF EMITTING 250 TONS PER YEAR

Pub. L. 95–95, title I, §127(b), Aug. 7, 1977, 91 Stat. 741, directed Administrator, within 1 year after Aug. 7, 1977, to report to Congress on consequences of that portion of definition of "major emitting facility" under this subpart which applies to facilities with potential to emit 250 tons per year or more.

SUBPART II—VISIBILITY PROTECTION

CODIFICATION

As originally enacted, subpart II of part C of subchapter I of this chapter was added following section 7478 of this title. Pub. L. 95–190, §14(a)(53), Nov. 16, 1977, 91 Stat. 1402, struck out subpart II and inserted such subpart following section 7479 of this title.

## §7491. Visibility protection for Federal class I areas

### (a) Impairment of visibility; list of areas; study and report

(1) Congress hereby declares as a national goal the prevention of any future, and the remedying of any existing, impairment of visibility in mandatory class I Federal areas which impairment results from manmade air pollution.

(2) Not later than six months after August 7, 1977, the Secretary of the Interior in consultation with other Federal land managers shall review all mandatory class I Federal areas and identify those where visibility is an important value of the area. From time to time the Secretary of the Interior may revise such identifications. Not later than one year after August 7, 1977, the Administrator shall, after consultation with the Secretary of the Interior, promulgate a list of mandatory class I Federal areas in which he determines visibility is an important value.

(3) Not later than eighteen months after August 7, 1977, the Administrator shall complete a study and report to Congress on available methods for implementing the national goal set forth in paragraph (1). Such report shall include recommendations for—

(A) methods for identifying, characterizing, determining, quantifying, and measuring visibility impairment in Federal areas referred to in paragraph (1), and

(B) modeling techniques (or other methods) for determining the extent to which manmade air pollution may reasonably be anticipated to cause or contribute to such impairment, and

(C) methods for preventing and remedying such manmade air pollution and resulting visibility impairment.

Such report shall also identify the classes or categories of sources and the types of air pollutants which, alone or in conjunction with other sources or pollutants, may reasonably be anticipated to cause or contribute significantly to impairment of visibility.

(4) Not later than twenty-four months after August 7, 1977, and after notice and public hearing, the Administrator shall promulgate regulations to assure (A) reasonable progress toward meeting the national goal specified in paragraph (1), and (B) compliance with the requirements of this section.

### (b) Regulations

Regulations under subsection (a)(4) of this section shall—

(1) provide guidelines to the States, taking into account the recommendations under subsection (a)(3) of this section on appropriate techniques and methods for implementing this section (as provided in subparagraphs (A) through (C) of such subsection (a)(3)), and

(2) require each applicable implementation plan for a State in which any area listed by the Administrator under subsection (a)(2) of this section is located (or for a State the emissions from which may reasonably be anticipated to cause or contribute to any impairment of visibility in any such area) to contain such emission limits, schedules of compliance and other measures as may be necessary to make reasonable progress toward meeting the national goal specified in subsection (a) of this section, including—

(A) except as otherwise provided pursuant to subsection (c) of this section, a requirement that each major stationary source which is in existence on August 7, 1977, but which has not been in operation for more than fifteen years as of such date, and which, as determined by the State (or the Administrator in the case of a plan promulgated under section 7410(c) of this title) emits any air pollutant which may reasonably be anticipated to cause or contribute to any impairment of visibility in any such area, shall procure, install, and operate, as expeditiously as practicable (and maintain thereafter) the best available retrofit technology, as determined by the State (or the Administrator in the case of a plan promulgated under section 7410(c) of this title) for controlling emissions from such source for the purpose of eliminating or reducing any such impairment, and

(B) a long-term (ten to fifteen years) strategy for making reasonable progress toward meeting the national goal specified in subsection (a) of this section.

In the case of a fossil-fuel fired generating powerplant having a total generating capacity in excess of 750 megawatts, the emission limitations required under this paragraph shall be determined pursuant to guidelines, promulgated by the Administrator under paragraph (1).

### (c) Exemptions

(1) The Administrator may, by rule, after notice and opportunity for public hearing, exempt any major stationary source from the requirement of subsection (b)(2)(A) of this section, upon his determination that such source does not or will not, by itself or in combination with other sources, emit any air pollutant which may rea-

sonably be anticipated to cause or contribute to a significant impairment of visibility in any mandatory class I Federal area.

(2) Paragraph (1) of this subsection shall not be applicable to any fossil-fuel fired powerplant with total design capacity of 750 megawatts or more, unless the owner or operator of any such plant demonstrates to the satisfaction of the Administrator that such powerplant is located at such distance from all areas listed by the Administrator under subsection (a)(2) of this section that such powerplant does not or will not, by itself or in combination with other sources, emit any air pollutant which may reasonably be anticipated to cause or contribute to significant impairment of visibility in any such area.

(3) An exemption under this subsection shall be effective only upon concurrence by the appropriate Federal land manager or managers with the Administrator's determination under this subsection.

**(d) Consultations with appropriate Federal land managers**

Before holding the public hearing on the proposed revision of an applicable implementation plan to meet the requirements of this section, the State (or the Administrator, in the case of a plan promulgated under section 7410(c) of this title) shall consult in person with the appropriate Federal land manager or managers and shall include a summary of the conclusions and recommendations of the Federal land managers in the notice to the public.

**(e) Buffer zones**

In promulgating regulations under this section, the Administrator shall not require the use of any automatic or uniform buffer zone or zones.

**(f) Nondiscretionary duty**

For purposes of section 7604(a)(2) of this title, the meeting of the national goal specified in subsection (a)(1) of this section by any specific date or dates shall not be considered a "nondiscretionary duty" of the Administrator.

**(g) Definitions**

For the purpose of this section—

(1) in determining reasonable progress there shall be taken into consideration the costs of compliance, the time necessary for compliance, and the energy and nonair quality environmental impacts of compliance, and the remaining useful life of any existing source subject to such requirements;

(2) in determining best available retrofit technology the State (or the Administrator in determining emission limitations which reflect such technology) shall take into consideration the costs of compliance, the energy and nonair quality environmental impacts of compliance, any existing pollution control technology in use at the source, the remaining useful life of the source, and the degree of improvement in visibility which may reasonably be anticipated to result from the use of such technology;

(3) the term "manmade air pollution" means air pollution which results directly or indirectly from human activities;

(4) the term "as expeditiously as practicable" means as expeditiously as practicable but in no event later than five years after the date of approval of a plan revision under this section (or the date of promulgation of such a plan revision in the case of action by the Administrator under section 7410(c) of this title for purposes of this section);

(5) the term "mandatory class I Federal areas" means Federal areas which may not be designated as other than class I under this part;

(6) the terms "visibility impairment" and "impairment of visibility" shall include reduction in visual range and atmospheric discoloration; and

(7) the term "major stationary source" means the following types of stationary sources with the potential to emit 250 tons or more of any pollutant: fossil-fuel fired steam electric plants of more than 250 million British thermal units per hour heat input, coal cleaning plants (thermal dryers), kraft pulp mills, Portland Cement plants, primary zinc smelters, iron and steel mill plants, primary aluminum ore reduction plants, primary copper smelters, municipal incinerators capable of charging more than 250 tons of refuse per day, hydrofluoric, sulfuric, and nitric acid plants, petroleum refineries, lime plants, phosphate rock processing plants, coke oven batteries, sulfur recovery plants, carbon black plants (furnace process), primary lead smelters, fuel conversion plants, sintering plants, secondary metal production facilities, chemical process plants, fossil-fuel boilers of more than 250 million British thermal units per hour heat input, petroleum storage and transfer facilities with a capacity exceeding 300,000 barrels, taconite ore processing facilities, glass fiber processing plants, charcoal production facilities.

(July 14, 1955, ch. 360, title I, § 169A, as added Pub. L. 95–95, title I, § 128, Aug. 7, 1977, 91 Stat. 742.)

EFFECTIVE DATE

Subpart effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

**§ 7492. Visibility**

**(a) Studies**

(1) The Administrator, in conjunction with the National Park Service and other appropriate Federal agencies, shall conduct research to identify and evaluate sources and source regions of both visibility impairment and regions that provide predominantly clean air in class I areas. A total of $8,000,000 per year for 5 years is authorized to be appropriated for the Environmental Protection Agency and the other Federal agencies to conduct this research. The research shall include—

(A) expansion of current visibility related monitoring in class I areas;

(B) assessment of current sources of visibility impairing pollution and clean air corridors;

(C) adaptation of regional air quality models for the assessment of visibility;

(D) studies of atmospheric chemistry and physics of visibility.

(2) Based on the findings available from the research required in subsection (a)(1) of this section as well as other available scientific and technical data, studies, and other available information pertaining to visibility source-receptor relationships, the Administrator shall conduct an assessment and evaluation that identifies, to the extent possible, sources and source regions of visibility impairment including natural sources as well as source regions of clear air for class I areas. The Administrator shall produce interim findings from this study within 3 years after November 15, 1990.

**(b) Impacts of other provisions**

Within 24 months after November 15, 1990, the Administrator shall conduct an assessment of the progress and improvements in visibility in class I areas that are likely to result from the implementation of the provisions of the Clean Air Act Amendments of 1990 other than the provisions of this section. Every 5 years thereafter the Administrator shall conduct an assessment of actual progress and improvement in visibility in class I areas. The Administrator shall prepare a written report on each assessment and transmit copies of these reports to the appropriate committees of Congress.

**(c) Establishment of visibility transport regions and commissions**

**(1) Authority to establish visibility transport regions**

Whenever, upon the Administrator's motion or by petition from the Governors of at least two affected States, the Administrator has reason to believe that the current or projected interstate transport of air pollutants from one or more States contributes significantly to visibility impairment in class I areas located in the affected States, the Administrator may establish a transport region for such pollutants that includes such States. The Administrator, upon the Administrator's own motion or upon petition from the Governor of any affected State, or upon the recommendations of a transport commission established under subsection (b) of this section[1] may—

(A) add any State or portion of a State to a visibility transport region when the Administrator determines that the interstate transport of air pollutants from such State significantly contributes to visibility impairment in a class I area located within the transport region, or

(B) remove any State or portion of a State from the region whenever the Administrator has reason to believe that the control of emissions in that State or portion of the State pursuant to this section will not significantly contribute to the protection or enhancement of visibility in any class I area in the region.

**(2) Visibility transport commissions**

Whenever the Administrator establishes a transport region under subsection (c)(1) of this section, the Administrator shall establish a transport commission comprised of (as a minimum) each of the following members:

(A) the Governor of each State in the Visibility Transport Region, or the Governor's designee;

(B) The[2] Administrator or the Administrator's designee; and

(C) A[2] representative of each Federal agency charged with the direct management of each class I area or areas within the Visibility Transport Region.

**(3) Ex officio members**

All representatives of the Federal Government shall be ex officio members.

**(4) Federal Advisory Committee Act**

The visibility transport commissions shall be exempt from the requirements of the Federal Advisory Committee Act [5 U.S.C. App.].

**(d) Duties of visibility transport commissions**

A Visibility Transport Commission—

(1) shall assess the scientific and technical data, studies, and other currently available information, including studies conducted pursuant to subsection (a)(1) of this section, pertaining to adverse impacts on visibility from potential or projected growth in emissions from sources located in the Visibility Transport Region; and

(2) shall, within 4 years of establishment, issue a report to the Administrator recommending what measures, if any, should be taken under this chapter to remedy such adverse impacts. The report required by this subsection shall address at least the following measures:

(A) the establishment of clean air corridors, in which additional restrictions on increases in emissions may be appropriate to protect visibility in affected class I areas;

(B) the imposition of the requirements of part D of this subchapter affecting the construction of new major stationary sources or major modifications to existing sources in such clean air corridors specifically including the alternative siting analysis provisions of section 7503(a)(5) of this title; and

(C) the promulgation of regulations under section 7491 of this title to address long range strategies for addressing regional haze which impairs visibility in affected class I areas.

**(e) Duties of Administrator**

(1) The Administrator shall, taking into account the studies pursuant to subsection (a)(1) of this section and the reports pursuant to subsection (d)(2) of this section and any other relevant information, within eighteen months of receipt of the report referred to in subsection (d)(2) of this section, carry out the Administrator's regulatory responsibilities under section 7491 of this title, including criteria for measuring "reasonable progress" toward the national goal.

---

[1] So in original. Words "subsection (b) of this section" probably should be "paragraph (2)".

[2] So in original. Probably should not be capitalized.

(2) Any regulations promulgated under section 7491 of this title pursuant to this subsection shall require affected States to revise within 12 months their implementation plans under section 7410 of this title to contain such emission limits, schedules of compliance, and other measures as may be necessary to carry out regulations promulgated pursuant to this subsection.

**(f) Grand Canyon visibility transport commission**

The Administrator pursuant to subsection (c)(1) of this section shall, within 12 months, establish a visibility transport commission for the region affecting the visibility of the Grand Canyon National Park.

(July 14, 1955, ch. 360, title I, §169B, as added Pub. L. 101–549, title VIII, §816, Nov. 15, 1990, 104 Stat. 2695.)

REFERENCES IN TEXT

The Clean Air Act Amendments of 1990, referred to in subsec. (b), probably means Pub. L. 101–549, Nov. 15, 1990, 104 Stat. 2399. For complete classification of this Act to the Code, see Short Title note set out under section 7401 of this title and Tables.

The Federal Advisory Committee Act, referred to in subsec. (c)(4), is Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 770, as amended, which is set out in the Appendix to Title 5, Government Organization and Employees.

PART D—PLAN REQUIREMENTS FOR<br>NONATTAINMENT AREAS

SUBPART 1—NONATTAINMENT AREAS IN GENERAL

**§ 7501. Definitions**

For the purpose of this part—

(1) REASONABLE FURTHER PROGRESS.—The term "reasonable further progress" means such annual incremental reductions in emissions of the relevant air pollutant as are required by this part or may reasonably be required by the Administrator for the purpose of ensuring attainment of the applicable national ambient air quality standard by the applicable date.

(2) NONATTAINMENT AREA.—The term "nonattainment area" means, for any air pollutant, an area which is designated "nonattainment" with respect to that pollutant within the meaning of section 7407(d) of this title.

(3) The term "lowest achievable emission rate" means for any source, that rate of emissions which reflects—

(A) the most stringent emission limitation which is contained in the implementation plan of any State for such class or category of source, unless the owner or operator of the proposed source demonstrates that such limitations are not achievable, or

(B) the most stringent emission limitation which is achieved in practice by such class or category of source, whichever is more stringent.

In no event shall the application of this term permit a proposed new or modified source to emit any pollutant in excess of the amount allowable under applicable new source standards of performance.

(4) The terms "modifications" and "modified" mean the same as the term "modification" as used in section 7411(a)(4) of this title.

(July 14, 1955, ch. 360, title I, §171, as added Pub. L. 95–95, title I, §129(b), Aug. 7, 1977, 91 Stat. 745; amended Pub. L. 101–549, title I, §102(a)(2), Nov. 15, 1990, 104 Stat. 2412.)

AMENDMENTS

1990—Pub. L. 101–549, §102(a)(2)(A), struck out "and section 7410(a)(2)(I) of this title" after "purpose of this part".

Pars. (1), (2). Pub. L. 101–549, §102(a)(2)(B), (C), amended pars. (1) and (2) generally. Prior to amendment, pars. (1) and (2) read as follows:

"(1) The term 'reasonable further progress' means annual incremental reductions in emissions of the applicable air pollutant (including substantial reductions in the early years following approval or promulgation of plan provisions under this part and section 7410(a)(2)(I) of this title and regular reductions thereafter) which are sufficient in the judgment of the Administrator, to provide for attainment of the applicable national ambient air quality standard by the date required in section 7502(a) of this title.

"(2) The term 'nonattainment area' means, for any air pollutant an area which is shown by monitored data or which is calculated by air quality modeling (or other methods determined by the Administrator to be reliable) to exceed any national ambient air quality standard for such pollutant. Such term includes any area identified under subparagraphs (A) through (C) of section 7407(d)(1) of this title."

EFFECTIVE DATE

Part effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

**§ 7502. Nonattainment plan provisions in general**

**(a) Classifications and attainment dates**

**(1) Classifications**

(A) On or after the date the Administrator promulgates the designation of an area as a nonattainment area pursuant to section 7407(d) of this title with respect to any national ambient air quality standard (or any revised standard, including a revision of any standard in effect on November 15, 1990), the Administrator may classify the area for the purpose of applying an attainment date pursuant to paragraph (2), and for other purposes. In determining the appropriate classification, if any, for a nonattainment area, the Administrator may consider such factors as the severity of nonattainment in such area and the availability and feasibility of the pollution control measures that the Administrator believes may be necessary to provide for attainment of such standard in such area.

(B) The Administrator shall publish a notice in the Federal Register announcing each classification under subparagraph (A), except the Administrator shall provide an opportunity for at least 30 days for written comment. Such classification shall not be subject to the provisions of sections 553 through 557 of title 5 (concerning notice and comment) and shall not be subject to judicial review until the Administrator takes final action under subsection (k) or (l) of section 7410 of this title (concerning action on plan submissions) or section 7509 of this title (concerning sanctions) with respect to any plan submissions required by virtue of such classification.

SEC. 2. *Designation of Facilities.* (a) The Administrator of the Environmental Protection Agency (hereinafter referred to as "the Administrator") shall be responsible for the attainment of the purposes and objectives of this Order.

(b) In carrying out his responsibilities under this Order, the Administrator shall, in conformity with all applicable requirements of law, designate facilities which have given rise to a conviction for an offense under section 113(c)(1) of the Air Act [42 U.S.C. 7413(c)(1)] or section 309(c) of the Water Act [33 U.S.C. 1319(c)]. The Administrator shall, from time to time, publish and circulate to all Federal agencies lists of those facilities, together with the names and addresses of the persons who have been convicted of such offenses. Whenever the Administrator determines that the condition which gave rise to a conviction has been corrected, he shall promptly remove the facility and the name and address of the person concerned from the list.

SEC. 3. *Contracts, Grants, or Loans.* (a) Except as provided in section 8 of this Order, no Federal agency shall enter into any contract for the procurement of goods, materials, or services which is to be performed in whole or in part in a facility then designated by the Administrator pursuant to section 2.

(b) Except as provided in section 8 of this Order, no Federal agency authorized to extend Federal assistance by way of grant, loan, or contract shall extend such assistance in any case in which it is to be used to support any activity or program involving the use of a facility then designated by the Administrator pursuant to section 2.

SEC. 4. *Procurement, Grant, and Loan Regulations.* The Federal Procurement Regulations, the Armed Services Procurement Regulations, and to the extent necessary, any supplemental or comparable regulations issued by any agency of the Executive Branch shall, following consultation with the Administrator, be amended to require, as a condition of entering into, renewing, or extending any contract for the procurement of goods, materials, or services or extending any assistance by way of grant, loan, or contract, inclusion of a provision requiring compliance with the Air Act, the Water Act, and standards issued pursuant thereto in the facilities in which the contract is to be performed, or which are involved in the activity or program to receive assistance.

SEC. 5. *Rules and Regulations.* The Administrator shall issue such rules, regulations, standards, and guidelines as he may deem necessary or appropriate to carry out the purposes of this Order.

SEC. 6. *Cooperation and Assistance.* The head of each Federal agency shall take such steps as may be necessary to insure that all officers and employees of this agency whose duties entail compliance or comparable functions with respect to contracts, grants, and loans are familiar with the provisions of this Order. In addition to any other appropriate action, such officers and employees shall report promptly any condition in a facility which may involve noncompliance with the Air Act or the Water Act or any rules, regulations, standards, or guidelines issued pursuant to this Order to the head of the agency, who shall transmit such reports to the Administrator.

SEC. 7. *Enforcement.* The Administrator may recommend to the Department of Justice or other appropriate agency that legal proceedings be brought or other appropriate action be taken whenever he becomes aware of a breach of any provision required, under the amendments issued pursuant to section 4 of this Order, to be included in a contract or other agreement.

SEC. 8. *Exemptions—Reports to Congress.* (a) Upon a determination that the paramount interest of the United States so requires—

(1) The head of a Federal agency may exempt any contract, grant, or loan, and, following consultation with the Administrator, any class of contracts, grants or loans from the provisions of this Order. In any such case, the head of the Federal agency granting such ex-

emption shall (A) promptly notify the Administrator of such exemption and the justification therefor; (B) review the necessity for each such exemption annually; and (C) report to the Administrator annually all such exemptions in effect. Exemptions granted pursuant to this section shall be for a period not to exceed one year. Additional exemptions may be granted for periods not to exceed one year upon the making of a new determination by the head of the Federal agency concerned.

(2) The Administrator may, by rule or regulation, exempt any or all Federal agencies from any or all of the provisions of this Order with respect to any class or classes of contracts, grants, or loans, which (A) involve less than specified dollar amounts, or (B) have a minimal potential impact upon the environment, or (C) involve persons who are not prime contractors or direct recipients of Federal assistance by way of contracts, grants, or loans.

(b) Federal agencies shall reconsider any exemption granted under subsection (a) whenever requested to do so by the Administrator.

(c) The Administrator shall annually notify the President and the Congress of all exemptions granted, or in effect, under this Order during the preceding year.

SEC. 9. *Related Actions.* The imposition of any sanction or penalty under or pursuant to this Order shall not relieve any person of any legal duty to comply with any provisions of the Air Act or the Water Act.

SEC. 10. *Applicability.* This Order shall not apply to contracts, grants, or loans involving the use of facilities located outside the United States.

SEC. 11. *Uniformity.* Rules, regulations, standards, and guidelines issued pursuant to this order and section 508 of the Water Act [33 U.S.C. 1368] shall, to the maximum extent feasible, be uniform with regulations issued pursuant to this order, Executive Order No. 11602 of June 29, 1971 [formerly set out above], and section 306 of the Air Act [this section].

SEC. 12. *Order Superseded.* Executive Order No. 11602 of June 29, 1971, is hereby superseded.

RICHARD NIXON.

## § 7607. Administrative proceedings and judicial review

### (a) Administrative subpenas; confidentiality; witnesses

In connection with any determination under section 7410(f) of this title, or for purposes of obtaining information under section 7521(b)(4)[1] or 7545(c)(3) of this title, any investigation, monitoring, reporting requirement, entry, compliance inspection, or administrative enforcement proceeding under the[2] chapter (including but not limited to section 7413, section 7414, section 7420, section 7429, section 7477, section 7524, section 7525, section 7542, section 7603, or section 7606 of this title),[3] the Administrator may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents, and he may administer oaths. Except for emission data, upon a showing satisfactory to the Administrator by such owner or operator that such papers, books, documents, or information or particular part thereof, if made public, would divulge trade secrets or secret processes of such owner or operator, the Administrator shall consider such record, report, or information or particular portion thereof confidential in accordance with the purposes of section 1905 of title 18, except that such paper, book, document, or information may be dis-

[1] See References in Text note below.
[2] So in original. Probably should be "this".
[3] So in original.

closed to other officers, employees, or authorized representatives of the United States concerned with carrying out this chapter, to persons carrying out the National Academy of Sciences' study and investigation provided for in section 7521(c) of this title, or when relevant in any proceeding under this chapter. Witnesses summoned shall be paid the same fees and mileage that are paid witnesses in the courts of the United States. In case of contumacy or refusal to obey a subpena served upon any person under this subparagraph,[4] the district court of the United States for any district in which such person is found or resides or transacts business, upon application by the United States and after notice to such person, shall have jurisdiction to issue an order requiring such person to appear and give testimony before the Administrator to appear and produce papers, books, and documents before the Administrator, or both, and any failure to obey such order of the court may be punished by such court as a contempt thereof.

**(b) Judicial review**

(1) A petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard, any emission standard or requirement under section 7412 of this title, any standard of performance or requirement under section 7411 of this title,[3] any standard under section 7521 of this title (other than a standard required to be prescribed under section 7521(b)(1) of this title), any determination under section 7521(b)(5)[1] of this title, any control or prohibition under section 7545 of this title, any standard under section 7571 of this title, any rule issued under section 7413, 7419, or under section 7420 of this title, or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia. A petition for review of the Administrator's action in approving or promulgating any implementation plan under section 7410 of this title or section 7411(d) of this title, any order under section 7411(j) of this title, under section 7412 of this title, under section 7419 of this title, or under section 7420 of this title, or his action under section 1857c–10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977) or under regulations thereunder, or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title, or any other final action of the Administrator under this chapter (including any denial or disapproval by the Administrator under subchapter I of this chapter) which is locally or regionally applicable may be filed only in the United States Court of Appeals for the appropriate circuit. Notwithstanding the preceding sentence a petition for review of any action referred to in such sentence may be filed only in the United States Court of Appeals for the District of Columbia if such action is based on a determination of nationwide scope or effect and if in taking such action the Administrator finds and pub-

lishes that such action is based on such a determination. Any petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register, except that if such petition is based solely on grounds arising after such sixtieth day, then any petition for review under this subsection shall be filed within sixty days after such grounds arise. The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action.

(2) Action of the Administrator with respect to which review could have been obtained under paragraph (1) shall not be subject to judicial review in civil or criminal proceedings for enforcement. Where a final decision by the Administrator defers performance of any nondiscretionary statutory action to a later time, any person may challenge the deferral pursuant to paragraph (1).

**(c) Additional evidence**

In any judicial proceeding in which review is sought of a determination under this chapter required to be made on the record after notice and opportunity for hearing, if any party applies to the court for leave to adduce additional evidence, and shows to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Administrator, the court may order such additional evidence (and evidence in rebuttal thereof) to be taken before the Administrator, in such manner and upon such terms and conditions as to[5] the court may deem proper. The Administrator may modify his findings as to the facts, or make new findings, by reason of the additional evidence so taken and he shall file such modified or new findings, and his recommendation, if any, for the modification or setting aside of his original determination, with the return of such additional evidence.

**(d) Rulemaking**

(1) This subsection applies to—

(A) the promulgation or revision of any national ambient air quality standard under section 7409 of this title,

(B) the promulgation or revision of an implementation plan by the Administrator under section 7410(c) of this title,

(C) the promulgation or revision of any standard of performance under section 7411 of this title, or emission standard or limitation under section 7412(d) of this title, any standard under section 7412(f) of this title, or any regulation under section 7412(g)(1)(D) and (F) of this title, or any regulation under section 7412(m) or (n) of this title,

(D) the promulgation of any requirement for solid waste combustion under section 7429 of this title,

---

[4] So in original. Probably should be "subsection,".

[5] So in original. The word "to" probably should not appear.

(E) the promulgation or revision of any regulation pertaining to any fuel or fuel additive under section 7545 of this title,

(F) the promulgation or revision of any aircraft emission standard under section 7571 of this title,

(G) the promulgation or revision of any regulation under subchapter IV–A of this chapter (relating to control of acid deposition),

(H) promulgation or revision of regulations pertaining to primary nonferrous smelter orders under section 7419 of this title (but not including the granting or denying of any such order),

(I) promulgation or revision of regulations under subchapter VI of this chapter (relating to stratosphere and ozone protection),

(J) promulgation or revision of regulations under part C of subchapter I of this chapter (relating to prevention of significant deterioration of air quality and protection of visibility),

(K) promulgation or revision of regulations under section 7521 of this title and test procedures for new motor vehicles or engines under section 7525 of this title, and the revision of a standard under section 7521(a)(3) of this title,

(L) promulgation or revision of regulations for noncompliance penalties under section 7420 of this title,

(M) promulgation or revision of any regulations promulgated under section 7541 of this title (relating to warranties and compliance by vehicles in actual use),

(N) action of the Administrator under section 7426 of this title (relating to interstate pollution abatement),

(O) the promulgation or revision of any regulation pertaining to consumer and commercial products under section 7511b(e) of this title,

(P) the promulgation or revision of any regulation pertaining to field citations under section 7413(d)(3) of this title,

(Q) the promulgation or revision of any regulation pertaining to urban buses or the clean-fuel vehicle, clean-fuel fleet, and clean fuel programs under part C of subchapter II of this chapter,

(R) the promulgation or revision of any regulation pertaining to nonroad engines or nonroad vehicles under section 7547 of this title,

(S) the promulgation or revision of any regulation relating to motor vehicle compliance program fees under section 7552 of this title,

(T) the promulgation or revision of any regulation under subchapter IV–A of this chapter (relating to acid deposition),

(U) the promulgation or revision of any regulation under section 7511b(f) of this title pertaining to marine vessels, and

(V) such other actions as the Administrator may determine.

The provisions of section 553 through 557 and section 706 of title 5 shall not, except as expressly provided in this subsection, apply to actions to which this subsection applies. This subsection shall not apply in the case of any rule or circumstance referred to in subparagraphs (A) or (B) of subsection 553(b) of title 5.

(2) Not later than the date of proposal of any action to which this subsection applies, the Administrator shall establish a rulemaking docket for such action (hereinafter in this subsection referred to as a "rule"). Whenever a rule applies only within a particular State, a second (identical) docket shall be simultaneously established in the appropriate regional office of the Environmental Protection Agency.

(3) In the case of any rule to which this subsection applies, notice of proposed rulemaking shall be published in the Federal Register, as provided under section 553(b) of title 5, shall be accompanied by a statement of its basis and purpose and shall specify the period available for public comment (hereinafter referred to as the "comment period"). The notice of proposed rulemaking shall also state the docket number, the location or locations of the docket, and the times it will be open to public inspection. The statement of basis and purpose shall include a summary of—

(A) the factual data on which the proposed rule is based;

(B) the methodology used in obtaining the data and in analyzing the data; and

(C) the major legal interpretations and policy considerations underlying the proposed rule.

The statement shall also set forth or summarize and provide a reference to any pertinent findings, recommendations, and comments by the Scientific Review Committee established under section 7409(d) of this title and the National Academy of Sciences, and, if the proposal differs in any important respect from any of these recommendations, an explanation of the reasons for such differences. All data, information, and documents referred to in this paragraph on which the proposed rule relies shall be included in the docket on the date of publication of the proposed rule.

(4)(A) The rulemaking docket required under paragraph (2) shall be open for inspection by the public at reasonable times specified in the notice of proposed rulemaking. Any person may copy documents contained in the docket. The Administrator shall provide copying facilities which may be used at the expense of the person seeking copies, but the Administrator may waive or reduce such expenses in such instances as the public interest requires. Any person may request copies by mail if the person pays the expenses, including personnel costs to do the copying.

(B)(i) Promptly upon receipt by the agency, all written comments and documentary information on the proposed rule received from any person for inclusion in the docket during the comment period shall be placed in the docket. The transcript of public hearings, if any, on the proposed rule shall also be included in the docket promptly upon receipt from the person who transcribed such hearings. All documents which become available after the proposed rule has been published and which the Administrator determines are of central relevance to the rulemaking shall be placed in the docket as soon as possible after their availability.

(ii) The drafts of proposed rules submitted by the Administrator to the Office of Management

and Budget for any interagency review process prior to proposal of any such rule, all documents accompanying such drafts, and all written comments thereon by other agencies and all written responses to such written comments by the Administrator shall be placed in the docket no later than the date of proposal of the rule. The drafts of the final rule submitted for such review process prior to promulgation and all such written comments thereon, all documents accompanying such drafts, and written responses thereto shall be placed in the docket no later than the date of promulgation.

(5) In promulgating a rule to which this subsection applies (i) the Administrator shall allow any person to submit written comments, data, or documentary information; (ii) the Administrator shall give interested persons an opportunity for the oral presentation of data, views, or arguments, in addition to an opportunity to make written submissions; (iii) a transcript shall be kept of any oral presentation; and (iv) the Administrator shall keep the record of such proceeding open for thirty days after completion of the proceeding to provide an opportunity for submission of rebuttal and supplementary information.

(6)(A) The promulgated rule shall be accompanied by (i) a statement of basis and purpose like that referred to in paragraph (3) with respect to a proposed rule and (ii) an explanation of the reasons for any major changes in the promulgated rule from the proposed rule.

(B) The promulgated rule shall also be accompanied by a response to each of the significant comments, criticisms, and new data submitted in written or oral presentations during the comment period.

(C) The promulgated rule may not be based (in part or whole) on any information or data which has not been placed in the docket as of the date of such promulgation.

(7)(A) The record for judicial review shall consist exclusively of the material referred to in paragraph (3), clause (i) of paragraph (4)(B), and subparagraphs (A) and (B) of paragraph (6).

(B) Only an objection to a rule or procedure which was raised with reasonable specificity during the period for public comment (including any public hearing) may be raised during judicial review. If the person raising an objection can demonstrate to the Administrator that it was impracticable to raise such objection within such time or if the grounds for such objection arose after the period for public comment (but within the time specified for judicial review) and if such objection is of central relevance to the outcome of the rule, the Administrator shall convene a proceeding for reconsideration of the rule and provide the same procedural rights as would have been afforded had the information been available at the time the rule was proposed. If the Administrator refuses to convene such a proceeding, such person may seek review of such refusal in the United States court of appeals for the appropriate circuit (as provided in subsection (b) of this section). Such reconsideration shall not postpone the effectiveness of the rule. The effectiveness of the rule may be stayed during such reconsideration, however, by the Administrator or the court for a period not to exceed three months.

(8) The sole forum for challenging procedural determinations made by the Administrator under this subsection shall be in the United States court of appeals for the appropriate circuit (as provided in subsection (b) of this section) at the time of the substantive review of the rule. No interlocutory appeals shall be permitted with respect to such procedural determinations. In reviewing alleged procedural errors, the court may invalidate the rule only if the errors were so serious and related to matters of such central relevance to the rule that there is a substantial likelihood that the rule would have been significantly changed if such errors had not been made.

(9) In the case of review of any action of the Administrator to which this subsection applies, the court may reverse any such action found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; or

(D) without observance of procedure required by law, if (i) such failure to observe such procedure is arbitrary or capricious, (ii) the requirement of paragraph (7)(B) has been met, and (iii) the condition of the last sentence of paragraph (8) is met.

(10) Each statutory deadline for promulgation of rules to which this subsection applies which requires promulgation less than six months after date of proposal may be extended to not more than six months after date of proposal by the Administrator upon a determination that such extension is necessary to afford the public, and the agency, adequate opportunity to carry out the purposes of this subsection.

(11) The requirements of this subsection shall take effect with respect to any rule the proposal of which occurs after ninety days after August 7, 1977.

**(e) Other methods of judicial review not authorized**

Nothing in this chapter shall be construed to authorize judicial review of regulations or orders of the Administrator under this chapter, except as provided in this section.

**(f) Costs**

In any judicial proceeding under this section, the court may award costs of litigation (including reasonable attorney and expert witness fees) whenever it determines that such award is appropriate.

**(g) Stay, injunction, or similar relief in proceedings relating to noncompliance penalties**

In any action respecting the promulgation of regulations under section 7420 of this title or the administration or enforcement of section 7420 of this title no court shall grant any stay, injunctive, or similar relief before final judgment by such court in such action.

**(h) Public participation**

It is the intent of Congress that, consistent with the policy of subchapter II of chapter 5 of

title 5, the Administrator in promulgating any regulation under this chapter, including a regulation subject to a deadline, shall ensure a reasonable period for public participation of at least 30 days, except as otherwise expressly provided in section[6] 7407(d), 7502(a), 7511(a) and (b), and 7512(a) and (b) of this title.

(July 14, 1955, ch. 360, title III, § 307, as added Pub. L. 91–604, § 12(a), Dec. 31, 1970, 84 Stat. 1707; amended Pub. L. 92–157, title III, § 302(a), Nov. 18, 1971, 85 Stat. 464; Pub. L. 93–319, § 6(c), June 22, 1974, 88 Stat. 259; Pub. L. 95–95, title III, §§ 303(d), 305(a), (c), (f)–(h), Aug. 7, 1977, 91 Stat. 772, 776, 777; Pub. L. 95–190, § 14(a)(79), (80), Nov. 16, 1977, 91 Stat. 1404; Pub. L. 101–549, title I, §§ 108(p), 110(5), title III, § 302(g), (h), title VII, §§ 702(c), 703, 706, 707(h), 710(b), Nov. 15, 1990, 104 Stat. 2469, 2470, 2574, 2681–2684.)

### References in Text

Section 7521(b)(4) of this title, referred to in subsec. (a), was repealed by Pub. L. 101–549, title II, § 230(2), Nov. 15, 1990, 104 Stat. 2529.

Section 7521(b)(5) of this title, referred to in subsec. (b)(1), was repealed by Pub. L. 101–549, title II, § 230(3), Nov. 15, 1990, 104 Stat. 2529.

Section 1857c–10(c)(2)(A), (B), or (C) of this title (as in effect before August 7, 1977), referred to in subsec. (b)(1), was in the original "section 119(c)(2)(A), (B), or (C) (as in effect before the date of enactment of the Clean Air Act Amendments of 1977)", meaning section 119 of act July 14, 1955, ch. 360, title I, as added June 22, 1974, Pub. L. 93–319, § 3, 88 Stat. 248, (which was classified to section 1857c–10 of this title as in effect prior to the enactment of Pub. L. 95–95, Aug. 7, 1977, 91 Stat. 691, effective Aug. 7, 1977. Section 112(b)(1) of Pub. L. 95–95 repealed section 119 of act July 14, 1955, ch. 360, title I, as added by Pub. L. 93–319, and provided that all references to such section 119 in any subsequent enactment which supersedes Pub. L. 93–319 shall be construed to refer to section 113(d) of the Clean Air Act and to paragraph (5) thereof in particular which is classified to subsec. (d)(5) of section 7413 of this title. Section 7413(d) of this title was subsequently amended generally by Pub. L. 101–549, title VII, § 701, Nov. 15, 1990, 104 Stat. 2672, and, as so amended, no longer relates to final compliance orders. Section 117(b) of Pub. L. 95–95 added a new section 119 of act July 14, 1955, which is classified to section 7419 of this title.

Part C of subchapter I of this chapter, referred to in subsec. (d)(1)(J), was in the original "subtitle C of title I", and was translated as reading "part C of title I" to reflect the probable intent of Congress, because title I does not contain subtitles.

### Codification

In subsec. (h), "subchapter II of chapter 5 of title 5" was substituted for "the Administrative Procedures Act" on authority of Pub. L. 89–554, § 7(b), Sept. 6, 1966, 80 Stat. 631, the first section of which enacted Title 5, Government Organization and Employees.

Section was formerly classified to section 1857h–5 of this title.

### Prior Provisions

A prior section 307 of act July 14, 1955, was renumbered section 314 by Pub. L. 91–604 and is classified to section 7614 of this title.

Another prior section 307 of act July 14, 1955, ch. 360, title III, formerly § 14, as added Dec. 17, 1963, Pub. L. 88–206, § 1, 77 Stat. 401, was renumbered section 307 by Pub. L. 89–272, renumbered section 310 by Pub. L. 90–148, and renumbered section 317 by Pub. L. 91–604, and is set out as a Short Title note under section 7401 of this title.

---

[6] So in original. Probably should be "sections".

### Amendments

1990—Subsec. (a). Pub. L. 101–549, § 703, struck out par. (1) designation at beginning, inserted provisions authorizing issuance of subpoenas and administration of oaths for purposes of investigations, monitoring, reporting requirements, entries, compliance inspections, or administrative enforcement proceedings under this chapter, and struck out "or section 7521(b)(5)" after "section 7410(f)".

Subsec. (b)(1). Pub. L. 101–549, § 706(2), which directed amendment of second sentence by striking "under section 7413(d) of this title" immediately before "under section 7419 of this title", was executed by striking "under section 7413(d) of this title," before "under section 7419 of this title", to reflect the probable intent of Congress.

Pub. L. 101–549, § 706(1), inserted at end: "The filing of a petition for reconsideration by the Administrator of any otherwise final rule or action shall not affect the finality of such rule or action for purposes of judicial review nor extend the time within which a petition for judicial review of such rule or action under this section may be filed, and shall not postpone the effectiveness of such rule or action."

Pub. L. 101–549, § 702(c), inserted "or revising regulations for enhanced monitoring and compliance certification programs under section 7414(a)(3) of this title," before "or any other final action of the Administrator".

Pub. L. 101–549, § 302(g), substituted "section 7412" for "section 7412(c)".

Subsec. (b)(2). Pub. L. 101–549, § 707(h), inserted sentence at end authorizing challenge to deferrals of performance of nondiscretionary statutory actions.

Subsec. (d)(1)(C). Pub. L. 101–549, § 110(5)(A), amended subpar. (C) generally. Prior to amendment, subpar. (C) read as follows: "the promulgation or revision of any standard of performance under section 7411 of this title or emission standard under section 7412 of this title,".

Subsec. (d)(1)(D), (E). Pub. L. 101–549, § 302(h), added subpar. (D) and redesignated former subpar. (D) as (E). Former subpar. (E) redesignated (F).

Subsec. (d)(1)(F). Pub. L. 101–549, § 302(h), redesignated subpar. (E) as (F). Former subpar. (F) redesignated (G).

Pub. L. 101–549, § 110(5)(B), amended subpar. (F) generally. Prior to amendment, subpar. (F) read as follows: "promulgation or revision of regulations pertaining to orders for coal conversion under section 7413(d)(5) of this title (but not including orders granting or denying any such orders),".

Subsec. (d)(1)(G), (H). Pub. L. 101–549, § 302(h), redesignated subpars. (F) and (G) as (G) and (H), respectively. Former subpar. (H) redesignated (I).

Subsec. (d)(1)(I). Pub. L. 101–549, § 710(b), which directed that subpar. (H) be amended by substituting "subchapter VI of this chapter" for "part B of subchapter I of this chapter", was executed by making the substitution in subpar. (I), to reflect the probable intent of Congress and the intervening redesignation of subpar. (H) as (I) by Pub. L. 101–549, § 302(h), see below.

Pub. L. 101–549, § 302(h), redesignated subpar. (H) as (I). Former subpar. (I) redesignated (J).

Subsec. (d)(1)(J) to (M). Pub. L. 101–549, § 302(h), redesignated subpars. (I) to (L) as (J) to (M), respectively. Former subpar. (M) redesignated (N).

Subsec. (d)(1)(N). Pub. L. 101–549, § 302(h), redesignated subpar. (M) as (N). Former subpar. (N) redesignated (O).

Pub. L. 101–549, § 110(5)(C), added subpar. (N) and redesignated former subpar. (N) as (U).

Subsec. (d)(1)(O) to (T). Pub. L. 101–549, § 302(h), redesignated subpars. (N) to (S) as (O) to (T), respectively. Former subpar. (T) redesignated (U).

Pub. L. 101–549, § 110(5)(C), added subpars. (O) to (T).

Subsec. (d)(1)(U). Pub. L. 101–549, § 302(h), redesignated subpar. (T) as (U). Former subpar. (U) redesignated (V).

Pub. L. 101–549, § 110(5)(C), redesignated former subpar. (N) as (U).

Subsec. (d)(1)(V). Pub. L. 101–549, § 302(h), redesignated subpar. (U) as (V).

Subsec. (h). Pub. L. 101–549, § 108(p), added subsec. (h).

1977—Subsec. (b)(1). Pub. L. 95–190 in text relating to filing of petitions for review in the United States Court of Appeals for the District of Columbia inserted provision respecting requirements under sections 7411 and 7412 of this title, and substituted provisions authorizing review of any rule issued under section 7413, 7419, or 7420 of this title, for provisions authorizing review of any rule or order issued under section 7420 of this title, relating to noncompliance penalties, and in text relating to filing of petitions for review in the United States Court of Appeals for the appropriate circuit inserted provision respecting review under section 7411(j), 7412(c), 7413(d), or 7419 of this title, provision authorizing review of actions under section 1857c–10(c)(2)(A), (B), or (C) to the period prior to Aug. 7, 1977, and provisions authorizing review of denials or disapprovals by the Administrator under subchapter I of this chapter.

Pub. L. 95–95, § 305(c), (h), inserted rules or orders issued under section 7420 of this title (relating to noncompliance penalties) and any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter to the enumeration of actions of the Administrator for which a petition for review may be filed only in the United States Court of Appeals for the District of Columbia, added the approval or promulgation by the Administrator of orders under section 7420 of this title, or any other final action of the Administrator under this chapter which is locally or regionally applicable to the enumeration of actions by the Administrator for which a petition for review may be filed only in the United States Court of Appeals for the appropriate circuit, inserted provision that petitions otherwise capable of being filed in the Court of Appeals for the appropriate circuit may be filed only in the Court of Appeals for the District of Columbia if the action is based on a determination of nationwide scope, and increased from 30 days to 60 days the period during which the petition must be filed.

Subsec. (d). Pub. L. 95–95, § 305(a), added subsec. (d).

Subsec. (e). Pub. L. 95–95, § 303(d), added subsec. (e).

Subsec. (f). Pub. L. 95–95, § 305(f), added subsec. (f).

Subsec. (g). Pub. L. 95–95, § 305(g), added subsec. (g).

1974—Subsec. (b)(1). Pub. L. 93–319 inserted reference to the Administrator's action under section 1857c–10(c)(2)(A), (B), or (C) of this title or under regulations thereunder and substituted reference to the filing of a petition within 30 days from the date of promulgation, approval, or action for reference to the filing of a petition within 30 days from the date of promulgation or approval.

1971—Subsec. (a)(1). Pub. L. 92–157 substituted reference to section "7545(c)(3)" for "7545(c)(4)" of this title.

Effective Date of 1977 Amendment

Amendment by Pub. L. 95–95 effective Aug. 7, 1977, except as otherwise expressly provided, see section 406(d) of Pub. L. 95–95, set out as a note under section 7401 of this title.

Termination of Advisory Committees

Advisory committees established after Jan. 5, 1973, to terminate not later than the expiration of the 2-year period beginning on the date of their establishment, unless, in the case of a committee established by the President or an officer of the Federal Government, such committee is renewed by appropriate action prior to the expiration of such 2-year period, or in the case of a committee established by the Congress, its duration is otherwise provided for by law. See section 14 of Pub. L. 92–463, Oct. 6, 1972, 86 Stat. 776, set out in the Appendix to Title 5, Government Organization and Employees.

Pending Actions and Proceedings

Suits, actions, and other proceedings lawfully commenced by or against the Administrator or any other officer or employee of the United States in his official capacity or in relation to the discharge of his official duties under act July 14, 1955, the Clean Air Act, as in effect immediately prior to the enactment of Pub. L. 95–95 [Aug. 7, 1977], not to abate by reason of the taking effect of Pub. L. 95–95, see section 406(a) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

Modification or Rescission of Rules, Regulations, Orders, Determinations, Contracts, Certifications, Authorizations, Delegations, and Other Actions

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect immediately prior to the date of enactment of Pub. L. 95–95 [Aug. 7, 1977] to continue in full force and effect until modified or rescinded in accordance with act July 14, 1955, as amended by Pub. L. 95–95 [this chapter], see section 406(b) of Pub. L. 95–95, set out as an Effective Date of 1977 Amendment note under section 7401 of this title.

## § 7608. Mandatory licensing

Whenever the Attorney General determines, upon application of the Administrator—

(1) that—

(A) in the implementation of the requirements of section 7411, 7412, or 7521 of this title, a right under any United States letters patent, which is being used or intended for public or commercial use and not otherwise reasonably available, is necessary to enable any person required to comply with such limitation to so comply, and

(B) there are no reasonable alternative methods to accomplish such purpose, and

(2) that the unavailability of such right may result in a substantial lessening of competition or tendency to create a monopoly in any line of commerce in any section of the country,

the Attorney General may so certify to a district court of the United States, which may issue an order requiring the person who owns such patent to license it on such reasonable terms and conditions as the court, after hearing, may determine. Such certification may be made to the district court for the district in which the person owning the patent resides, does business, or is found.

(July 14, 1955, ch. 360, title III, § 308, as added Pub. L. 91–604, § 12(a), Dec. 31, 1970, 84 Stat. 1708.)

Codification

Section was formerly classified to section 1857h–6 of this title.

Prior Provisions

A prior section 308 of act July 14, 1955, was renumbered section 315 by Pub. L. 91–604 and is classified to section 7615 of this title.

Modification or Rescission of Rules, Regulations, Orders, Determinations, Contracts, Certifications, Authorizations, Delegations, and Other Actions

All rules, regulations, orders, determinations, contracts, certifications, authorizations, delegations, or other actions duly issued, made, or taken by or pursuant to act July 14, 1955, the Clean Air Act, as in effect

major modification that would be constructed in an area that is designated attainment or unclassified under section 107(d)(1)(D) or (E) of the CAA, the State plan must, in any review under §51.166 with respect to visibility protection and analyses, provide for:

(1) Written notification of all affected Federal Land Managers of any proposed new major stationary source or major modification that may affect visibility in any Federal Class I area. Such notification must be made in writing and include a copy of all information relevant to the permit application within 30 days of receipt of and at least 60 days prior to public hearing by the State on the application for permit to construct. Such notification must include an analysis of the anticipated impacts on visibility in any Federal Class I area,

(2) Where the State requires or receives advance notification (e.g. early consultation with the source prior to submission of the application or notification of intent to monitor under §51.166) of a permit application of a source that may affect visibility the State must notify all affected Federal Land Managers within 30 days of such advance notification, and

(3) Consideration of any analysis performed by the Federal Land Manager, provided within 30 days of the notification and analysis required by paragraph (a)(1) of this section, that such proposed new major stationary source or major modification may have an adverse impact on visibility in any Federal Class I area. Where the State finds that such an analysis does not demonstrate to the satisfaction of the State that an adverse impact will result in the Federal Class I area, the State must, in the notice of public hearing, either explain its decision or give notice as to where the explanation can be obtained.

(b) The plan shall also provide for the review of any new major stationary source or major modification:

(1) That may have an impact on any integral vista of a mandatory Class I Federal area, if it is identified in accordance with §51.304 by the Federal Land Manager at least 12 months before submission of a complete permit application, except where the Federal

Land Manager has provided notice and opportunity for public comment on the integral vista in which case the review must include impacts on any integral vista identified at least 6 months prior to submission of a complete permit application, unless the State determines under §51.304(d) that the identification was not in accordance with the identification criteria, or

(2) That proposes to locate in an area classified as nonattainment under section 107(d)(1)(A), (B), or (C) of the Clean Air Act that may have an impact on visibility in any mandatory Class I Federal area.

(c) Review of any major stationary source or major modification under paragraph (b) of this section, shall be conducted in accordance with paragraph (a) of this section, and §51.166(o), (p)(1) through (2), and (q). In conducting such reviews the State must ensure that the source's emissions will be consistent with making reasonable progress toward the national visibility goal referred to in §51.300(a). The State may take into account the costs of compliance, the time necessary for compliance, the energy and nonair quality environmental impacts of compliance, and the useful life of the source.

(d) The State may require monitoring of visibility in any Federal Class I area near the proposed new stationary source or major modification for such purposes and by such means as the State deems necessary and appropriate.

[45 FR 80089, Dec. 2, 1980, as amended at 64 FR 35765, 35774, July 1, 1999]

§ 51.308  Regional haze program requirements.

(a) *What is the purpose of this section?* This section establishes requirements for implementation plans, plan revisions, and periodic progress reviews to address regional haze.

(b) *When are the first implementation plans due under the regional haze program?* Except as provided in §51.309(c), each State identified in §51.300(b)(3) must submit, for the entire State, an implementation plan for regional haze meeting the requirements of paragraphs (d) and (e) of this section no later than December 17, 2007.

**Environmental Protection Agency**                                       **§ 51.308**

(c) [Reserved]

(d) *What are the core requirements for the implementation plan for regional haze?* The State must address regional haze in each mandatory Class I Federal area located within the State and in each mandatory Class I Federal area located outside the State which may be affected by emissions from within the State. To meet the core requirements for regional haze for these areas, the State must submit an implementation plan containing the following plan elements and supporting documentation for all required analyses:

(1) *Reasonable progress goals.* For each mandatory Class I Federal area located within the State, the State must establish goals (expressed in deciviews) that provide for reasonable progress towards achieving natural visibility conditions. The reasonable progress goals must provide for an improvement in visibility for the most impaired days over the period of the implementation plan and ensure no degradation in visibility for the least impaired days over the same period.

(i) In establishing a reasonable progress goal for any mandatory Class I Federal area within the State, the State must:

(A) Consider the costs of compliance, the time necessary for compliance, the energy and non-air quality environmental impacts of compliance, and the remaining useful life of any potentially affected sources, and include a demonstration showing how these factors were taken into consideration in selecting the goal.

(B) Analyze and determine the rate of progress needed to attain natural visibility conditions by the year 2064. To calculate this rate of progress, the State must compare baseline visibility conditions to natural visibility conditions in the mandatory Federal Class I area and determine the uniform rate of visibility improvement (measured in deciviews) that would need to be maintained during each implementation period in order to attain natural visibility conditions by 2064. In establishing the reasonable progress goal, the State must consider the uniform rate of improvement in visibility and the emission reduction measures need-

ed to achieve it for the period covered by the implementation plan.

(ii) For the period of the implementation plan, if the State establishes a reasonable progress goal that provides for a slower rate of improvement in visibility than the rate that would be needed to attain natural conditions by 2064, the State must demonstrate, based on the factors in paragraph (d)(1)(i)(A) of this section, that the rate of progress for the implementation plan to attain natural conditions by 2064 is not reasonable; and that the progress goal adopted by the State is reasonable. The State must provide to the public for review as part of its implementation plan an assessment of the number of years it would take to attain natural conditions if visibility improvement continues at the rate of progress selected by the State as reasonable.

(iii) In determining whether the State's goal for visibility improvement provides for reasonable progress towards natural visibility conditions, the Administrator will evaluate the demonstrations developed by the State pursuant to paragraphs (d)(1)(i) and (d)(1)(ii) of this section.

(iv) In developing each reasonable progress goal, the State must consult with those States which may reasonably be anticipated to cause or contribute to visibility impairment in the mandatory Class I Federal area. In any situation in which the State cannot agree with another such State or group of States that a goal provides for reasonable progress, the State must describe in its submittal the actions taken to resolve the disagreement. In reviewing the State's implementation plan submittal, the Administrator will take this information into account in determining whether the State's goal for visibility improvement provides for reasonable progress towards natural visibility conditions.

(v) The reasonable progress goals established by the State are not directly enforceable but will be considered by the Administrator in evaluating the adequacy of the measures in the implementation plan to achieve the progress goal adopted by the State.

(vi) The State may not adopt a reasonable progress goal that represents

297

**§ 51.308**

less visibility improvement than is expected to result from implementation of other requirements of the CAA during the applicable planning period.

(2) *Calculations of baseline and natural visibility conditions.* For each mandatory Class I Federal area located within the State, the State must determine the following visibility conditions (expressed in deciviews):

(i) Baseline visibility conditions for the most impaired and least impaired days. The period for establishing baseline visibility conditions is 2000 to 2004. Baseline visibility conditions must be calculated, using available monitoring data, by establishing the average degree of visibility impairment for the most and least impaired days for each calendar year from 2000 to 2004. The baseline visibility conditions are the average of these annual values. For mandatory Class I Federal areas without onsite monitoring data for 2000–2004, the State must establish baseline values using the most representative available monitoring data for 2000–2004, in consultation with the Administrator or his or her designee;

(ii) For an implementation plan that is submitted by 2003, the period for establishing baseline visibility conditions for the period of the first long-term strategy is the most recent 5-year period for which visibility monitoring data are available for the mandatory Class I Federal areas addressed by the plan. For mandatory Class I Federal areas without onsite monitoring data, the State must establish baseline values using the most representative available monitoring data, in consultation with the Administrator or his or her designee;

(iii) Natural visibility conditions for the most impaired and least impaired days. Natural visibility conditions must be calculated by estimating the degree of visibility impairment existing under natural conditions for the most impaired and least impaired days, based on available monitoring information and appropriate data analysis techniques; and

(iv)(A) For the first implementation plan addressing the requirements of paragraphs (d) and (e) of this section, the number of deciviews by which baseline conditions exceed natural visibility conditions for the most impaired and least impaired days; or

(B) For all future implementation plan revisions, the number of deciviews by which current conditions, as calculated under paragraph (f)(1) of this section, exceed natural visibility conditions for the most impaired and least impaired days.

(3) *Long-term strategy for regional haze.* Each State listed in § 51.300(b)(3) must submit a long-term strategy that addresses regional haze visibility impairment for each mandatory Class I Federal area within the State and for each mandatory Class I Federal area located outside the State which may be affected by emissions from the State. The long-term strategy must include enforceable emissions limitations, compliance schedules, and other measures as necessary to achieve the reasonable progress goals established by States having mandatory Class I Federal areas. In establishing its long-term strategy for regional haze, the State must meet the following requirements:

(i) Where the State has emissions that are reasonably anticipated to contribute to visibility impairment in any mandatory Class I Federal area located in another State or States, the State must consult with the other State(s) in order to develop coordinated emission management strategies. The State must consult with any other State having emissions that are reasonably anticipated to contribute to visibility impairment in any mandatory Class I Federal area within the State.

(ii) Where other States cause or contribute to impairment in a mandatory Class I Federal area, the State must demonstrate that it has included in its implementation plan all measures necessary to obtain its share of the emission reductions needed to meet the progress goal for the area. If the State has participated in a regional planning process, the State must ensure it has included all measures needed to achieve its apportionment of emission reduction obligations agreed upon through that process.

(iii) The State must document the technical basis, including modeling, monitoring and emissions information,

298

**Environmental Protection Agency**                                            **§ 51.308**

on which the State is relying to determine its apportionment of emission reduction obligations necessary for achieving reasonable progress in each mandatory Class I Federal area it affects. The State may meet this requirement by relying on technical analyses developed by the regional planning organization and approved by all State participants. The State must identify the baseline emissions inventory on which its strategies are based. The baseline emissions inventory year is presumed to be the most recent year of the consolidate periodic emissions inventory.

(iv) The State must identify all anthropogenic sources of visibility impairment considered by the State in developing its long-term strategy. The State should consider major and minor stationary sources, mobile sources, and area sources.

(v) The State must consider, at a minimum, the following factors in developing its long-term strategy:

(A) Emission reductions due to ongoing air pollution control programs, including measures to address reasonably attributable visibility impairment;

(B) Measures to mitigate the impacts of construction activities;

(C) Emissions limitations and schedules for compliance to achieve the reasonable progress goal;

(D) Source retirement and replacement schedules;

(E) Smoke management techniques for agricultural and forestry management purposes including plans as currently exist within the State for these purposes;

(F) Enforceability of emissions limitations and control measures; and

(G) The anticipated net effect on visibility due to projected changes in point, area, and mobile source emissions over the period addressed by the long-term strategy.

(4) *Monitoring strategy and other implementation plan requirements.* The State must submit with the implementation plan a monitoring strategy for measuring, characterizing, and reporting of regional haze visibility impairment that is representative of all mandatory Class I Federal areas within the State. This monitoring strategy must be coordinated with the monitoring strategy required in § 51.305 for reasonably attributable visibility impairment. Compliance with this requirement may be met through participation in the Interagency Monitoring of Protected Visual Environments network. The implementation plan must also provide for the following:

(i) The establishment of any additional monitoring sites or equipment needed to assess whether reasonable progress goals to address regional haze for all mandatory Class I Federal areas within the State are being achieved.

(ii) Procedures by which monitoring data and other information are used in determining the contribution of emissions from within the State to regional haze visibility impairment at mandatory Class I Federal areas both within and outside the State.

(iii) For a State with no mandatory Class I Federal areas, procedures by which monitoring data and other information are used in determining the contribution of emissions from within the State to regional haze visibility impairment at mandatory Class I Federal areas in other States.

(iv) The implementation plan must provide for the reporting of all visibility monitoring data to the Administrator at least annually for each mandatory Class I Federal area in the State. To the extent possible, the State should report visibility monitoring data electronically.

(v) A statewide inventory of emissions of pollutants that are reasonably anticipated to cause or contribute to visibility impairment in any mandatory Class I Federal area. The inventory must include emissions for a baseline year, emissions for the most recent year for which data are available, and estimates of future projected emissions. The State must also include a commitment to update the inventory periodically.

(vi) Other elements, including reporting, recordkeeping, and other measures, necessary to assess and report on visibility.

(e) *Best Available Retrofit Technology (BART) requirements for regional haze visibility impairment.* The State must

submit an implementation plan containing emission limitations representing BART and schedules for compliance with BART for each BART-eligible source that may reasonably be anticipated to cause or contribute to any impairment of visibility in any mandatory Class I Federal area, unless the State demonstrates that an emissions trading program or other alternative will achieve greater reasonable progress toward natural visibility conditions.

(1) To address the requirements for BART, the State must submit an implementation plan containing the following plan elements and include documentation for all required analyses:

(i) A list of all BART-eligible sources within the State.

(ii) A determination of BART for each BART-eligible source in the State that emits any air pollutant which may reasonably be anticipated to cause or contribute to any impairment of visibility in any mandatory Class I Federal area. All such sources are subject to BART.

(A) The determination of BART must be based on an analysis of the best system of continuous emission control technology available and associated emission reductions achievable for each BART-eligible source that is subject to BART within the State. In this analysis, the State must take into consideration the technology available, the costs of compliance, the energy and nonair quality environmental impacts of compliance, any pollution control equipment in use at the source, the remaining useful life of the source, and the degree of improvement in visibility which may reasonably be anticipated to result from the use of such technology.

(B) The determination of BART for fossil-fuel fired power plants having a total generating capacity greater than 750 megawatts must be made pursuant to the guidelines in appendix Y of this part (Guidelines for BART Determinations Under the Regional Haze Rule).

(C) *Exception.* A State is not required to make a determination of BART for $SO_2$ or for $NO_X$ if a BART-eligible source has the potential to emit less than 40 tons per year of such pollutant(s), or for $PM_{10}$ if a BART-eligible source has the potential to emit less than 15 tons per year of such pollutant.

(iii) If the State determines in establishing BART that technological or economic limitations on the applicability of measurement methodology to a particular source would make the imposition of an emission standard infeasible, it may instead prescribe a design, equipment, work practice, or other operational standard, or combination thereof, to require the application of BART. Such standard, to the degree possible, is to set forth the emission reduction to be achieved by implementation of such design, equipment, work practice or operation, and must provide for compliance by means which achieve equivalent results.

(iv) A requirement that each source subject to BART be required to install and operate BART as expeditiously as practicable, but in no event later than 5 years after approval of the implementation plan revision.

(v) A requirement that each source subject to BART maintain the control equipment required by this subpart and establish procedures to ensure such equipment is properly operated and maintained.

(2) A State may opt to implement or require participation in an emissions trading program or other alternative measure rather than to require sources subject to BART to install, operate, and maintain BART. Such an emissions trading program or other alternative measure must achieve greater reasonable progress than would be achieved through the installation and operation of BART. For all such emission trading programs or other alternative measures, the State must submit an implementation plan containing the following plan elements and include documentation for all required analyses:

(i) A demonstration that the emissions trading program or other alternative measure will achieve greater reasonable progress than would have resulted from the installation and operation of BART at all sources subject to BART in the State and covered by the alternative program. This demonstration must be based on the following:

**Environmental Protection Agency**                              **§ 51.308**

(A) A list of all BART-eligible sources within the State.

(B) A list of all BART-eligible sources and all BART source categories covered by the alternative program. The State is not required to include every BART source category or every BART-eligible source within a BART source category in an alternative program, but each BART-eligible source in the State must be subject to the requirements of the alternative program, have a federally enforceable emission limitation determined by the State and approved by EPA as meeting BART in accordance with section 302(c) or paragraph (e)(1) of this section, or otherwise addressed under paragraphs (e)(1) or (e)(4)of this section.

(C) An analysis of the best system of continuous emission control technology available and associated emission reductions achievable for each source within the State subject to BART and covered by the alternative program. This analysis must be conducted by making a determination of BART for each source subject to BART and covered by the alternative program as provided for in paragraph (e)(1) of this section, unless the emissions trading program or other alternative measure has been designed to meet a requirement other than BART (such as the core requirement to have a long-term strategy to achieve the reasonable progress goals established by States). In this case, the State may determine the best system of continuous emission control technology and associated emission reductions for similar types of sources within a source category based on both source-specific and category-wide information, as appropriate.

(D) An analysis of the projected emissions reductions achievable through the trading program or other alternative measure.

(E) A determination under paragraph (e)(3) of this section or otherwise based on the clear weight of evidence that the trading program or other alternative measure achieves greater reasonable progress than would be achieved through the installation and operation of BART at the covered sources.

(ii) [Reserved]

(iii) A requirement that all necessary emission reductions take place during the period of the first long-term strategy for regional haze. To meet this requirement, the State must provide a detailed description of the emissions trading program or other alternative measure, including schedules for implementation, the emission reductions required by the program, all necessary administrative and technical procedures for implementing the program, rules for accounting and monitoring emissions, and procedures for enforcement.

(iv) A demonstration that the emission reductions resulting from the emissions trading program or other alternative measure will be surplus to those reductions resulting from measures adopted to meet requirements of the CAA as of the baseline date of the SIP.

(v) At the State's option, a provision that the emissions trading program or other alternative measure may include a geographic enhancement to the program to address the requirement under § 51.302(c) related to BART for reasonably attributable impairment from the pollutants covered under the emissions trading program or other alternative measure.

(vi) For plans that include an emissions trading program that establishes a cap on total annual emissions of $SO_2$ or $NO_X$ from sources subject to the program, requires the owners and operators of sources to hold allowances or authorizations to emit equal to emissions, and allows the owners and operators of sources and other entities to purchase, sell, and transfer allowances, the following elements are required concerning the emissions covered by the cap:

(A) Applicability provisions defining the sources subject to the program. The State must demonstrate that the applicability provisions (including the size criteria for including sources in the program) are designed to prevent any significant potential shifting within the State of production and emissions from sources in the program to sources outside the program. In the case of a program covering sources in

301

multiple States, the States must demonstrate that the applicability provisions in each State cover essentially the same size facilities and, if source categories are specified, cover the same source categories and prevent any significant, potential shifting within such States of production and emissions to sources outside the program.

(B) Allowance provisions ensuring that the total value of allowances (in tons) issued each year under the program will not exceed the emissions cap (in tons) on total annual emissions from the sources in the program.

(C) Monitoring provisions providing for consistent and accurate measurements of emissions from sources in the program to ensure that each allowance actually represents the same specified tonnage of emissions and that emissions are measured with similar accuracy at all sources in the program. The monitoring provisions must require that boilers, combustion turbines, and cement kilns in the program allowed to sell or transfer allowances must comply with the requirements of part 75 of this chapter. The monitoring provisions must require that other sources in the program allowed to sell or transfer allowances must provide emissions information with the same precision, reliability, accessibility, and timeliness as information provided under part 75 of this chapter.

(D) Recordkeeping provisions that ensure the enforceability of the emissions monitoring provisions and other program requirements. The recordkeeping provisions must require that boilers, combustion turbines, and cement kilns in the program allowed to sell or transfer allowances must comply with the recordkeeping provisions of part 75 of this chapter. The recordkeeping provisions must require that other sources in the program allowed to sell or transfer allowances must comply with recordkeeping requirements that, as compared with the recordkeeping provisions under part 75 of this chapter, are of comparable stringency and require recording of comparable types of information and retention of the records for comparable periods of time.

(E) Reporting provisions requiring timely reporting of monitoring data with sufficient frequency to ensure the enforceability of the emissions monitoring provisions and other program requirements and the ability to audit the program. The reporting provisions must require that boilers, combustion turbines, and cement kilns in the program allowed to sell or transfer allowances must comply with the reporting provisions of part 75 of this chapter, except that, if the Administrator is not the tracking system administrator for the program, emissions may be reported to the tracking system administrator, rather than to the Administrator. The reporting provisions must require that other sources in the program allowed to sell or transfer allowances must comply with reporting requirements that, as compared with the reporting provisions under part 75 of this chapter, are of comparable stringency and require reporting of comparable types of information and require comparable timeliness and frequency of reporting.

(F) Tracking system provisions which provide for a tracking system that is publicly available in a secure, centralized database to track in a consistent manner all allowances and emissions in the program.

(G) Authorized account representative provisions ensuring that the owners and operators of a source designate one individual who is authorized to represent the owners and operators in all matters pertaining to the trading program.

(H) Allowance transfer provisions providing procedures that allow timely transfer and recording of allowances, minimize administrative barriers to the operation of the allowance market, and ensure that such procedures apply uniformly to all sources and other potential participants in the allowance market.

(I) Compliance provisions prohibiting a source from emitting a total tonnage of a pollutant that exceeds the tonnage value of its allowance holdings, including the methods and procedures for determining whether emissions exceed allowance holdings. Such method and procedures shall apply consistently from source to source.

(J) Penalty provisions providing for mandatory allowance deductions for

**Environmental Protection Agency**                                    **§ 51.308**

excess emissions that apply consistently from source to source. The tonnage value of the allowances deducted shall equal at least three times the tonnage of the excess emissions.

(K) For a trading program that allows banking of allowances, provisions clarifying any restrictions on the use of these banked allowances.

(L) Program assessment provisions providing for periodic program evaluation to assess whether the program is accomplishing its goals and whether modifications to the program are needed to enhance performance of the program.

(3) A State which opts under 40 CFR 51.308(e)(2) to implement an emissions trading program or other alternative measure rather than to require sources subject to BART to install, operate, and maintain BART may satisfy the final step of the demonstration required by that section as follows: If the distribution of emissions is not substantially different than under BART, and the alternative measure results in greater emission reductions, then the alternative measure may be deemed to achieve greater reasonable progress. If the distribution of emissions is significantly different, the State must conduct dispersion modeling to determine differences in visibility between BART and the trading program for each impacted Class I area, for the worst and best 20 percent of days. The modeling would demonstrate "greater reasonable progress" if both of the following two criteria are met:

(i) Visibility does not decline in any Class I area, and

(ii) There is an overall improvement in visibility, determined by comparing the average differences between BART and the alternative over all affected Class I areas.

(4) A State that chooses to meet the emission reduction requirements of the Clean Air Interstate Rule (CAIR) by participating in one or more of the EPA-administered CAIR trading programs for $SO_2$ and $NO_X$ need not require BART—eligible EGUs subject to such trading programs in the State to install, operate, and maintain BART for the pollutants covered by such trading programs in the State. A State may choose to participate in the EPA-

administered CAIR trading programs either by submitting a State implementation plan that incorporates the CAIR model trading rules in part 96 of this chapter, and is approved, in accordance with § 51.123(o)(1) or (2) (for the $NO_X$ annual program) and (aa)(1) or (2) (for the $NO_X$ ozone season program) and § 51.124(o)(1) or (2) (for the $SO_2$ program) or by remaining subject to the Federal implementation plan in part 97 of this chapter (which may be modified by a State implementation plan approved in accordance with §§ 51.123(p) and (ee) and 51.124(r)). A State that chooses to participate in such trading programs may also adopt provisions, consistent with such trading programs, for a geographic enhancement to the program to address the requirement under § 51.302(c) related to BART for reasonably attributable impairment from the pollutants covered by the CAIR cap-and-trade programs.

(5) After a State has met the requirements for BART or implemented emissions trading program or other alternative measure that achieves more reasonable progress than the installation and operation of BART, BART-eligible sources will be subject to the requirements of paragraph (d) of this section in the same manner as other sources.

(6) Any BART-eligible facility subject to the requirement under paragraph (e) of this section to install, operate, and maintain BART may apply to the Administrator for an exemption from that requirement. An application for an exemption will be subject to the requirements of § 51.303(a)(2)–(h).

(f) *Requirements for comprehensive periodic revisions of implementation plans for regional haze.* Each State identified in § 51.300(b)(3) must revise and submit its regional haze implementation plan revision to EPA by July 31, 2018 and every ten years thereafter. In each plan revision, the State must evaluate and reassess all of the elements required in paragraph (d) of this section, taking into account improvements in monitoring data collection and analysis techniques, control technologies, and other relevant factors. In evaluating and reassessing these elements, the State must address the following:

(1) Current visibility conditions for the most impaired and least impaired

303

**§ 51.308**                                              **40 CFR Ch. I (7–1–11 Edition)**

days, and actual progress made towards natural conditions during the previous implementation period. The period for calculating current visibility conditions is the most recent five year period preceding the required date of the implementation plan submittal for which data are available. Current visibility conditions must be calculated based on the annual average level of visibility impairment for the most and least impaired days for each of these five years. Current visibility conditions are the average of these annual values.

(2) The effectiveness of the long-term strategy for achieving reasonable progress goals over the prior implementation period(s); and

(3) Affirmation of, or revision to, the reasonable progress goal in accordance with the procedures set forth in paragraph (d)(1) of this section. If the State established a reasonable progress goal for the prior period which provided a slower rate of progress than that needed to attain natural conditions by the year 2064, the State must evaluate and determine the reasonableness, based on the factors in paragraph (d)(1)(i)(A) of this section, of additional measures that could be adopted to achieve the degree of visibility improvement projected by the analysis contained in the first implementation plan described in paragraph (d)(1)(i)(B) of this section.

(g) *Requirements for periodic reports describing progress towards the reasonable progress goals.* Each State identified in § 51.300(b)(3) must submit a report to the Administrator every 5 years evaluating progress towards the reasonable progress goal for each mandatory Class I Federal area located within the State and in each mandatory Class I Federal area located outside the State which may be affected by emissions from within the State. The first progress report is due 5 years from submittal of the initial implementation plan addressing paragraphs (d) and (e) of this section. The progress reports must be in the form of implementation plan revisions that comply with the procedural requirements of § 51.102 and § 51.103. Periodic progress reports must contain at a minimum the following elements:

(1) A description of the status of implementation of all measures included

in the implementation plan for achieving reasonable progress goals for mandatory Class I Federal areas both within and outside the State.

(2) A summary of the emissions reductions achieved throughout the State through implementation of the measures described in paragraph (g)(1) of this section.

(3) For each mandatory Class I Federal area within the State, the State must assess the following visibility conditions and changes, with values for most impaired and least impaired days expressed in terms of 5-year averages of these annual values.

(i) The current visibility conditions for the most impaired and least impaired days;

(ii) The difference between current visibility conditions for the most impaired and least impaired days and baseline visibility conditions;

(iii) The change in visibility impairment for the most impaired and least impaired days over the past 5 years;

(4) An analysis tracking the change over the past 5 years in emissions of pollutants contributing to visibility impairment from all sources and activities within the State. Emissions changes should be identified by type of source or activity. The analysis must be based on the most recent updated emissions inventory, with estimates projected forward as necessary and appropriate, to account for emissions changes during the applicable 5-year period.

(5) An assessment of any significant changes in anthropogenic emissions within or outside the State that have occurred over the past 5 years that have limited or impeded progress in reducing pollutant emissions and improving visibility.

(6) An assessment of whether the current implementation plan elements and strategies are sufficient to enable the State, or other States with mandatory Federal Class I areas affected by emissions from the State, to meet all established reasonable progress goals.

(7) A review of the State's visibility monitoring strategy and any modifications to the strategy as necessary.

(h) *Determination of the adequacy of existing implementation plan.* At the

304

**Environmental Protection Agency**                                    **§ 51.309**

same time the State is required to submit any 5-year progress report to EPA in accordance with paragraph (g) of this section, the State must also take one of the following actions based upon the information presented in the progress report:

(1) If the State determines that the existing implementation plan requires no further substantive revision at this time in order to achieve established goals for visibility improvement and emissions reductions, the State must provide to the Administrator a negative declaration that further revision of the existing implementation plan is not needed at this time.

(2) If the State determines that the implementation plan is or may be inadequate to ensure reasonable progress due to emissions from sources in another State(s) which participated in a regional planning process, the State must provide notification to the Administrator and to the other State(s) which participated in the regional planning process with the States. The State must also collaborate with the other State(s) through the regional planning process for the purpose of developing additional strategies to address the plan's deficiencies.

(3) Where the State determines that the implementation plan is or may be inadequate to ensure reasonable progress due to emissions from sources in another country, the State shall provide notification, along with available information, to the Administrator.

(4) Where the State determines that the implementation plan is or may be inadequate to ensure reasonable progress due to emissions from sources within the State, the State shall revise its implementation plan to address the plan's deficiencies within one year.

(i) *What are the requirements for State and Federal Land Manager coordination?* (1) By November 29, 1999, the State must identify in writing to the Federal Land Managers the title of the official to which the Federal Land Manager of any mandatory Class I Federal area can submit any recommendations on the implementation of this subpart including, but not limited to:

(i) Identification of impairment of visibility in any mandatory Class I Federal area(s); and

(ii) Identification of elements for inclusion in the visibility monitoring strategy required by §51.305 and this section.

(2) The State must provide the Federal Land Manager with an opportunity for consultation, in person and at least 60 days prior to holding any public hearing on an implementation plan (or plan revision) for regional haze required by this subpart. This consultation must include the opportunity for the affected Federal Land Managers to discuss their:

(i) Assessment of impairment of visibility in any mandatory Class I Federal area; and

(ii) Recommendations on the development of the reasonable progress goal and on the development and implementation of strategies to address visibility impairment.

(3) In developing any implementation plan (or plan revision), the State must include a description of how it addressed any comments provided by the Federal Land Managers.

(4) The plan (or plan revision) must provide procedures for continuing consultation between the State and Federal Land Manager on the implementation of the visibility protection program required by this subpart, including development and review of implementation plan revisions and 5-year progress reports, and on the implementation of other programs having the potential to contribute to impairment of visibility in mandatory Class I Federal areas.

[64 FR 35765, July 1, 1999, as amended at 70 FR 39156, July 6, 2005; 71 FR 60631, Oct. 13, 2006]

**§ 51.309   Requirements related to the Grand Canyon Visibility Transport Commission.**

(a) What is the purpose of this section? This section establishes the requirements for the first regional haze implementation plan to address regional haze visibility impairment in the 16 Class I areas covered by the Grand Canyon Visibility Transport Commission Report. For the period through 2018, certain States (defined in

**Environmental Protection Agency**                                      **§ 51.308**

Land Manager has provided notice and opportunity for public comment on the integral vista in which case the review must include impacts on any integral vista identified at least 6 months prior to submission of a complete permit application, unless the State determines under §51.304(d) that the identification was not in accordance with the identification criteria, or

(2) That proposes to locate in an area classified as nonattainment under section 107(d)(1)(A), (B), or (C) of the Clean Air Act that may have an impact on visibility in any mandatory Class I Federal area.

(c) Review of any major stationary source or major modification under paragraph (b) of this section, shall be conducted in accordance with paragraph (a) of this section, and §51.166(o), (p)(1) through (2), and (q). In conducting such reviews the State must ensure that the source's emissions will be consistent with making reasonable progress toward the national visibility goal referred to in §51.300(a). The State may take into account the costs of compliance, the time necessary for compliance, the energy and nonair quality environmental impacts of compliance, and the useful life of the source.

(d) The State may require monitoring of visibility in any Federal Class I area near the proposed new stationary source or major modification for such purposes and by such means as the State deems necessary and appropriate.

[45 FR 80089, Dec. 2, 1980, as amended at 64 FR 35765, 35774, July 1, 1999]

**§ 51.308 Regional haze program requirements.**

(a) *What is the purpose of this section?* This section establishes requirements for implementation plans, plan revisions, and periodic progress reviews to address regional haze.

(b) *When are the first implementation plans due under the regional haze program?* Except as provided in §51.309(c), each State identified in §51.300(b)(3) must submit, for the entire State, an implementation plan for regional haze meeting the requirements of paragraphs (d) and (e) of this section no later than December 17, 2007.

(c) [Reserved]

(d) *What are the core requirements for the implementation plan for regional haze?* The State must address regional haze in each mandatory Class I Federal area located within the State and in each mandatory Class I Federal area located outside the State which may be affected by emissions from within the State. To meet the core requirements for regional haze for these areas, the State must submit an implementation plan containing the following plan elements and supporting documentation for all required analyses:

(1) *Reasonable progress goals.* For each mandatory Class I Federal area located within the State, the State must establish goals (expressed in deciviews) that provide for reasonable progress towards achieving natural visibility conditions. The reasonable progress goals must provide for an improvement in visibility for the most impaired days over the period of the implementation plan and ensure no degradation in visibility for the least impaired days over the same period.

(i) In establishing a reasonable progress goal for any mandatory Class I Federal area within the State, the State must:

(A) Consider the costs of compliance, the time necessary for compliance, the energy and non-air quality environmental impacts of compliance, and the remaining useful life of any potentially affected sources, and include a demonstration showing how these factors were taken into consideration in selecting the goal.

(B) Analyze and determine the rate of progress needed to attain natural visibility conditions by the year 2064. To calculate this rate of progress, the State must compare baseline visibility conditions to natural visibility conditions in the mandatory Federal Class I area and determine the uniform rate of visibility improvement (measured in deciviews) that would need to be maintained during each implementation period in order to attain natural visibility conditions by 2064. In establishing the reasonable progress goal, the State must consider the uniform rate of improvement in visibility and

299

the emission reduction measures needed to achieve it for the period covered by the implementation plan.

(ii) For the period of the implementation plan, if the State establishes a reasonable progress goal that provides for a slower rate of improvement in visibility than the rate that would be needed to attain natural conditions by 2064, the State must demonstrate, based on the factors in paragraph (d)(1)(i)(A) of this section, that the rate of progress for the implementation plan to attain natural conditions by 2064 is not reasonable; and that the progress goal adopted by the State is reasonable. The State must provide to the public for review as part of its implementation plan an assessment of the number of years it would take to attain natural conditions if visibility improvement continues at the rate of progress selected by the State as reasonable.

(iii) In determining whether the State's goal for visibility improvement provides for reasonable progress towards natural visibility conditions, the Administrator will evaluate the demonstrations developed by the State pursuant to paragraphs (d)(1)(i) and (d)(1)(ii) of this section.

(iv) In developing each reasonable progress goal, the State must consult with those States which may reasonably be anticipated to cause or contribute to visibility impairment in the mandatory Class I Federal area. In any situation in which the State cannot agree with another such State or group of States that a goal provides for reasonable progress, the State must describe in its submittal the actions taken to resolve the disagreement. In reviewing the State's implementation plan submittal, the Administrator will take this information into account in determining whether the State's goal for visibility improvement provides for reasonable progress towards natural visibility conditions.

(v) The reasonable progress goals established by the State are not directly enforceable but will be considered by the Administrator in evaluating the adequacy of the measures in the implementation plan to achieve the progress goal adopted by the State.

(vi) The State may not adopt a reasonable progress goal that represents less visibility improvement than is expected to result from implementation of other requirements of the CAA during the applicable planning period.

(2) *Calculations of baseline and natural visibility conditions.* For each mandatory Class I Federal area located within the State, the State must determine the following visibility conditions (expressed in deciviews):

(i) Baseline visibility conditions for the most impaired and least impaired days. The period for establishing baseline visibility conditions is 2000 to 2004. Baseline visibility conditions must be calculated, using available monitoring data, by establishing the average degree of visibility impairment for the most and least impaired days for each calendar year from 2000 to 2004. The baseline visibility conditions are the average of these annual values. For mandatory Class I Federal areas without onsite monitoring data for 2000–2004, the State must establish baseline values using the most representative available monitoring data for 2000–2004, in consultation with the Administrator or his or her designee;

(ii) For an implementation plan that is submitted by 2003, the period for establishing baseline visibility conditions for the period of the first long-term strategy is the most recent 5-year period for which visibility monitoring data are available for the mandatory Class I Federal areas addressed by the plan. For mandatory Class I Federal areas without onsite monitoring data, the State must establish baseline values using the most representative available monitoring data, in consultation with the Administrator or his or her designee;

(iii) Natural visibility conditions for the most impaired and least impaired days. Natural visibility conditions must be calculated by estimating the degree of visibility impairment existing under natural conditions for the most impaired and least impaired days, based on available monitoring information and appropriate data analysis techniques; and

(iv)(A) For the first implementation plan addressing the requirements of paragraphs (d) and (e) of this section,

300

**Environmental Protection Agency**                                                                §51.308

the number of deciviews by which baseline conditions exceed natural visibility conditions for the most impaired and least impaired days; or

(B) For all future implementation plan revisions, the number of deciviews by which current conditions, as calculated under paragraph (f)(1) of this section, exceed natural visibility conditions for the most impaired and least impaired days.

(3) *Long-term strategy for regional haze.* Each State listed in §51.300(b)(3) must submit a long-term strategy that addresses regional haze visibility impairment for each mandatory Class I Federal area within the State and for each mandatory Class I Federal area located outside the State which may be affected by emissions from the State. The long-term strategy must include enforceable emissions limitations, compliance schedules, and other measures as necessary to achieve the reasonable progress goals established by States having mandatory Class I Federal areas. In establishing its long-term strategy for regional haze, the State must meet the following requirements:

(i) Where the State has emissions that are reasonably anticipated to contribute to visibility impairment in any mandatory Class I Federal area located in another State or States, the State must consult with the other State(s) in order to develop coordinated emission management strategies. The State must consult with any other State having emissions that are reasonably anticipated to contribute to visibility impairment in any mandatory Class I Federal area within the State.

(ii) Where other States cause or contribute to impairment in a mandatory Class I Federal area, the State must demonstrate that it has included in its implementation plan all measures necessary to obtain its share of the emission reductions needed to meet the progress goal for the area. If the State has participated in a regional planning process, the State must ensure it has included all measures needed to achieve its apportionment of emission reduction obligations agreed upon through that process.

(iii) The State must document the technical basis, including modeling, monitoring and emissions information, on which the State is relying to determine its apportionment of emission reduction obligations necessary for achieving reasonable progress in each mandatory Class I Federal area it affects. The State may meet this requirement by relying on technical analyses developed by the regional planning organization and approved by all State participants. The State must identify the baseline emissions inventory on which its strategies are based. The baseline emissions inventory year is presumed to be the most recent year of the consolidate periodic emissions inventory.

(iv) The State must identify all anthropogenic sources of visibility impairment considered by the State in developing its long-term strategy. The State should consider major and minor stationary sources, mobile sources, and area sources.

(v) The State must consider, at a minimum, the following factors in developing its long-term strategy:

(A) Emission reductions due to ongoing air pollution control programs, including measures to address reasonably attributable visibility impairment;

(B) Measures to mitigate the impacts of construction activities;

(C) Emissions limitations and schedules for compliance to achieve the reasonable progress goal;

(D) Source retirement and replacement schedules;

(E) Smoke management techniques for agricultural and forestry management purposes including plans as currently exist within the State for these purposes;

(F) Enforceability of emissions limitations and control measures; and

(G) The anticipated net effect on visibility due to projected changes in point, area, and mobile source emissions over the period addressed by the long-term strategy.

(4) *Monitoring strategy and other implementation plan requirements.* The State must submit with the implementation plan a monitoring strategy for measuring, characterizing, and reporting of regional haze visibility impairment that is representative of all mandatory Class I Federal areas within the State.

301

This monitoring strategy must be coordinated with the monitoring strategy required in §51.305 for reasonably attributable visibility impairment. Compliance with this requirement may be met through participation in the Interagency Monitoring of Protected Visual Environments network. The implementation plan must also provide for the following:

(i) The establishment of any additional monitoring sites or equipment needed to assess whether reasonable progress goals to address regional haze for all mandatory Class I Federal areas within the State are being achieved.

(ii) Procedures by which monitoring data and other information are used in determining the contribution of emissions from within the State to regional haze visibility impairment at mandatory Class I Federal areas both within and outside the State.

(iii) For a State with no mandatory Class I Federal areas, procedures by which monitoring data and other information are used in determining the contribution of emissions from within the State to regional haze visibility impairment at mandatory Class I Federal areas in other States.

(iv) The implementation plan must provide for the reporting of all visibility monitoring data to the Administrator at least annually for each mandatory Class I Federal area in the State. To the extent possible, the State should report visibility monitoring data electronically.

(v) A statewide inventory of emissions of pollutants that are reasonably anticipated to cause or contribute to visibility impairment in any mandatory Class I Federal area. The inventory must include emissions for a baseline year, emissions for the most recent year for which data are available, and estimates of future projected emissions. The State must also include a commitment to update the inventory periodically.

(vi) Other elements, including reporting, recordkeeping, and other measures, necessary to assess and report on visibility.

(e) *Best Available Retrofit Technology (BART) requirements for regional haze visibility impairment.* The State must submit an implementation plan containing emission limitations representing BART and schedules for compliance with BART for each BART-eligible source that may reasonably be anticipated to cause or contribute to any impairment of visibility in any mandatory Class I Federal area, unless the State demonstrates that an emissions trading program or other alternative will achieve greater reasonable progress toward natural visibility conditions.

(1) To address the requirements for BART, the State must submit an implementation plan containing the following plan elements and include documentation for all required analyses:

(i) A list of all BART-eligible sources within the State.

(ii) A determination of BART for each BART-eligible source in the State that emits any air pollutant which may reasonably be anticipated to cause or contribute to any impairment of visibility in any mandatory Class I Federal area. All such sources are subject to BART.

(A) The determination of BART must be based on an analysis of the best system of continuous emission control technology available and associated emission reductions achievable for each BART-eligible source that is subject to BART within the State. In this analysis, the State must take into consideration the technology available, the costs of compliance, the energy and nonair quality environmental impacts of compliance, any pollution control equipment in use at the source, the remaining useful life of the source, and the degree of improvement in visibility which may reasonably be anticipated to result from the use of such technology.

(B) The determination of BART for fossil-fuel fired power plants having a total generating capacity greater than 750 megawatts must be made pursuant to the guidelines in appendix Y of this part (Guidelines for BART Determinations Under the Regional Haze Rule).

(C) *Exception.* A State is not required to make a determination of BART for SO₂ or for NOₓ if a BART-eligible source has the potential to emit less than 40 tons per year of such pollutant(s), or for PM₁₀ if a BART-eligible

**Environmental Protection Agency**                                    **§ 51.308**

source has the potential to emit less than 15 tons per year of such pollutant.

(iii) If the State determines in establishing BART that technological or economic limitations on the applicability of measurement methodology to a particular source would make the imposition of an emission standard infeasible, it may instead prescribe a design, equipment, work practice, or other operational standard, or combination thereof, to require the application of BART. Such standard, to the degree possible, is to set forth the emission reduction to be achieved by implementation of such design, equipment, work practice or operation, and must provide for compliance by means which achieve equivalent results.

(iv) A requirement that each source subject to BART be required to install and operate BART as expeditiously as practicable, but in no event later than 5 years after approval of the implementation plan revision.

(v) A requirement that each source subject to BART maintain the control equipment required by this subpart and establish procedures to ensure such equipment is properly operated and maintained.

(2) A State may opt to implement or require participation in an emissions trading program or other alternative measure rather than to require sources subject to BART to install, operate, and maintain BART. Such an emissions trading program or other alternative measure must achieve greater reasonable progress than would be achieved through the installation and operation of BART. For all such emission trading programs or other alternative measures, the State must submit an implementation plan containing the following plan elements and include documentation for all required analyses:

(i) A demonstration that the emissions trading program or other alternative measure will achieve greater reasonable progress than would have resulted from the installation and operation of BART at all sources subject to BART in the State and covered by the alternative program. This demonstration must be based on the following:

(A) A list of all BART-eligible sources within the State.

(B) A list of all BART-eligible sources and all BART source categories covered by the alternative program. The State is not required to include every BART source category or every BART-eligible source within a BART source category in an alternative program, but each BART-eligible source in the State must be subject to the requirements of the alternative program, have a federally enforceable emission limitation determined by the State and approved by EPA as meeting BART in accordance with section 302(c) or paragraph (e)(1) of this section, or otherwise addressed under paragraphs (e)(1) or (e)(4)of this section.

(C) An analysis of the best system of continuous emission control technology available and associated emission reductions achievable for each source within the State subject to BART and covered by the alternative program. This analysis must be conducted by making a determination of BART for each source subject to BART and covered by the alternative program as provided for in paragraph (e)(1) of this section, unless the emissions trading program or other alternative measure has been designed to meet a requirement other than BART (such as the core requirement to have a long-term strategy to achieve the reasonable progress goals established by States). In this case, the State may determine the best system of continuous emission control technology and associated emission reductions for similar types of sources within a source category based on both source-specific and category-wide information, as appropriate.

(D) An analysis of the projected emissions reductions achievable through the trading program or other alternative measure.

(E) A determination under paragraph (e)(3) of this section or otherwise based on the clear weight of evidence that the trading program or other alternative measure achieves greater reasonable progress than would be achieved through the installation and operation of BART at the covered sources.

(ii) [Reserved]

303

(iii) A requirement that all necessary emission reductions take place during the period of the first long-term strategy for regional haze. To meet this requirement, the State must provide a detailed description of the emissions trading program or other alternative measure, including schedules for implementation, the emission reductions required by the program, all necessary administrative and technical procedures for implementing the program, rules for accounting and monitoring emissions, and procedures for enforcement.

(iv) A demonstration that the emission reductions resulting from the emissions trading program or other alternative measure will be surplus to those reductions resulting from measures adopted to meet requirements of the CAA as of the baseline date of the SIP.

(v) At the State's option, a provision that the emissions trading program or other alternative measure may include a geographic enhancement to the program to address the requirement under §51.302(c) related to BART for reasonably attributable impairment from the pollutants covered under the emissions trading program or other alternative measure.

(vi) For plans that include an emissions trading program that establishes a cap on total annual emissions of $SO_2$ or $NO_X$ from sources subject to the program, requires the owners and operators of sources to hold allowances or authorizations to emit equal to emissions, and allows the owners and operators of sources and other entities to purchase, sell, and transfer allowances, the following elements are required concerning the emissions covered by the cap:

(A) Applicability provisions defining the sources subject to the program. The State must demonstrate that the applicability provisions (including the size criteria for including sources in the program) are designed to prevent any significant potential shifting within the State of production and emissions from sources in the program to sources outside the program. In the case of a program covering sources in multiple States, the States must demonstrate that the applicability provi-

sions in each State cover essentially the same size facilities and, if source categories are specified, cover the same source categories and prevent any significant, potential shifting within such States of production and emissions to sources outside the program.

(B) Allowance provisions ensuring that the total value of allowances (in tons) issued each year under the program will not exceed the emissions cap (in tons) on total annual emissions from the sources in the program.

(C) Monitoring provisions providing for consistent and accurate measurements of emissions from sources in the program to ensure that each allowance actually represents the same specified tonnage of emissions and that emissions are measured with similar accuracy at all sources in the program. The monitoring provisions must require that boilers, combustion turbines, and cement kilns in the program allowed to sell or transfer allowances must comply with the requirements of part 75 of this chapter. The monitoring provisions must require that other sources in the program allowed to sell or transfer allowances must provide emissions information with the same precision, reliability, accessibility, and timeliness as information provided under part 75 of this chapter.

(D) Recordkeeping provisions that ensure the enforceability of the emissions monitoring provisions and other program requirements. The recordkeeping provisions must require that boilers, combustion turbines, and cement kilns in the program allowed to sell or transfer allowances must comply with the recordkeeping provisions of part 75 of this chapter. The recordkeeping provisions must require that other sources in the program allowed to sell or transfer allowances must comply with recordkeeping requirements that, as compared with the recordkeeping provisions under part 75 of this chapter, are of comparable stringency and require recording of comparable types of information and retention of the records for comparable periods of time.

(E) Reporting provisions requiring timely reporting of monitoring data with sufficient frequency to ensure the

**Environmental Protection Agency** §51.308

enforceability of the emissions monitoring provisions and other program requirements and the ability to audit the program. The reporting provisions must require that boilers, combustion turbines, and cement kilns in the program allowed to sell or transfer allowances must comply with the reporting provisions of part 75 of this chapter, except that, if the Administrator is not the tracking system administrator for the program, emissions may be reported to the tracking system administrator, rather than to the Administrator. The reporting provisions must require that other sources in the program allowed to sell or transfer allowances must comply with reporting requirements that, as compared with the reporting provisions under part 75 of this chapter, are of comparable stringency and require reporting of comparable types of information and require comparable timeliness and frequency of reporting.

(F) Tracking system provisions which provide for a tracking system that is publicly available in a secure, centralized database to track in a consistent manner all allowances and emissions in the program.

(G) Authorized account representative provisions ensuring that the owners and operators of a source designate one individual who is authorized to represent the owners and operators in all matters pertaining to the trading program.

(H) Allowance transfer provisions providing procedures that allow timely transfer and recording of allowances, minimize administrative barriers to the operation of the allowance market, and ensure that such procedures apply uniformly to all sources and other potential participants in the allowance market.

(I) Compliance provisions prohibiting a source from emitting a total tonnage of a pollutant that exceeds the tonnage value of its allowance holdings, including the methods and procedures for determining whether emissions exceed allowance holdings. Such method and procedures shall apply consistently from source to source.

(J) Penalty provisions providing for mandatory allowance deductions for excess emissions that apply consist-

ently from source to source. The tonnage value of the allowances deducted shall equal at least three times the tonnage of the excess emissions.

(K) For a trading program that allows banking of allowances, provisions clarifying any restrictions on the use of these banked allowances.

(L) Program assessment provisions providing for periodic program evaluation to assess whether the program is accomplishing its goals and whether modifications to the program are needed to enhance performance of the program.

(3) A State which opts under 40 CFR 51.308(e)(2) to implement an emissions trading program or other alternative measure rather than to require sources subject to BART to install, operate, and maintain BART may satisfy the final step of the demonstration required by that section as follows: If the distribution of emissions is not substantially different than under BART, and the alternative measure results in greater emission reductions, then the alternative measure may be deemed to achieve greater reasonable progress. If the distribution of emissions is significantly different, the State must conduct dispersion modeling to determine differences in visibility between BART and the trading program for each impacted Class I area, for the worst and best 20 percent of days. The modeling would demonstrate "greater reasonable progress" if both of the following two criteria are met:

(i) Visibility does not decline in any Class I area, and

(ii) There is an overall improvement in visibility, determined by comparing the average differences between BART and the alternative over all affected Class I areas.

(4) A State subject to a trading program established in accordance with §52.38 or §52.39 under a Transport Rule Federal Implementation Plan need not require BART-eligible fossil fuel-fired steam electric plants in the State to install, operate, and maintain BART for the pollutant covered by such trading program in the State. A State that chooses to meet the emission reduction requirements of the Transport Rule by

305

submitting a SIP revision that establishes a trading program and is approved as meeting the requirements of §52.38 or §52.39 also need not require BART-eligible fossil fuel-fired steam electric plants in the State to install, operate, and maintain BART for the pollutant covered by such trading program in the State. A State may adopt provisions, consistent with the requirements applicable to the State for a trading program established in accordance with §52.38 or §52.39 under the Transport Rule Federal Implementation Plan or established under a SIP revision that is approved as meeting the requirements of §52.38 or §52.39, for a geographic enhancement to the program to address the requirement under §51.302(c) related to BART for reasonably attributable impairment from the pollutant covered by such trading program in that State.

(5) After a State has met the requirements for BART or implemented emissions trading program or other alternative measure that achieves more reasonable progress than the installation and operation of BART, BART-eligible sources will be subject to the requirements of paragraph (d) of this section in the same manner as other sources.

(6) Any BART-eligible facility subject to the requirement under paragraph (e) of this section to install, operate, and maintain BART may apply to the Administrator for an exemption from that requirement. An application for an exemption will be subject to the requirements of §51.303(a)(2)-(h).

(f) *Requirements for comprehensive periodic revisions of implementation plans for regional haze.* Each State identified in §51.300(b)(3) must revise and submit its regional haze implementation plan revision to EPA by July 31, 2018 and every ten years thereafter. In each plan revision, the State must evaluate and reassess all of the elements required in paragraph (d) of this section, taking into account improvements in monitoring data collection and analysis techniques, control technologies, and other relevant factors. In evaluating and reassessing these elements, the State must address the following:

(1) Current visibility conditions for the most impaired and least impaired days, and actual progress made towards natural conditions during the previous implementation period. The period for calculating current visibility conditions is the most recent five year period preceding the required date of the implementation plan submittal for which data are available. Current visibility conditions must be calculated based on the annual average level of visibility impairment for the most and least impaired days for each of these five years. Current visibility conditions are the average of these annual values.

(2) The effectiveness of the long-term strategy for achieving reasonable progress goals over the prior implementation period(s); and

(3) Affirmation of, or revision to, the reasonable progress goal in accordance with the procedures set forth in paragraph (d)(1) of this section. If the State established a reasonable progress goal for the prior period which provided a slower rate of progress than that needed to attain natural conditions by the year 2064, the State must evaluate and determine the reasonableness, based on the factors in paragraph (d)(1)(i)(A) of this section, of additional measures that could be adopted to achieve the degree of visibility improvement projected by the analysis contained in the first implementation plan described in paragraph (d)(1)(i)(B) of this section.

(g) *Requirements for periodic reports describing progress towards the reasonable progress goals.* Each State identified in §51.300(b)(3) must submit a report to the Administrator every 5 years evaluating progress towards the reasonable progress goal for each mandatory Class I Federal area located within the State and in each mandatory Class I Federal area located outside the State which may be affected by emissions from within the State. The first progress report is due 5 years from submittal of the initial implementation plan addressing paragraphs (d) and (e) of this section. The progress reports must be in the form of implementation plan revisions that comply with the procedural requirements of §51.102 and §51.103. Periodic progress reports must contain at a minimum the following elements:

(1) A description of the status of implementation of all measures included

**Environmental Protection Agency**      **§ 51.308**

in the implementation plan for achieving reasonable progress goals for mandatory Class I Federal areas both within and outside the State.

(2) A summary of the emissions reductions achieved throughout the State through implementation of the measures described in paragraph (g)(1) of this section.

(3) For each mandatory Class I Federal area within the State, the State must assess the following visibility conditions and changes, with values for most impaired and least impaired days expressed in terms of 5-year averages of these annual values.

(i) The current visibility conditions for the most impaired and least impaired days;

(ii) The difference between current visibility conditions for the most impaired and least impaired days and baseline visibility conditions;

(iii) The change in visibility impairment for the most impaired and least impaired days over the past 5 years;

(4) An analysis tracking the change over the past 5 years in emissions of pollutants contributing to visibility impairment from all sources and activities within the State. Emissions changes should be identified by type of source or activity. The analysis must be based on the most recent updated emissions inventory, with estimates projected forward as necessary and appropriate, to account for emissions changes during the applicable 5-year period.

(5) An assessment of any significant changes in anthropogenic emissions within or outside the State that have occurred over the past 5 years that have limited or impeded progress in reducing pollutant emissions and improving visibility.

(6) An assessment of whether the current implementation plan elements and strategies are sufficient to enable the State, or other States with mandatory Federal Class I areas affected by emissions from the State, to meet all established reasonable progress goals.

(7) A review of the State's visibility monitoring strategy and any modifications to the strategy as necessary.

(h) *Determination of the adequacy of existing implementation plan.* At the same time the State is required to sub-

mit any 5-year progress report to EPA in accordance with paragraph (g) of this section, the State must also take one of the following actions based upon the information presented in the progress report:

(1) If the State determines that the existing implementation plan requires no further substantive revision at this time in order to achieve established goals for visibility improvement and emissions reductions, the State must provide to the Administrator a negative declaration that further revision of the existing implementation plan is not needed at this time.

(2) If the State determines that the implementation plan is or may be inadequate to ensure reasonable progress due to emissions from sources in another State(s) which participated in a regional planning process, the State must provide notification to the Administrator and to the other State(s) which participated in the regional planning process with the States. The State must also collaborate with the other State(s) through the regional planning process for the purpose of developing additional strategies to address the plan's deficiencies.

(3) Where the State determines that the implementation plan is or may be inadequate to ensure reasonable progress due to emissions from sources in another country, the State shall provide notification, along with available information, to the Administrator.

(4) Where the State determines that the implementation plan is or may be inadequate to ensure reasonable progress due to emissions from sources within the State, the State shall revise its implementation plan to address the plan's deficiencies within one year.

(i) *What are the requirements for State and Federal Land Manager coordination?* (1) By November 29, 1999, the State must identify in writing to the Federal Land Managers the title of the official to which the Federal Land Manager of any mandatory Class I Federal area can submit any recommendations on the implementation of this subpart including, but not limited to:

(i) Identification of impairment of visibility in any mandatory Class I Federal area(s); and

(ii) Identification of elements for inclusion in the visibility monitoring strategy required by § 51.305 and this section.

(2) The State must provide the Federal Land Manager with an opportunity for consultation, in person and at least 60 days prior to holding any public hearing on an implementation plan (or plan revision) for regional haze required by this subpart. This consultation must include the opportunity for the affected Federal Land Managers to discuss their:

(i) Assessment of impairment of visibility in any mandatory Class I Federal area; and

(ii) Recommendations on the development of the reasonable progress goal and on the development and implementation of strategies to address visibility impairment.

(3) In developing any implementation plan (or plan revision), the State must include a description of how it addressed any comments provided by the Federal Land Managers.

(4) The plan (or plan revision) must provide procedures for continuing consultation between the State and Federal Land Manager on the implementation of the visibility protection program required by this subpart, including development and review of implementation plan revisions and 5-year progress reports, and on the implementation of other programs having the potential to contribute to impairment of visibility in mandatory Class I Federal areas.

[64 FR 35765, July 1, 1999, as amended at 70 FR 39156, July 6, 2005; 71 FR 60631, Oct. 13, 2006; 77 FR 33656, June 7, 2012]

§ 51.309 Requirements related to the Grand Canyon Visibility Transport Commission.

(a) What is the purpose of this section? This section establishes the requirements for the first regional haze implementation plan to address regional haze visibility impairment in the 16 Class I areas covered by the Grand Canyon Visibility Transport Commission Report. For the period through 2018, certain States (defined in paragraph (b) of this section as Transport Region States) may choose to implement the Commission's rec-

ommendations within the framework of the national regional haze program and applicable requirements of the Act by complying with the provisions of this section. If a Transport Region State submits an implementation plan which is approved by EPA as meeting the requirements of this section, it will be deemed to comply with the requirements for reasonable progress with respect to the 16 Class I areas for the period from approval of the plan through 2018. Any Transport Region State electing not to submit an implementation plan under this section is subject to the requirements of § 51.308 in the same manner and to the same extent as any State not included within the Transport Region. Except as provided in paragraph (g) of this section, each Transport Region State is also subject to the requirements of § 51.308 with respect to any other Federal mandatory Class I areas within the State or affected by emissions from the State.

(b) Definitions. For the purposes of this section:

(1) 16 Class I areas means the following mandatory Class I Federal areas on the Colorado Plateau: Grand Canyon National Park, Sycamore Canyon Wilderness, Petrified Forest National Park, Mount Baldy Wilderness, San Pedro Parks Wilderness, Mesa Verde National Park, Weminuche Wilderness, Black Canyon of the Gunnison Wilderness, West Elk Wilderness, Maroon Bells Wilderness, Flat Tops Wilderness, Arches National Park, Canyonlands National Park, Capital Reef National Park, Bryce Canyon National Park, and Zion National Park.

(2) Transport Region State means one of the States that is included within the Transport Region addressed by the Grand Canyon Visibility Transport Commission (Arizona, California, Colorado, Idaho, Nevada, New Mexico, Oregon, Utah, and Wyoming).

(3) Commission Report means the report of the Grand Canyon Visibility Transport Commission entitled "Recommendations for Improving Western Vistas," dated June 10, 1996.

(4) Fire means wildfire, wildland fire (including prescribed natural fire), prescribed fire, and agricultural burning conducted and occurring on Federal,